IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARIO FLAVIO GARCIA,

          Petitioner,               No. CIV S-10-0968 GEB DAD P

     vs.

KEN CLARK, Warden,              <u>ORDER AND</u>

          Respondent.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on January 11, 2007 in the Placer County Superior Court on charges of first degree murder in violation of California Penal Code § 187 and possession of a deadly weapon in violation of California Penal Code § 12020(a)(1).  In his petition before this court he raises nineteen grounds for federal habeas relief.  Petitioner has also filed a motion seeking an order allowing him to engage in discovery with respect to his claims, and several other motions which are addressed below.  Upon careful consideration of the record and the applicable law, the undersigned will deny all of petitioner's motions and will recommend that petitioner's application for federal habeas corpus relief be denied.

/////

FACTUAL BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal[1], the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Defendant Mario Garcia appeared on a video surveillance tape leaving the Thunder Valley Casino with Christie Wilson early in the morning of October 5, 2005. They were last seen walking towards his car. Wilson was never seen again and her body was never found. A jury convicted defendant of first degree murder (Pen. Code, § 187) of Wilson and possession of a deadly weapon (Pen. Code, § 12020, subd. (a)(1)). The court found true allegations that defendant had a prior serious felony conviction (Pen. Code, §§ 667, subds. (a) & (b)-(i); 1170.12, subds. (a)-(d)). Sentenced to 59 years to life in state prison (25 years to life for the murder, doubled, plus four years for the weapons charge and five years for the prior felony enhancement), defendant appeals.
>
> Defendant contends the trial court committed numerous errors in admitting evidence and instructing the jury and the conviction for murder is not supported by the evidence. He contends the court erred in failing to suppress evidence from defendant's car and his interview with police, as well as in admitting evidence of his bad character at work, expert evidence on date rape drugs, an officer's opinions and conclusions about the case and an exhibit summarizing testimony in a timeline. Defendant contends there was instructional error as to reasonable doubt, failure to explain evidence, and third party culpability. He contends there was insufficient evidence of first degree murder under either a theory of premeditation and deliberation or felony murder based on kidnapping. He asserts the evidence is sufficient to support a conviction only for involuntary manslaughter.
>
> We affirm. While we find it was error to use defendant's assertion of his Fourth and Fifth Amendment rights in ending the interview with the police as evidence of consciousness of guilt, the error was harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant's consciousness of guilt. We reject defendant's remaining contentions. There was sufficient evidence of first degree murder on a felony-murder theory predicated on kidnapping.

/////

/////

---

[1] Notice of Lodging Documents on September 23, 2010 (Doc. No. 32), Resp't's Lod. Doc. No. 1 (hereinafter Opinion).

## FACTS

Because Christie Wilson disappeared and her body was never found, the prosecution's case against defendant for murder was based on circumstantial evidence.  The prosecution sought to prove, first, that Wilson's disappearance meant that she was dead, and second, that defendant murdered her.

## Christie Wilson

Christie Wilson's mother described her as driven, organized, goal-oriented and a good student.  Wilson had a "huge heart," was outgoing and loved animals; she tried to see the best in people.  Wilson was close to her family and friends and kept in contact with them frequently by phone and e-mail.  On October 4, 2005, she exchanged voice mail with her mother and sent an e-mail of her cat dressed up for Halloween to a number of family and friends.  That was the last communication they had with her.

Wilson and her sister took kickboxing classes together.  Wilson knew how to defend herself and was aggressive.  Wilson's stepfather was a sergeant with the San Jose police.  He had warned Wilson about protecting herself in case of attack.  He gave her tips on how to act if attacked, suggesting she tell an attacker that she had a venereal disease.

Wilson graduated from Chico State in 2000 with a degree in production operations management.  She held a number of jobs in high tech industries, a field that did not suit her.  She was terminated from some jobs and at times collected unemployment insurance.

Wilson struggled with depression after college.  In June 2005, she was assessed by a psychiatrist, who diagnosed major depression, recurrent severe.  She was taking the antidepressant drug Lexapro.  In September 2005, Wilson ordered a CD and DVD version of a self-help program for depression and anxiety.

Wilson had an off and on relationship with Daniel Burlando.  Her mother and stepfather and some friends did not approve of the relationship.  Wilson and Burlando fought; they both had stress over jobs or the lack of jobs and Wilson did not approve of how Burlando lived.  In March 2005, they had a physical fight over a cell phone.  Burlando called the police and both were arrested.  Neither was prosecuted.  Burlando had scratch marks on his torso and neck from the fight.

Wilson liked to gamble; she had met Burlando at Cache Creek Casino.  She had a player's card, that tracked play and offered rewards, at Thunder Valley Casino.  Wilson had a great time when she won, but lost control when she lost.  She borrowed money to

3

gamble and her gambling concerned Burlando, as well as her mother and stepfather.

By the fall of 2005, Wilson was taking steps to improve her life and her demeanor improved. She was very excited about a job prospect at Zoom Eyeworks in Berkeley, an excitement she shared with family and friends. Her first two interviews with the company had gone well and she e-mailed the vice president about her continued interest on October 3. A third and final interview was scheduled for October 7; Wilson did not show up for the interview.

**Christie Wilson's Disappearance**

The evening of October 4, 2005, Burlando went to a family get-together and did not invite Wilson. When he returned home, she was not there. He invited a friend over. Around 10:30 p.m., Wilson called and said she was finishing up at Thunder Valley Casino. Burlando went to bed at 2:00 a.m. and never heard from Wilson again.

Wilson went to Thunder Valley Casino that night before 7:00 p.m. She played blackjack at various tables and met defendant at one. Around 9:30 p.m. they sat at blackjack table 36, where they stayed for about three and a half hours. They were friendly to each other. Wilson appeared happy and was drinking. She said her boyfriend had hit her that morning and pulled her hair. She raised her arm to show a bruise. Wilson talked about losing her job and getting another that would allow her to travel the world. Defendant told her he could get her a job. At one point, Wilson went to the restroom; she complained of a stomach ache and diarrhea.

Defendant bought Wilson a glass of wine and a man bought a bottle for the table. As the evening progressed, Wilson and defendant became intoxicated and loud. They were kissing and hugging and acting like boyfriend and girlfriend. Wilson was losing and she borrowed money several times from defendant; she also borrowed from another man at the table. As she lost, her demeanor changed and Wilson became angry and abusive. She called the dealer names. Her behavior became so bad that a pit boss was called, who told her to stop or she would be asked to leave. Defendant told her to calm down. Several times he tried to get her to leave, but she would not. Finally, just before the casino was prepared to throw them out, they left. As they did, the man who had lent Wilson money asked about his money. She threw chips at him and called him a name. Wilson and defendant together left the casino at 1:13 a.m., walking towards his car. Wilson was never seen again.

Video surveillance of the parking lot showed defendant and Wilson walking towards his car at 1:13 a.m. As they are out of view in the darkness, there are four flashes from a car's headlights, then two

4

more flashes.  The flashes are similar to those caused by a keyless entry system to unlock a car.  Three minutes and 41 seconds after the flashing, headlights in the same vicinity come on and a white car leaves the parking lot.  A surveillance specialist from the Los Angeles Police Department enhanced the video.  The enhanced video shows the white car leaving the parking lot with only one occupant, defendant, inside.  The car turned right on Athens Road, proceeding westbound.[2]  The video cameras do not show Wilson returning to her car at any time in the hour after 1:20.  There was no report of a struggle or a cry for help in the parking lot that night.  Security guards present that night and a deputy sheriff called for a disturbance did not notice a woman in distress.

No one at the casino that night noticed any injuries on defendant's face.

Wilson's cell phone was found under the blackjack table.  No one came forward to claim it over the next few days.  Eventually it was turned over to the police.

**Initial Response to Wilson's Disappearance**

On Wednesday, October 5, Burlando called Wilson several times, but she did not answer.  He called hospitals and jails, looking for her.  That night he had dinner with friends, who offered to go to the casino to look for Wilson.  Burlando declined.

The next day, Burlando went to Thunder Valley Casino and found Wilson's car.  He asked the casino to check her player's card and page her.  He looked for her everywhere.  While waiting for the pit boss, he played a little blackjack.  He called Tim Nordloff, a close friend of Wilson's, who had not spoken to Wilson since earlier that week.  Then he called Wilson's parents and told them he was going to file a missing person's report.  After that call, Burlando called the police, as did Pat Boyd, Wilson's stepfather and a San Jose police sergeant.

Officer Mark Roddy responded to the missing person's call.  He met with Burlando, who was cooperative and concerned, and searched the apartment.  Burlando continued to be cooperative through follow-up investigation.  He allowed the police access to his apartment, computer and phone records, and gave a two-hour taped interview.  Police found a stun gun in Burlando's car.

---

[2]  Sergeant McDonald testified that one leaving the casino and going to Highway 65, as defendant said he did, would turn left on Athens Road.  Turning right on Athens takes one to Fiddeyment Road, where Athens dead ends.  From Fiddeyment Road one can go to Lincoln and Highway 193.  It is about the same distance to Interstate 80 by either Highway 65 or Highway 193.

After contacting Burlando, Roddy went to Thunder Valley Casino and found Wilson's car. He also contacted the casino's surveillance supervisor. Photographs of Wilson and Burlando were sent to Thunder Valley Casino to match to surveillance tapes.

The next morning there was a neighborhood search. A BOLO (be on the lookout for) was issued to three neighboring counties. A more far reaching APB (all points bulletin) was issued. A flier, a critical reach bulletin, was sent to other agencies. Nationwide databases of missing persons data were checked; there was no hit. Numerous additional searches, both governmental and volunteer, were conducted, some using dogs. No trace of Wilson was found.

There was no activity on Wilson's bank account after October 4. No wages were paid on Wilson's social security number after September. No data on Wilson appeared after October 4 on the Lexis/Nexis person locator tool. There were no e-mails generated by Wilson after October 4, 2005, and there was no logon activity on her e-mail account. There was no activity for Wilson in DMV records after October 5. Contacts with various police departments revealed nothing. No passport was issued in Wilson's name.

**Defendant's Activities October 3–7**

Defendant worked as a senior technical project manager at Sutter Health Information Technology. For several years he was assigned to an electronic ICU project that allowed remote monitoring of several hospitals at one central location. The week of October 3–7, 2005, was the kickoff of a major upgrade to the project. On Monday, defendant worked at the Mather site all day. Tuesday, October 4, he worked at the data center from 10:00 a.m. to 5:30 p.m. He sent his supervisor an e-mail at 5:25 p.m. The e-mail expressed his frustration with a coworker and said he was "having some tequila tonight." Others could tell the supervisor "that this day will live in infamy." Defendant went to Thunder Valley Casino that night.

At 7:51 a.m. the next morning, Wednesday, October 5, defendant made an outgoing call on his cell phone to his wife. The call was handled by the north sector of the Lone Star cell tower. A Sprint Nextel manager believed, based on the cell tower used, that this call was not made from defendant's residence, but rather from a location to the north.

Defendant was assigned to be at the data center Wednesday to meet and escort vendors who were making installations for the project. He was expected to be there all day, with a meeting scheduled for 9:00 a.m. One of the vendors arrived at 9:05. Defendant was not there to let him in, so the vendor called him. Defendant said he had gotten caught up in an accident and was running late. Defendant arrived shortly after 10:00. Defendant had scratches on

6

his face and a burst blood vessel in his eye.  Someone said the injuries were from a motorcycle accident.  A coworker joked he hoped the other guy looked worse.  Defendant explained he was working in his yard with a tractor and a branch got caught in the cage.

Defendant left work at 11:14 a.m.  It was unusual for him to be late for an important meeting and to leave early.  Defendant did not check in with his supervisor as he usually did.  The next day defendant took sick leave.  Friday he telecommuted from home, although that arrangement was not preapproved as required.

On Thursday, October 6, defendant went to the UC Davis Ambulatory Care Center.  He reported pain in his left eye, telling the doctor he fell from a 15–foot tree when the branch broke. Defendant was upset.  He had blurry vision in his left eye, a swollen lower lip, and multiple abrasions to his face, torso and arms.  He was treated with antibiotics for a possible skin infection and referred to an eye doctor for his eye.  The nurse did not believe his injuries were consistent with a fall from a tree.

Later that day, defendant saw Dr. Barnes, a doctor of optometry. Defendant's chief complaint was blurred vision.  Dr. Barnes found multiple facial abrasions, a blood blister in the eye, and a significant eye infection on the eyelid margin.  He believed the blurred vision was caused by a force separate from that causing the infection.  The nature of the eyelid injury was unusual to be caused by contact with a plant because of the degree of pus formation.  It was hard to imagine blurred vision that could be corrected by a lens could be caused by falling out of a tree.  The doctor believed the infection was caused by gram-negative bacteria.  Plants were associated more with fungi than bacteria and any bacteria seen in association with soil was usually gram positive.  Defendant's injuries were, however, consistent with clawing from fingernails and a punch to the eye.

**Sergeant McDonald Takes Over Investigation and Interviews Defendant**

After the Sacramento police found Wilson's car at Thunder Valley Casino and viewed the videotape showing her leaving, the case was passed to the Placer County Sheriff's Department.  On Saturday, October 8, Sergeant Robert McDonald was briefed on the case.  He obtained the videos from Thunder Valley Casino and was able to identify the man leaving with Wilson as defendant through his player's card.  McDonald confirmed defendant's residence by driving by it.

The next morning, Sunday October 9, McDonald went to defendant's residence and found him in the front yard.  McDonald told him he was investigating a missing person's case and

7

defendant had been seen in the missing person's company. Defendant was visibly nervous and looked towards the house. He said he had been at the casino and lost a large amount of money. If his wife found out, he would be in big trouble. Defendant verified that he met Wilson; he claimed they just happened to leave at the same time. On the way towards the car, Wilson realized she lost her cell phone and went back. Defendant said both he and Wilson were intoxicated. He claimed he would not have had sex with a strange woman because he feared herpes.

McDonald returned to the casino and asked that the surveillance tapes be reviewed to determine if Wilson returned to the casino for her cell phone. That afternoon, after he was told there was no sign of Wilson on the tapes, he returned to defendant's home for a fuller statement.

McDonald asked defendant to come to the office and give a statement. When McDonald asked what car defendant drove that night, defendant was reluctant to answer and asked to call a friend who was an attorney. When the attorney friend arrived, defendant pointed out the car and drove it to the station. Before defendant gave a statement, his attorney friend noted, "[l]ooks like somebody smacked you under your eye." Defendant said he had an accident with a tractor and a tree and had poison oak on his face.

McDonald began the interview by telling defendant he was not under arrest, but under suspicion. His statement was voluntary and the door was open; defendant was free to leave and not under compulsion to do anything. Defendant stated he went to Thunder Valley Casino Tuesday after work. He met Wilson and probably flirted with her; he was pretty drunk. Wilson reported mental problems and problems with her boyfriend; she showed bruises on her arm. She was losing "big time." Defendant loaned her $50 and another man at the table loaned her $100. Wilson left the table to use the restroom or make calls; she lost her phone. They left the casino together, but Wilson was not with him. Wilson had been calling the dealer names and the pit boss was threatening to throw her out. Defendant got home at 2:00 a.m. He took Highway 65 to Interstate 80 and then went up Highway 49.

McDonald told defendant they would check the car for fingerprints, saliva, hair, skin and body fluids. He encouraged defendant to tell him everything now. McDonald wanted to take a picture of the "mouse" or small black eye that defendant had. Defendant's attorney friend said okay, but defendant refused after confirming that he was not under arrest. McDonald told him his refusal could be used against him. The interview ended. McDonald attempted to take a picture of defendant, but defendant held his hands up in front of the camera lens. Defendant then left the interview room.

/////

8

The next day, Monday October 10, a search warrant was issued for defendant's person, car and residence.  It was served Tuesday; the residence was searched Thursday.  Defendant was arrested Friday on a weapons charge, based on a collapsible baton found in the trunk of his car.

**Defendant's Activities October 9–14**

Early Sunday morning, defendant purchased a variety of anti-itch creams and laundry detergent at Long's Drugs.  In addition to his interview with McDonald, defendant, who did not have regular garbage service, made a trip to the landfill to dispose of garbage.  The attendant noted he looked beat up.  That night defendant took a picture of himself with a digital camera from work.  He later deleted the photo but it was able to be recovered.  The photo showed defendant had marks on his chin, face, forehead and neck.

On Monday, defendant worked half the day and took the other half off.  He also made a return visit to the eye doctor.  He told the doctor he felt much better and the abrasions on his arms were due to poison oak.  Defendant sent an e-mail to work explaining he had poison oak.  That night defendant did several Google searches on the computer for the term forensics.

Tuesday defendant e-mailed a request to work remotely, claiming he had personal issues that prevented him from coming to the office.  At 5:17 p.m., he went to his supervisor.  She noticed welts on his forearm covered with a white lotion and that he was growing a beard.  That night defendant searched the computer regarding Penal Code section 1524 on warrants.

On Wednesday defendant telecommuted to work, participating in a morning conference call.  He e-mailed his supervisor explaining he had problems due to being in the wrong place at the wrong time and had retained an attorney.  Defendant's telecommuting was formally approved.  He returned to the medical clinic, complaining of poison oak.  That day he performed several Google searches, using the term "TOXICOLOGY + VALLEY."  He visited a Web page, for 23 seconds, which discussed rave/date drug screens.  The Web page listed a number of rave/date drugs and indicated that urine was the preferred matrix for this toxicology panel.

Defendant worked at the data center on Thursday.  The next day, Friday, he took a sick day, claiming he had medical problems and went to the hospital with chest pains.  His supervisor sent an e-mail requesting that he return a work laptop computer.  He responded by voice mail, saying he would.  Defendant was arrested that day.  When defendant was booked, he told the officer he had poison oak; he had gotten it on Sunday.  As the officer prepared to note the date, defendant said he got it two weeks ago.

/////

9

**Search of Defendant's Car**

The car defendant drove to the casino October 4 was a 2004 Toyota Camry which was sold with a trunk mat and carpet. Enterprise Rent a Car had purchased the car used in January 2005; it was involved in an accident shortly thereafter.  Enterprise sold the car to B.N., who repaired it and sold it to defendant in the summer of 2005.  It was sold with a carpet in the trunk; the carpet was missing when the police searched the car.  One of defendant's coworkers had seen the carpet in the trunk before.

Defendant left the car with the sheriff's department, in a secured area, the day of his interview.  It was searched two days later.  The car was clean and the back seat appeared to have been cleaned and vacuumed.  Nonetheless, trace evidence was found implicating defendant.

A detective found a collapsible night stick inside the trunk.  This weapon was the basis of defendant's arrest for possession of a deadly weapon.

An evidence technician found a hair, identified as 1 TH, wedged in the exterior front passenger door handle.  There was testimony the hair was in the catagen stage, transitioning from growing to dead, and required some force to extract from the head.  DNA testing revealed the hair matched Wilson's at 15 markers.  The statistical probability of a match was 1 in 3.2 sextillion African–Americans, 1 in 720 quintillion Caucasians, and 1 in 6.2 sextillion Hispanics.

A second search of the car was performed on October 17.  A human hair consistent with Wilson's, identified as 19 TH, was found in a tape lift from the trunk area.  This hair was in the anagen or active growing stage and would require force to extract from the head.  The hair also had an unusual diameter variation and dramatic color change, as did the comparison hair from Wilson's hairbrush.  DNA analysis matched the hair to Wilson's profile, a profile occurring once in every 720 quintillion Caucasians, 3.2 sextillion African–Americans, and 6.2 sextillion Hispanics.

Another human hair was found in a tape lift from the rear passenger floorboard.  It fell within the standards of Wilson's hair.  Mitochondrial DNA testing could not exclude Wilson as the source.  A similar profile was found in 1 of 384 African–Americans and Caucasians and 1 in 256 Hispanics.  In performing the mitochondrial testing, there were two instances where the analyst's DNA ended up in the evidence.

The car was turned over to the Department of Justice for further examination.  Stains on the rear seat tested presumptively positive for blood.  There were five small blood stains.  After conducting an experiment, a criminalist determined the stains were consistent

with a splatter and could be caused by scratching.  The splatter occurred at medium to high velocity when the car door was open. It was consistent with a single event.  DNA testing revealed a mixture of two people; defendant matched at 15 loci and Wilson at 8.  The DNA profile of the minor contributor occurred once in every 3,200 African–Americans, 5,800 Caucasians, and 7,900 Hispanics.

DNA testing of another cutting from the rear seat was also consistent with a mixture.  Defendant's DNA profile was consistent with a major contributor, found once in 29 billion African–Americans, 300 million Caucasians, and 100 million Hispanics.  Wilson could not be excluded as a minor contributor; the DNA profile occurred once in 40,000 African–Americans, 31,000 Caucasians, and 260,000 Hispanics.

A swab from the rear interior driver's side door handle was consistent with Wilson as the major contributor and defendant as the minor contributor.  The probability of a random individual being the major contributor was 1 in 280 million African–Americans, 1 in 3.6 million Caucasians, and 1 in 5.6 million Hispanics.  A swab from an interior door was consistent with Wilson as the major contributor.  The DNA profile occurred once in 710,000 African–Americans, 240,000 Caucasians, and 30,000 Hispanics.[3]

**Search of Defendant's Residence**

When the police searched defendant's residence, they asked defendant about the clothes he wore to the casino.  He said his wife probably took them to the cleaners.  When the police asked defendant's wife, she pointed out some clothes draped over exercise equipment in the bedroom.  The last visit to the cleaners was a drop off on October 3 and a pick up on October 6.

On the kitchen table were printouts of Evidence Code sections 911 through 919, concerning privileges, and State Bar master rules and Penal Code section 1524 through 1524.4, concerning warrants. There were chips from Thunder Valley Casino in a dresser drawer.

**Expert Testimony**

An arborist testified there was a broken willow branch on defendant's property.  He believed it had fallen due to wind and rain.  On his first trip he found no poison oak; on a second trip he

---

[3]  The senior criminalist who performed the DNA analysis testified to a case of contamination.  He performed analysis on cuttings from a shirt seized from defendant's bedroom. One of the cuttings contained the criminalist's DNA.

found poison oak near some oak trees, but no broken branch from which one could have fallen.

Dr. Connie Mitchell, an emergency room physician, testified about defendant's injuries and disputed that they were the result of falling from a tree. She found the injuries consistent with a struggle and scratching in close quarters. A corneal abrasion was more common in an assaultive encounter than an accident. She believed the parallel pattern of abrasions was more likely caused by fingernails than a tree branch. Defendant's injuries were consistent with blunt force trauma and grabbing of soft tissue. He had a classic claw injury. Bruises on his arm were suggestive of a bite mark, not falling from a tree. The lack of injuries to defendant's back and the few on his legs were more consistent with a fight than falling.

A dermatologist testified poison oak is an allergic dermatitis, characterized by red lesions with blistering. It generally appears 18 to 48 hours after exposure. If defendant was exposed Sunday, October 2, he should have had symptoms and itching by Wednesday, October 5, but the medical records from that date did not suggest poison oak. The doctor believed the abrasions on defendant's face were not poison oak; it is not associated with bruising.

Over defense objection, Detective Don Murchison testified that based on the witnesses' description of Wilson at the casino, Wilson exhibited symptoms consistent with consuming the date rape drug. Those symptoms were slow or slurred speech, upset stomach, diarrhea, amnesia, impaired motor skills and a sleepy appearance. The drug was usually put in a fruity drink, such as wine, to mask its taste. The videotape did not show anyone drop anything in Wilson's drink.

**The Defense**

Defendant testified he did not kill, murder, rape or kidnap Wilson. He maintained he had nothing to do with her disappearance. He denied fighting with Wilson. Defendant was certain she was never in his car and he could not explain the presence of her hair or DNA in his car. It was part of his normal routine to wash his car and go to the dump. He claimed there was never a carpet or rug in his trunk and the baton was part of his son's martial arts gear. His injuries were due to a fall from a willow tree.

William Pence was in Folsom on October 5 and saw a woman. She asked if he knew where Thunder Valley Casino was. She explained she had had too much to drink the night before and left her car in the parking lot. She was trying to get back. When he told her the casino was 20 to 30 miles away, she said she would walk. When the police showed Pence a photographic lineup, he

1   could not identify Wilson as the woman he saw.  He thought she
    was wearing a sundress and perhaps sandals.  After he heard about
2   Wilson's disappearance on the radio, he saw a picture of her on the
    internet and was 70 to 75 percent sure she was the woman he saw.

3

4                        PROCEDURAL BACKGROUND

5          On January 11, 2007, petitioner filed a notice of appeal from his judgment of

6   conviction and on February 15, 2008, filed his opening brief in the California Court of Appeal

7   for the Third Appellate District.  (Resp't's Lod. Doc. 14, Clerk's Transcript on Appeal

8   (hereinafter CT) at 1433; Resp't's Lod. Doc. 17.)

9          On November 25, 2008, petitioner filed a petition for writ of habeas corpus in the

10  Placer County Superior Court.  (Resp't's Lod. Doc. 5.)  On December 8, 2008, the Superior

11  Court denied that petition, stating, in part:

12         Petitioner has an appeal of his conviction currently pending at the
           Third District Court of Appeal.  Briefs have been filed and the case
13         has been submitted for decision.  Petitioner has failed to state a
           prima facie basis why the appellate court cannot adequately
14         address the issues.  All issues raised by Petitioner in his 27-page
           Writ petition can and should be raised in the appellate court.

15

16  (Resp't's Lod. Doc. 6.)

17         On December 26, 2008, petitioner filed a petition for writ of habeas corpus in the

18  California Court of Appeal for the Third Appellate District.  (Resp't's Lod. Doc. 7.)  That

19  petition was summarily denied by order dated January 8, 2009.  (Resp't's Lod. Doc. 8.)

20         On February 25, 2009, the California Court of Appeal affirmed petitioner's

21  conviction in an unpublished opinion.  (Resp't's Lod. Doc. 1.)  On March 11, 2009, that court

22  issued an order certifying its opinion for partial publication.  (Resp't's Lod. Doc. 4.)  On April 8,

23  2009, petitioner filed a petition for review in the California Supreme Court.  (Resp't's Lod. Doc.

24  2.)  On June 10, 2009, the California Supreme Court summarily denied review and ordered that

25  the opinion of the Court of Appeal affirming petitioner's judgment of conviction be depublished.

26  (Resp't's Lod. Doc. 3.)

                                      13

On September 3, 2009, petitioner filed a petition for writ of certiorari in the United States Supreme Court.  (Resp't's Lod. Doc. 23.)  On November 2, 2009, that petition was denied.  (Id.)

On May 13, 2009, petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (Resp't's Lod. Doc. 9.)  On October 22, 2009, that petition was summarily denied.  (Resp't's Lod. Doc. 10.)  On January 4, 2010, petitioner filed a second habeas petition in the California Supreme Court.  (Resp't's Lod. Doc. 11.)  The Supreme Court denied that petition on July 21, 2010, with citations to In re Robbins, 18 Cal.4th 770, 780 (1998) and In re Clark, 5 Cal.4th 750 (1993).  (Resp't's Lod. Doc. 12.)

Petitioner commenced this federal habeas action by filing a petition for writ of habeas corpus in this court on April 21, 2010.  (Doc. No. 1.)  Respondent filed an answer on September 22, 2010, and petitioner filed a traverse on December 13, 2010.  (Doc. Nos. 31, 41.) On March 21, 2011 and June 29, 2011, petitioner filed motions for leave to amend his habeas petition to add additional claims of ineffective assistance of trial counsel and a claim that the prosecutor committed misconduct by intimidating a defense witness.  Both of these motions to amend were denied by order dated March 1, 2012.

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that

---

[4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

application must also be unreasonable." <u>Williams</u>, 529 U.S. at 412. <u>See also</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Lockyer</u>, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S.___, ___,131 S. Ct. 770, 786 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington</u>,131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008); <u>see also</u> <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Stanley</u>, 633 F.3d at 859; <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Harrington</u>, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other

1    explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker,

2    501 U.S. 797, 803 (1991)).  Where the state court reaches a decision on the merits but provides

3    no reasoning to support its conclusion, a federal habeas court independently reviews the record to

4    determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860;

5    Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is

6    not de novo review of the constitutional issue, but rather, the only method by which we can

7    determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at

8    853.  Where no reasoned decision is available, the habeas petitioner still has the burden of

9    "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct.

10   at 784.

11          When it is clear, however, that a state court has not reached the merits of a

12   petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a

13   federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v.

14   Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.

15   2003).

16   II.  Petitioner's Claims[5]

17          A.  Use of Petitioner's Pre-Arrest Silence and Refusal to be Photographed as Evidence of

18              Guilt (Grounds One and Two)

19          In petitioner's first two grounds for federal habeas relief he claims that the trial

20   court violated his rights under the Fourth, Fifth, and Fourteenth Amendments when it admitted

21   into evidence testimony that he refused to have his photograph taken by Sergeant McDonald and

22   that he stopped cooperating in the middle of his police interview and left the police station.

23   (Doc. No. 1 at 4, 7; Resp't's Lod. Doc. 17 at ii, 51-72.)  In the last reasoned state court decision

24   addressing these claims the California Court of Appeal for the Third Appellate District

25   _____

26      [5] For purposes of clarity and coherence, the court will not address petitioner's claims in
     the exact order in which they are presented in his petition.

concluded that the trial court erred in allowing the introduction into evidence of petitioner's

assertion of his Fourth and Fifth Amendment rights as evidence of consciousness of guilt, but

found that any such error was "harmless beyond a reasonable doubt." (Opinion at 2.) The court

reasoned as follows:

> **It was Error to Use Defendant's Assertion of Fourth and Fifth Amendment Rights as Evidence of Guilt, but the Error Was Harmless Beyond a Reasonable Doubt**
>
> During his interview of defendant on October 9, Sergeant McDonald asked defendant to walk him through the point where he left Wilson. Defendant asked why that was important and McDonald responded it was very important. McDonald reminded defendant they had his car and admonished defendant to tell him everything because the police were going to search his car for trace evidence. Defendant told his friend Little he needed a criminal attorney because there were too many questions and "this is going far too deep." McDonald said he could not ask any more questions, but wanted to take a picture of defendant. Defendant refused, got up and left the interview.
>
> The prosecution used this evidence as consciousness of guilt. In closing argument, the prosecutor focused on the interview and argued defendant was suppressing evidence. The prosecutor argued defendant buttoned up his shirt at the beginning of the interview; "what is he covering up?" The argument continued: "Holding his hands in front of the camera. Is this cooperation? If he had nothing to hide, why not just let him take some pictures? And then he leaves. Are these the actions of an innocent man?"
>
> Defendant contends the trial court erred in admitting into evidence his refusal to permit Sergeant McDonald to take his picture and his leaving the interview room. This evidence came in through McDonald's testimony, a redacted videotape of the interview, and several stills from the videotape showing defendant putting his hands out to block the taking of a picture.
>
> Defendant contends the admission of this evidence violated both his Fourth and Fifth Amendment rights. He contends his refusal to be photographed was an assertion of his Fourth Amendment right not to be seized or detained for the picture taking. Defendant contends that although he was not in custody, and thus had no rights under Miranda v. Arizona (1966) 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.2d 694 (Miranda), the context makes clear he was relying on his Fifth Amendment rights in terminating the interview. Recognizing that his trial counsel objected only on Fifth Amendment grounds, he contends he has not forfeited the Fourth Amendment contention. He notes the prosecution initially framed

the issue in terms of the Fifth and Sixth Amendment, and contends the defense simply followed the prosecution's lead.  He asserts the issue is the same whether raised under the Fourth, Fifth or Sixth Amendments – whether a defendant's assertion of rights can be used against him.  Finally, if this court finds forfeiture due to failure to raise the contention expressly in the trial court, defendant contends he was denied effective assistance of counsel.  Defendant argues this evidence of consciousness of guilt played an important role in the circumstantial evidence case, so its erroneous admission was not harmless.

**Proceedings in the Trial Court**

Before trial, the People filed a trial brief on the admissibility of various statements by defendant.  The People sought to introduce defendant's statements to McDonald on October 9, except his request for an attorney.  The People claimed there was no issue under Miranda because defendant was not under arrest; the only significant issue was his request for counsel.  The defense initially responded that the interrogation was involuntary because it was coerced by McDonald's threat to seize all of defendant's cars.  Further, defendant had asserted his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel.

At the hearing on the admissibility of defendant's statements, the defense argued admitting evidence of defendant's refusal to be photographed "flies in the face" of his rights to leave, retain counsel and remain silent.  The People argued taking a picture was nontestimonial and did not implicate Miranda rights.  The defense argued defendant's actions in ending the interview must be considered together; his refusal was tied to his request for an attorney and the right to remain silent.  Both the Fifth and Sixth Amendments were implicated.  The defense urged that defendant's assertion of the right to counsel and to remain silent was an assertion of constitutional rights, not evidence of a consciousness of guilt.  The trial court ruled evidence of defendant's refusal to be photographed was admissible.

**Analysis**

We agree with trial counsel that when defendant ended the interview, he was asserting various constitutional rights: to not be detained, to not incriminate himself, and to have the assistance of counsel.  In requesting a photograph, McDonald was attempting to obtain physical evidence from defendant.  "[T]he obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels – the 'seizure' of the 'person' necessary to bring him into contact with government agents, [citation], and the subsequent search for and seizure of the evidence." (United States v. Dionisio (1973) 410 U.S. 1, 8, 93 S. Ct. 764, 769, 35 L.Ed.2d 67, 76.)  Here the second level is not a

19

Fourth Amendment violation because taking a picture of someone is not a search.  (United States v. Emmett (7th Cir.2003) 321 F.3d 669, 672.)  "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  (Katz v. United States (1967) 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L.Ed.2d 576, 582.)  Defendant was not seized and brought into contact with the police; he voluntarily accompanied them to the interview.  When he ended the interview, however, he withdrew his consent to the voluntary detention; at that point he asserted his Fourth Amendment rights.[6]  The invocation of Fourth Amendment rights cannot be used to show guilt.  (People v. Wood (2002) 103 Cal. App.4th 803, 809, 127 Cal. Rptr.2d 132; People v. Keener (1983) 148 Cal. App.3d 73, 78–79, 195 Cal. Rptr. 733.)

Whether a defendant has invoked his right to remain silent is to be determined from the facts and circumstances.  (People v. Musselwhite (1998) 17 Cal.4th 1216, 1238, 74 Cal. Rptr.2d 212, 954 P.2d 475.)  Here defendant stopped the interview once the questioning turned to "the most important part of everything."  McDonald was asking defendant about his actions in leaving the casino with Wilson; as defendant was already under suspicion, his answers could be incriminating.  Defendant understood this as he told Little the questions were getting "too deep" and he needed a criminal attorney.  These circumstances "'lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment.'"  (People v. Riel (2000) 22 Cal.4th 1153, 1189, 96 Cal. Rptr.2d 1, 998 P.2d 969 [silence may not be used as adoptive admission if reliance on Fifth Amendment].)

The United States Supreme Court has not considered whether prearrest silence is protected by the Fifth Amendment.  (Jenkins v. Anderson (1980) 447 U.S. 231, 236, fn. 2, 100 S. Ct. 2124, 2128, 65 L.Ed.2d 86, 93.)  There is a split of authority among the circuit courts.  Focusing on the fact that defendant is not in custody, the Fifth, Ninth and Eleventh Circuits have held it is permissible to comment on defendant's prearrest silence.  (United States v. Zanabria (5th Cir.1996) 74 F.3d 590, 593; United States v. Oplinger (9th Cir.1998) 150 F.3d 1061, 1066–1067; United States v. Rivera (11th Cir.1991) 944 F.2d 1563, 1567–1568.)  The Attorney General urges us to follow these cases.  Defendant contends the decisions of circuit courts that have held the use of prearrest silence as substantive evidence of defendant's guilt violates the Fifth Amendment are better reasoned.  (Combs v.

---

[6]  We recognize that this contention was not made as clearly to the trial court.  Trial counsel focused on defendant's refusal to be photographed and did not mention the Fourth Amendment.  Given trial counsel's argument that defendant was asserting his right to leave – and since on appeal defendant contends any failure to adequately preserve the issue is ineffective assistance of counsel – we address the merits without considering forfeiture.

Coyle (6th Cir.2000) 205 F.3d 269, 283; United States v. Burson (10th Cir.1991) 952 F.2d 1196, 1201; Coppola v. Powell (1st Cir.1989) 878 F.2d 1562, 1568; United States ex rel. Savory v. Lane (7th Cir.1987) 832 F.2d 1011, 1017.)  These cases rely on three Fifth Amendment principles: (1) the invocation of the privilege must be given a broad and liberal construction; (2) the invocation of the privilege requires no special words; and (3) the privilege can be asserted by a suspect during an investigation. (United States v. Burson, supra, at p. 1200.)  "In a prearrest setting as well as in a post-arrest setting, it is clear that a potential defendant's comments could provide damaging evidence that might be used in a criminal prosecution; the privilege should thus apply." (Combs v. Coyle, supra, at p. 283.)  We find the reasoning of these cases more persuasive.  Because defendant was exercising his Fourth and Fifth Amendment rights in terminating the interview, the trial court erred in admitting into evidence that defendant ended the interview and left.

Under Chapman v. California (1967) 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L.Ed.2d 705, 710, a violation of a criminal defendant's federal constitutional rights requires reversal of the judgment unless the reviewing court determines "beyond a reasonable doubt that the error complained of did not contribute to the verdict."  Applying that standard, we find the error in admitting evidence of defendant's refusal to be photographed and termination of the interview was harmless beyond a reasonable doubt.

Certainly evidence that defendant stopped cooperating with the police once the questioning turned to the critical area that could incriminate him was powerful evidence of consciousness of guilt and evidence of consciousness of guilt was especially important in a circumstantial evidence case.  In this case, however, there was overwhelming evidence of defendant's consciousness of guilt; almost all of his actions after Wilson's disappearance showed a consciousness of guilt.  Defendant had suspicious injuries for which he offered differing explanations.  He was growing a beard, perhaps to hide his injuries.  His attendance at work was erratic despite the critical stage of his important project.  He was extremely nervous when McDonald first contacted him.  He took an alternate route home from the casino, but failed to tell the police about it.  He was reluctant to point out the car he drove that night. When asked about the clothes he wore that night, he immediately said they were at the cleaners.  He made a series of Google searches relating to forensics, date rape drugs and privileges.  This evidence, combined with the medical evidence contradicting defendant's explanations of his injuries, and the forensic evidence that placed Wilson in the back seat and trunk of his car and indicated a violent struggle, was considerable evidence of defendant's guilt.  The addition of his refusal to be photographed and to continue the interview added little to the prosecution's case.

/////

1   (Id. at 27-35.)

2   Petitioner argues extensively in his traverse that the evidence introduced at his

3   trial that tended to show his consciousness of guilt was not credible, not believable, or subject to

4   a different interpretation.  (Traverse at 30-47.)  Specifically, petitioner points to evidence that his

5   facial injuries after Wilson's disappearance were caused by poison oak and a fall from a tree, that

6   the DNA evidence found in his vehicle could have been contaminated at the laboratory, that his

7   nervousness on being contacted by Sergeant McDonald was misinterpreted, that he conducted his

8   computer searches related to forensics, date rape drugs and privileges only in response to the

9   police investigation at that time and not from any sinister motive, and that the blood evidence in

10  his car may have been planted after he gave blood at the prison.  (Id. at 33-44.)  Petitioner also

11  argues that in its analysis of these claims, the California Court of Appeal failed to consider

12  evidence that someone else committed the murder.  In support of this argument, petitioner directs

13  the court's attention to William Pence's testimony that he saw Wilson several days after her

14  disappearance, other trial testimony that Wilson and Burlando had a "turbulent and physically

15  violent relationship," and testimony that Burlando had the opportunity to commit the crime and

16  had fought with Wilson shortly before her disappearance.  (Id. at 31-34.)[7]

17  _____

18      [7] In connection with a different claim he presented on appeal in state court, petitioner
    explained the alleged weaknesses in the prosecution's case in more detail as follows:
19

20          The problems with the prosecution's case have been discussed in
            detail previously: the hair, with the full DNA match, was
21          explicable by the fact that appellant *was* touching Christie Wilson
            and that hair is easily transferable; the blood provided only a partial
22          match, and went troublesomely undetected for over two months
            despite careful examination by trained criminalists; there was
23          documented lab contamination in the DNA testing connected to
            this case; the short amount of time between Wilson's last
24          appearance on the video surveillance and the appearance of
            appellant's car leaving the casino parking lot; the lack of any
25          substantial evidence as to exactly where the alleged homicide
            occurred and the complete lack of evidence as to how it occurred;
26          the inability of the prosecution to completely refute appellant's
            claim that he was exposed to poison ivy on October 2 and on

22

1    In arguing that petitioner is not entitled to relief on this claim, respondent

2  disagrees with the conclusion of the California Court of Appeal that petitioner's invocation of his

3  rights to counsel and against self-incrimination violated the Fifth Amendment.  Respondent

4  argues that at the time petitioner invoked these rights he had not been arrested and was not

5  subject to custodial interrogation and therefore his Fifth Amendment rights had not yet attached.

6  (Doc. No. 31 at 55.)  Respondent also argues that the Ninth Circuit's rule that use of a

7  defendant's pre-arrest silence as evidence of guilt is proper "should be adopted here even though

8  other federal courts have held to the contrary."  (Id. at 55-57.)  Respondent contends that because

9  the United States Supreme Court has not held that use of pre-arrest silence or the invocation of

10 Fourth Amendment rights may not be admitted into evidence in a criminal trial as substantive

11 evidence of guilt, the application of any such rule to grant federal habeas relief in this case would

12 be barred by the non-retroactivity doctrine announced in Teague v. Lane, 489 U.S. 288 (1989).

13 (Id. at 57, 59.)[8]

14    Furthermore, citing the decision in Stone v. Powell, 428 U.S. 465, 481-82 (1986),

15 respondent argues that to the extent petitioner is claiming that his refusal to be photographed

16 violated his rights under the Fourth Amendment, his claim is not cognizable in this federal

17 habeas proceeding and, in any event, lacks merit because petitioner did not possess a valid Fourth

18 Amendment right to refuse to be photographed.  (Id. at 58, 60-62.)  Respondent also contends

19

20            October 5; the evidence of third-party culpability; and finally the
             testimony of William Pence, which was impeached undoubtedly,
21           but not so substantially as to completely undermine its force and
             effect . . .  If the prosecution case was strong in certain respects, the
             defense case was certainly substantial enough to raise a reasonable
22           doubt as to guilt . . ."

23 (Resp't's Lod. Doc. 17 at 84.)

24    [8] In Teague, the United States Supreme Court held that new rules of criminal procedure
    are generally not applicable on habeas review.  489 U.S. at 301, 310; see also Gonzalez v. Pliler,
25 341 F.3d 897, 904 (9th Cir. 2003).  Thus, "[w]ith few exceptions, the Teague non-retroactivity
    doctrine prohibits courts from announcing new rules of law in federal habeas proceedings."
26 Hoffman v. Arave, 236 F.3d 523, 537 (9th Cir. 2001).

1    that the admission of evidence that petitioner refused to be photographed did not violate his

2    Fourteenth Amendment right to due process because such evidence did not render petitioner's

3    trial fundamentally unfair in light of the substantial evidence of his guilt.  (Id. at 58-59.)  Finally,

4    respondent argues that any error in admitting evidence that petitioner terminated the police

5    interview and refused to be photographed by Sergeant McDonald was harmless in light of the

6    other substantial evidence of his consciousness of guilt and his actual guilt of the charged crimes.

7    (Id. at 62-68.)

8            This court concludes that regardless of whether petitioner's Claims One and Two

9    contained in the instant federal habeas petition are barred by the Teague doctrine, they fail on

10   their merits.  For the reasons discussed below, the conclusion of the California Court of Appeal

11   that any error by the trial court in admitting the challenged evidence was harmless is not contrary

12   to or an unreasonable application of clearly established federal law.  Therefore, petitioner is not

13   entitled to federal habeas relief on these claims.

14           In Fry v. Pliler, 551 U.S. 112, 121-22 (2007), the United States Supreme Court

15   clarified that the AEDPA did not replace the traditional test for assessing prejudice on collateral

16   review first established in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).[9]  Under the holding

17   in Fry, a federal habeas court must assess the prejudicial impact of constitutional error in a state-

18   court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht. 551

19   U.S. at 121-22.  Further, "[w]hen a state court has found a constitutional error to be harmless

20   beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's

21   determination is objectively unreasonable."  Towery v. Schriro  641 F.3d 300, 307 (9th Cir.

22   2010).

23   /////

24

25       [9]  In Brecht the Supreme Court held that on collateral review of a state court criminal
     judgment under 28 U.S.C. § 2254, an error is harmless unless it had "a substantial and injurious
26   effect or influence in determining the jury's verdict."  507 U.S. at 631.

Viewing the trial record as a whole, this court agrees with the California Court of Appeal that the trial court's erroneous admission of evidence that petitioner terminated his police interview and refused to be photographed would not have had a substantial or injurious effect on the jury verdict in this case.  This is the case even though there was evidence introduced at trial that tended to support the defense case that petitioner was not involved in Wilson's disappearance, or that at least raised questions about the prosecution's theory of the case.  The state appellate court concluded that in light of the substantial and significant evidence of petitioner's consciousness of guilt, as described in that court's opinion, the challenged evidence was relatively insignificant and "added little to the prosecution's case." (Opinion at 35.)  The state appellate court's conclusion in this regard is not objectively unreasonable and is certainly not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-87.

Accordingly, petitioner is not entitled to federal habeas relief with respect to his Claims One and Two set forth in the instant petition.

B.  Seizure of Petitioner's Vehicle (Ground Three)

In his third ground for relief, petitioner claims that the seizure of his vehicle by the police was "without consent and without probable cause, and the evidence subsequently obtained because of the seizure should have been suppressed as the fruit of a Fourth Amendment illegality." (Doc. No. 1 at 7.)  In state court, petitioner challenged the trial court's denial of his motion to suppress the evidence obtained as a result of the search of his vehicle on the grounds that the vehicle was seized without probable cause and without his consent.  (Resp't's Lod. Doc. No. 17 at 39-51.)  In a heading of his traverse filed in this action petitioner explains that his "Fourth Amendment Claim Is Simply That He Did Not Consent To The Search Of His Toyota Camry, And When He Took His Car To The Police Station, He Did [So] Under The Threat That All Four (4) of His Vehicles Would Be Taken Away." (Traverse at 47.)  Specifically, petitioner

contends that he took his Toyota Camry to the police station to be searched only because

Sergeant McDonald threatened to seize and search all of his vehicles if he did not identify and

agree to a search of the vehicle he drove to the casino on the night in question.  (Id.)  On appeal

the California Court of Appeal rejected petitioner's Fourth Amendment challenge to the trial

court's denial of his suppression motion, concluding that the trial court did not err when it found

that petitioner had consented to the police search of his Toyota Camry.  (Opinion at 22-27.)[10]

The United States Supreme Court has held that "where the State has provided an

opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be

granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional

search or seizure was introduced at his trial."  Stone v. Powell, 428 U.S. 465, 494 (1976).  See

also Woolery v. Arave, 8 F.3d 1325, 1326 (9th Cir. 1993).  Here, petitioner filed a motion to

suppress the evidence obtained from the search of his Toyota Camry and received a hearing on

that motion in the state trial court.

The California Court of Appeal described the facts adduced at the hearing on

petitioner's motion to suppress as follows:

> At the hearing on the suppression motion, McDonald testified to
> his two contacts with defendant on October 9.  At the first meeting,
> defendant claimed Wilson left him in the parking lot to find her
> cell phone, so McDonald returned to the casino to check out this
> story.  After reviewing an hour of the tapes, security reported
> Wilson was not seen returning to or entering the casino.
> McDonald then returned to defendant's and told him he needed a
> detailed statement.  Defendant asked to call his friend, Pat Little,
> who is an attorney.  Defendant called Little and they waited for
> him to arrive.  McDonald told defendant they wanted to search his
> car.  Defendant asked why and questioned what else the police had
> done to find Wilson.

/////

/////

_____

[10]   Petitioner states that this claim is intertwined with claims eleven, twelve, and thirteen of the pending petition, and may be "cojoined with ground twelve."  (Id. at 49.)  However, in connection with this particular ground for relief , the court will address here only petitioner's Fourth Amendment argument.

> In the meantime, McDonald had requested Detective Donald Pollock meet him at defendant's. Pollock arrived while they were waiting for Little. He stayed in his car.
>
> When Little arrived, he spoke with defendant. Little announced that defendant wanted to cooperate fully and had nothing to hide. He asked what car they wanted to search and McDonald answered the car defendant drove the night Wilson disappeared. In relation to Little confirming which car defendant drove, McDonald said it beats taking them all in. McDonald believed he had probable cause at that time to seize all of defendant's cars. He was unsure whether his statement about taking all the cars was before or after Little verified with defendant which car he had driven. Little came forward as the spokesperson with no resistance by defendant. Little gave consent to search the car.
>
> Little testified he was a friend of defendant. He described the conversation about the car differently. In Little's version, McDonald was interested in taking the car defendant drove to the casino. McDonald said it was easier for defendant to give it to him, otherwise he would have to come back and take all the cars. Defendant then pointed to the Camry. Little denied he said defendant would cooperate, but admitted he said defendant had nothing to hide.

(Opinion at 24-25.) The trial court "found inconsistencies and misstatements in McDonald's testimony, but found the People met the burden of proving the seizure of the car was based on defendant's voluntary action." (Id. at 25.) Ultimately, the trial court denied petitioner's motion to suppress. (Id.)

There is no evidence before this court that petitioner was not provided a full and fair opportunity to litigate his Fourth Amendment claim before the state courts. The fact that petitioner believes the decisions of the state courts with respect to his suppression motion was wrong, does not mean that the hearing provided to him on the issue was unfair. See Terrovona v. Kincheloe, 912 F.2d 1176, 1179 (9th Cir. 1990) (where state trial court gave "ample consideration" to the legality of petitioner's arrest and the state appellate court considered the issue of probable cause as well, a full and fair opportunity to litigate the Fourth Amendment claim was provided and habeas review is barred by Stone); Abell v. Raines, 640 F.2d 1085, 1088

/////

27

1    (9th Cir. 1981) (same).  Accordingly, petitioner's Fourth Amendment claim is barred in this

2    federal habeas proceeding.  Stone, 428 U.S. at 494.

3         C.    Admissibility of Evidence/Ineffective Assistance of Trial Counsel (Ground Four)

4              In his fourth ground for relief, petitioner claims that the trial court violated his

5    right to due process in admitting evidence of his "irascibility and violence" at the workplace, and

6    that his trial counsel rendered ineffective assistance in failing to object to the admission of this

7    evidence.  (Doc. No. 1 at 5, 7; Resp't's Lod. Doc. 17 at 72-84; Traverse at 49-52.)  The

8    California Court of Appeal fairly described the background to this claim as follows:

> Defendant contends the trial court erred, or trial counsel was
> ineffective, in admitting evidence of defendant's irascibility and
> violence at work.
>
> Defendant's supervisor, Janet Wilde, testified at length about his
> erratic work schedule the days after Wilson's disappearance.
> Defendant was late for an important meeting, left early, failed to
> check in with his supervisor and telecommuted without prior
> approval.  The prosecution used this evidence as consciousness of
> guilt; defendant failed to show up at work for an important project
> because something else concerned him more.
>
> To rebut the idea that defendant had to be at work those days, on
> cross-examination the defense elicited testimony that defendant
> was one of the best program managers, had won an award, was a
> valued employee and would not be let go for failing to show up.
> The prosecution then asked Wilde about areas where defendant
> needed improvement.  The defense objected, but the court
> overruled the objection, finding the defense opened the door to
> evidence of defendant's character at work.  Wilde testified
> defendant did not always adhere to policies, such as timely
> submittal of expense reports and time sheets.  Further, defendant
> admitted he was a hothead and had been given coaching on how to
> approach people; he was warned that bodily contact was not always
> welcome.  A female coworker had expressed concern that there
> could be violence due to defendant's demeanor.  The complaint
> was investigated and was unsubstantiated.
>
> Later, outside the presence of the jury, defense counsel raised the
> issue of character evidence, explaining he had been very careful
> not to introduce character evidence and that he sought only to show
> that defendant's attendance at work on October 5 was not required.
> The defense asked that Wilde's testimony of defendant's character
> at work be stricken.  The court denied the motion, finding
> impeachment of defendant's character as to his employee status

1     was proper.  Counsel stated that if he had erred in not objecting to
      the prosecution's questioning on redirect, "then the ineffective
2     assistance of counsel is on my shoulders."

3  (Opinion at 35-36.)

4          In his petition pending before this court petitioner claims that the testimony of his

5  supervisor, Janet Wilde, about his character at work was "irrelevant, inadmissible, and

6  prejudicial." (Resp't's Lod. Doc. 17 at 72.)  He explains:

7          The evidence, if not inherently inflammatory, was inflammatory in
           the context of this case where so many circumstantial gaps in the
8          evidence tended to magnify the significance of every crumb and
           tidbit that could be weighed in the scale.  [Petitioner's] self-
9          confession that he was "hot headed" and the mere suggestion that
           he made a female worker nervous with his violent or rough
10         demeanor were more than tidbits and crumbs for the prosecution.
           Rather, they imported a corroboration that was quite to the point:
11         [petitioner] in a fit of anger violently assaulted Christie Wilson."

12  (Id. at 83.)  Petitioner argued in his opening brief on appeal that his trial counsel made a timely

13  objection to the challenged character testimony.  (Id. at 81-82.)  Alternatively, he argued that his

14  trial counsel's failure to object was excused under the doctrine of futility because it was clear the

15  trial judge intended to allow the evidence to be admitted.  (Id.)  He contended, however, that if

16  the appellate court found this issue was waived on appeal because of trial counsel's failure to

17  contemporaneously object, "then the claim of ineffective assistance of counsel must be advanced

18  for counsel's failure to make a timely objection to the evidence in question."  (Id. at 84.)

19         The California Court of Appeal rejected petitioner's due process arguments on

20  this point, reasoning as follows:

21         Defendant contends evidence that he was a valued employee was
           not character evidence and did not open the door to evidence of his
22         temper and the concerns of a female employee.  He contends he
           has not forfeited the contention; any failure to object properly was
23         excused by futility.  Finally, he contends if a proper and timely
           objection was required, he was denied effective assistance of
24         counsel.  We need not address the issues of forfeiture and
           ineffective assistance of counsel because we find the prosecution's
25         character evidence was properly admitted under Evidence Code
           section 1102, subdivision (b).

26  /////

                                      29

Generally, evidence of a person's character is not admissible to show conduct on a specified occasion.  (See Evid. Code, § 1101, subd. (a).)  Evidence Code section 1102 provides an exception: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is:  [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character. [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)."

"When a criminal defendant presents opinion or reputation evidence on his own behalf the prosecutor may present like evidence to rebut the defendant's evidence and show a likelihood of guilt.  (Evid. Code, § 1102, subd. (b).)"   (People v. Hempstead (1983) 148 Cal. App.3d 949, 953.)  The defense offered evidence of defendant's reputation as a valued employee to show he was not required to be at work October 5 and his absence from work would not have adverse consequences.  This evidence of his good character was offered to prove his conduct (absence from work) in conformity with such character.  (Evid. Code, § 1101, subd. (a.).)  Thus, the prosecution was able to offer character evidence to rebut defendant's offer of good character.  (Evid. Code, § 1102, subd. (b).)  The trial court did not err in admitting the evidence.

(Opinion at 35-38.)

As explained above, a federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law.  Wilson, 131 S. Ct. at 16.  Absent some federal constitutional violation, a violation of state law does not provide a basis for habeas relief.  Id.  Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point.").

A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'"

Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983)).  Admission of evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence."  Jammal, 926 F.2d at 920.  "Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'"  Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463 (9th Cir. 1986)).

Moreover, as the Ninth Circuit has observed:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley, 568 F.3d at 1101.  Therefore, "under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court."  Id.  Applying these legal principles here, the state court's rejection of petitioner's due process claim in this case does not support petitioner's request for federal habeas relief under AEDPA because the admission of evidence regarding his bad character at work did not violate any clearly established federal law.  Id.

In any event, the admission of the challenged evidence did not deny petitioner a fair trial.  In light of the significant and substantial evidence of petitioner's guilt, described in the opinion of the California Court of Appeal, Ms. Wilde's testimony that petitioner sometimes inadvertently offended co-workers, or that one female employee leveled an allegation against petitioner that was not able to be substantiated, would not have had a "substantial and injurious effect" on the verdict in this case.  See Brecht, 507 U.S. at 623; see also Penry v. Johnson, 532 U.S. 782, 793-96 (2001).  Finally, petitioner's trial counsel were not ineffective in failing to object to testimony that was proper under California law and did not violate petitioner's right to

/////

31

1   due process.  See Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a

2   meritless argument does not constitute ineffective assistance.").

3           For these reasons, petitioner is not entitled to federal habeas relief with respect to

4   Ground Four set forth in the instant petition.

5       D.  Admission into Evidence of Detective Murchison's Testimony Regarding Date Rape

6   Drugs (Ground Five)

7           In his fifth ground for relief, petitioner claims that the trial court violated his right

8   to due process when it admitted Detective Murchison's expert testimony that Christie Wilson's

9   behavior at the casino on the night in question was consistent with consumption of a "date rape

10  drug." (Doc. No. 1 at 7.)  Petitioner argues that this testimony was "irrelevant, with only a

11  speculative connection to the facts of the case." (Id.)  On appeal, petitioner had argued that "the

12  factual nexus between Murchison's expert testimony and the actual facts of the case were so

13  tenuous, and its irrelevance so apparent, as to constitute an abuse of discretion, and a prejudicial

14  one in providing the jury a basis to speculate that appellant had incapacitated Christie Wilson

15  with a date rape drug." (Resp't's Lod. Doc. No. 17 at 86.)  Petitioner argues that the evidence

16  introduced at his trial demonstrated, at most, that Wilson's behavior was consistent with "the

17  ingestion of marijuana, alcohol, or the combined ingestion of drugs and alcohol." (Id. at 87, 90.)

18  He notes that there was no evidence presented at trial, including the videotapes of himself and

19  Wilson at the casino, establishing that he gave Wilson a date rape drug. (Id. at 89.)  Petitioner

20  also argues that "absent Murchison's testimony about date rape symptoms, it is reasonably

21  probable that the case would have resulted more favorably for [petitioner]." (Id. at 92.)

22          In the last reasoned state court decision addressing this issue, the California Court

23  of Appeal rejected petitioner's argument that the admission of Detective Murchison's testimony

24  was improper or unfair.  That court reasoned as follows:

25          Defendant contends the trial court erred in admitting, over defense
            objection, the expert testimony of Detective Murchison on date
26          rape drugs.  Defendant contends the expert opinion evidence was

32

irrelevant because it had only a speculative connection to the facts of the case.

Murchison testified, over a relevancy objection, to his training and experience in the area of date rape drugs.  He had undercover experience on the use and distribution of such drugs, experience in cleaning up methamphetamine labs and specific training on rave and date rape drugs.  Over another relevancy objection, Murchison testified Wilson's symptoms the night she disappeared, as testified to by witnesses at the casino, and as he viewed on the casino tape, where consistent with the consumption of a date rape drug.  He testified such drugs are often put in fruity drinks, like wine, to mask their taste.

"The trial court is vested with wide discretion in determining the relevance of evidence.  [Citation.]  The court, however, has no discretion to admit irrelevant evidence.  [Citation.]  'Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.'  [Citations.]"  (<u>People v. Babbitt</u> (1988) 45 Cal.3d 660, 681.)

Defendant contends this expert testimony is speculative.  There was no direct evidence that Wilson was given a date rape drug; Murchison testified the videotape did not show anyone put anything in her drink.  Wilson's symptoms that night, her stomach ache and diarrhea, her mood change, and her clumsy handling of chips, are explained by other causes, including her alcohol consumption and evidence she was a poor loser when gambling.  Defendant asserts the prosecution admitted, in closing argument, the speculative nature of the evidence when it admitted it did not know if defendant slipped Wilson something.

While Wilson's ambiguous symptoms might be a slight foundation for Murchison's expert testimony, they are not the sole basis.  A week after Wilson's disappearance, and days after defendant was investigated by McDonald, he visited web sites relating to toxicology.  He spent 23 seconds on a web site relating to rave or date rape drugs.  From this evidence the jury could reasonably infer he was concerned about forensic discovery of date rape drugs if Wilson's body was found.  Since Murchison's expert testimony on date rape drugs had a "tendency in reason to prove or disprove any disputed [material] fact," it was relevant.  (Evid. Code, § 210.) The relative strength or weakness of such evidence was a determination for the jury.  (<u>People v. Cordova</u> (1979) 97 Cal.

/////

/////

33

1       App.3d 665, 669.)  The trial court did not err in admitting this
2       evidence.

3 (Opinion at 38-40.)

4       As explained above, "under AEDPA even clearly erroneous admissions of

5 evidence that render a trial fundamentally unfair may not permit the grant of federal habeas

6 corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

7 Court."  Holley, 568 F.3d at 1101.  The Supreme Court has left open the question whether "the

8 Constitution is violated by the admission of expert testimony concerning an ultimate issue to be

9 resolved by the trier of fact."  See Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009).  In light of

10 these binding authorities, the state court's rejection of petitioner's due process challenge to the

11 date rape drug testimony does not support the granting of federal habeas relief under AEDPA

12 because the admission of Detective Murchison's testimony did not violate any right clearly

13 established by United States Supreme Court precedent.

14       Nor was petitioner's trial rendered fundamentally unfair because of the admission

15 of Murchison's testimony.  As noted by the state appellate court, that testimony was relevant as a

16 possible explanation for certain aspects of the victim's behavior on the night in question and was

17 made even more pertinent by evidence that petitioner had conducted a computer search for

18 information on date rape drugs after he was made aware that he was being investigated in

19 connection with Wilson's disappearance.  The possibility that these actions by Wilson and

20 petitioner were prompted by Wilson's ingestion of a date rape drug is a rational and permissible

21 inference that the jury could draw from Detective Murchison's testimony.  Moreover, Murchison

22 conceded in his testimony that there was no direct evidence introduced at petitioner's trial that

23 petitioner had slipped Wilson a date rape drug.  Murchison did not testify that Wilson had, in

24 fact, ingested such a drug.  Rather, he simply explained the effects of date rape drugs on an

25 individual's behavior.  Under these circumstances, Detective Murchison's testimony was not

26 unduly prejudicial.  In short, petitioner has failed to demonstrate that the admission of

34

1    Murchison's expert testimony on date rape drugs had "a substantial and injurious effect" on the

2    verdict or prevented a fair trial.  See Brecht, 507 U.S. at 623.

3          For all of these reasons, petitioner is not entitled to federal habeas relief with

4    respect to this due process claim.

5          E.  Admission into Evidence of Expert Testimony by Sergeant McDonald (Ground Six)

6          In his sixth ground for relief, petitioner claims that the trial court violated his right

7    to due process by allowing Sergeant McDonald to testify "about his investigation of this case"

8    and about "irrelevant and incompetent opinions and conclusions about the evidence." (Doc. No.

9    1 at 7.)  Petitioner also suggests that this court "assess the proper limits of expert testimony in a

10   'no-body' case." (Id.)  On appeal, petitioner argued, in general, that the investigation conducted

11   by Sergeant McDonald was irrelevant to petitioner's guilt of the charged crimes because it

12   simply reflected McDonald's opinion as to which areas of investigation were important.

13   (Resp't's Lod. Doc. 17 at 94.)  Petitioner also argued that the trial court "inconsistently sustained

14   and overruled objections" and that "the result of this was a direct examination that improperly

15   allowed McDonald to present himself as an expert in police investigation, who indeed *was* giving

16   his opinions and conclusions on disputed issues in this case."  (Id.)  Petitioner stated, "[i]n sum,

17   the trial court abused its discretion and erred in allowing McDonald to testify as an expert on

18   matters for which expert testimony clearly was not required, and to give what can only be

19   denominated as his own opinions and conclusions about important and material factual issues in

20   this case, implying ultimately an opinion and conclusion about appellant's guilt."  (Id. at 104.)

21   Petitioner described in his appellate brief the specific portions of McDonald's testimony to which

22   he objected, and the basis for all of his objections to that testimony.  (Id. at 93-105.)

23          The California Court of Appeal addressed all of petitioner's arguments in this

24   regard and concluded that the trial court did not err in admitting those portions of Sergeant

25   McDonald's testimony to which petitioner had objected.  The court reasoned as follows:

26   /////

Defendant contends the trial court erred in permitting, over defense objection, McDonald to testify as to his investigation of the case and to give his opinions and conclusions as to what the evidence established. Defendant contends the actual steps of McDonald's investigation were irrelevant. McDonald's opinions, coming from the detective with 30 years' experience, carried "'an aura of special reliability and trustworthiness.' [Citation.]" (People v. Bledsow (1984) 36 Cal.3d 236, 251.) The result, defendant contends, was the jury did not weigh the evidence as carefully as it should have.

The trial court sustained numerous defense objections when the prosecutor asked McDonald about investigatory steps in general or his opinion about the evidence. The court only permitted questions about what McDonald actually did in this case. Defendant argues this distinction sets the wrong parameters; the investigation itself was irrelevant. Defendant relies on People v. Johnson (2006) 139 Cal. App.4th 1135, in which the court held a database search for a "cold hit" on DNA was not subject to the standard of admissibility set forth in People v. Kelly (1976) 17 Cal.3d 24. (People v. Johnson, supra, at p. 1141.) The court stated: "[T]he means by which a particular person comes to be suspected of a crime – the reason law enforcement's investigation focuses on him – is irrelevant to the issue to be decided at trial, i.e., that person's guilt or innocence, except insofar as it provides *independent* evidence of guilt or innocence." (Id. at p. 1150, original italics.)

We disagree that all evidence of McDonald's investigation was irrelevant and inadmissible. While the investigation may have been irrelevant to whether defendant was guilty of murder (except as it provided independent evidence of guilt), it was relevant to another facet of the case, to establish the corpus delicti. "In a homicide case, 'proof of death caused by a criminal agency' constitutes the corpus delicti. [Citation.]" (People v. Malfavon (2002) 102 Cal. App.4th 727, 734.) Since Wilson's body was never recovered, the People had to establish that she was dead and had been killed. The actual steps of the investigation served to offer proof of that. Having rejected defendant's global contention, we turn to his specific claims of error.

**Testimony No One Confirmed Defendant's Story**

McDonald testified defendant originally claimed he got home at 1:00 a.m., but changed his story when told the videotape showed him leaving the casino at 1:13 a.m. Defendant said he got home around 2:00. The prosecutor asked if he attempted to confirm this with anyone defendant lived with and McDonald said yes. Asked if he was successful, McDonald said no. Defendant contends his relevancy objection should have been sustained because McDonald's statement that he was unsuccessful in confirming defendant's return time home was an opinion. We disagree. McDonald did not testify no one could confirm defendant's story,

only that he was unable to do so.  To the extent it was an opinion, it was an admissible lay opinion rationally based on his experience and perception and helpful to a clear understanding of his testimony.  (Evid. Code, § 800.)

**Testimony about Methodology and Experience**

McDonald testified to his methodology in collecting evidence and his training and experience in "no body" homicides.  Defendant contends his relevancy objection to this testimony should have been sustained.  The Attorney General responds this testimony merely laid the foundation for the thoroughness of the investigation, which was relevant to establishing that Wilson was dead.  Evidence of the thoroughness of the investigation was also relevant to refute the defense assertion that the prosecution of defendant was a rush to judgment.  (See Kyles v. Whitley (1995) 514 U.S. 419, 446, fn. 15 [131 L.Ed. 2d 490, 513] [conscientious police work will enhance the probative force of the People's evidence, while slovenly work will diminish it.].)

**Testimony about Specific Categories of Evidence**

McDonald testified as to the specific categories of evidence he explored or directed others to explore; these included speaking with Wilson's family and friends and checking electronic databases.  When McDonald began to explain the importance of Wilson's state of mind, her upcoming job interview and her failure to take treasured possessions, such as her cat, the court sustained a defense objection.

Defendant objects this testimony was a commentary, not evidence.  Since there was direct testimony from Wilson's family and friends as to Wilson's personality, her employment experience, anticipated new job, and evidence about the databases that were checked, we fail to perceive any prejudice from McDonald's testimony that these things occurred.  As to the question about Wilson's state of mind, the objection was sustained and defendant did not move to strike McDonald's answer.

**Testimony of No Evidence of Suicide, Voluntary Disappearance of Third Party Abduction**

When the prosecutor asked McDonald about general steps of an investigation of a missing person, defense relevancy objections were sustained.  The court also sustained objections to questions asking for McDonald's opinion.  McDonald was permitted to testify, over objection that these were questions for the jury, that he found no evidence suggesting suicide, that Wilson started a new life, or that a third party abducted her and he had investigated those possibilities.  Defendant contends this testimony was improper opinion testimony as the investigation was wide-ranging and not

37

limited to finite physical evidence.  He further contends it was irrelevant and argumentatively cumulative of the other testimony and physical evidence.  The Attorney General contends McDonald's testimony was proper expert opinion.

We disagree that this testimony was improper opinion testimony. Defendant contends the questions were similar to one found improper in People v. One 1941 Chevrolet Coupe (1952) 113 Cal. App.2d 578.  That case was a forfeiture case where the issue was whether the vendor of the automobile made an adequate investigation into the buyer's moral responsibility.  The trial court sustained an objection to a question that asked:  "'And what did you find as a result . . . of that investigation?'"  The appellate court held the ruling was correct; the question asked for an irrelevant conclusion.  (Id. at p. 582.)  Here the questions were different. When the prosecutor tried to elicit McDonald's conclusion or opinion, the court sustained the objection.  McDonald was allowed to testify only as to what he actually found or did not find, not as to the conclusion he drew.  Moreover, McDonald's actual findings regarding any alternate reasons for Wilson's disappearance were relevant to the prosecution's burden of proof on the threshold issue of whether a crime occurred.

**Testimony about Incapacitating Someone and Boot Camp**

Defendant objects to McDonald's testimony that served to bolster the prosecution case that defendant violently subdued Wilson in the parking lot.[11]  McDonald testified he had seen hair embedded in objects as a result of violent force.  He further testified that while in boot camp in 1971, he became familiar with techniques to incapacitate someone quickly and that defendant served in the army and went through boot camp around the same time. Defendant contends expert opinion was not required in these areas and McDonald's testimony implied an ultimate opinion about defendant's guilt.

At trial, defendant objected to the testimony about embedded hair only on the basis of foundation.  Since he did not object on the basis argued on appeal, that contention is forfeited.  (Evid. Code, § 353, subd. (a).)

Defendant did initially object to the testimony about incapacitation and boot camp on the basis of relevancy, as well as that the question was leading.  The testimony came in afterwards without objection.  This testimony was not opinion evidence; it was based on McDonald's perceptions, both in boot camp and his

---

[11]  As discussed below in part XII, the prosecution presented this scenario to establish felony murder predicated on kidnapping.

investigation of defendant's military record.[12]  It was relevant to establishing that defendant had the means to commit the crime.

The trial court did not prejudicially err in admitting the testimony of McDonald.

(Opinion at 40-46.)

Petitioner has failed to demonstrate that the state court decision rejecting his due process challenges to the above-described portions of Sergeant McDonald's trial testimony is contrary to or an unreasonable application of federal law.  Nor has petitioner demonstrated that the admission of McDonald's testimony rendered his trial fundamentally unfair.  For the reasons described by the California Court of Appeal, the admission into evidence of Sergeant McDonald's testimony regarding aspects of his investigation into Wilson's disappearance did not violate petitioner's right to due process.  Accordingly, petitioner is not entitled to federal habeas relief on Claim Six contained in the instant petition.[13]

   F.  Jury Instruction Error (Grounds Seven, Eight, and Ten)

Petitioner raises several claims of jury instruction error.  After setting forth the applicable legal principles, the court will address each of these claims in turn below.

   1.  Applicable Legal Principles

In general, a challenge to jury instructions does not state a federal constitutional claim.  Estelle v. McGuire, 502 U.S. 62, 72 (1991); Engle v. Isaac, 456 U.S. 107, 119 (1982));

---

[12]  There was no hearsay objection.

[13]  Respondent argues that the portion of Claim Six wherein petitioner challenges Sergeant McDonald's testimony regarding the hair embedded in the door of petitioner's Toyota Camry is subject to a procedural default because of the state court's conclusion that this particular argument was waived on appeal.  Respondent argues that the state appellate court's ruling "results in a procedural bar (i.e., contemporaneous objection bar) which forecloses consideration of Petitioner's claim on federal habeas."  (Doc. No. 31 at 51.)  Regardless of whether this portion of petitioner's Claim Six is subject to a procedural bar, the undersigned recommends that the claim be rejected on the merits for the reasons set forth above.  See Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997) (a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim); Busby v. Dretke, 359 F.3d 708, 720 (5th Cir. 2004) (same).

1   Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas

2   relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even

3   "universally condemned,"' but must violate some due process right guaranteed by the fourteenth

4   amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973).  To prevail on such a claim

5   petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the

6   resulting conviction violates due process.'" Prantil v. State of Cal., 843 F.2d 314, 317 (9th Cir.

7   1988) (quoting Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its

8   determination, this court must evaluate the challenged jury instructions "'in the context of the

9   overall charge to the jury as a component of the entire trial process.'" Id. (quoting Bashor v.

10   Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where the challenge is to a refusal or failure to

11   give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an

12   incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

13   Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte v. Stewart, 111 F.3d 616,

14   624 (9th Cir. 1997).

15              2. CALCRIM No. 361 (Ground Seven)

16         In his seventh ground for relief, petitioner argues that the trial court violated his

17   right to due process and his right to testify when it instructed the jury pursuant to CALCRIM No.

18   361.  (Pet. (Doc. No. 1) at 8; Resp't's Lod. Doc. No. 17 at 124-29; Traverse at 59-60.)  The

19   California Court of Appeal issued the last reasoned state court decision addressing this claim.

20   That court described the claim and its ruling thereon as follows:

21           The People requested the court give CALCRIM No. 361 on
              defendant's failure to explain or deny incriminating evidence based

22           on defendant's failure to explain the forensic evidence found in his
              car and his failure to explain the absence of his injuries on October

23           4.  The defense opposed giving the instruction, arguing defendant
              did explain his injuries and he was not required to explain all the

24           forensic evidence.  When asked about this evidence, defendant
              testified he did not know how it got in his car.  The court found it

25           was within the possible range of evidence for defendant to explain
              the forensic evidence in his car.  The court agreed to the defense

26   /////

suggestion to modify the instruction by adding "If the jury finds" at the beginning.

The court instructed the jury: "If the jury finds that the defendant failed in his testimony to explain or deny evidence against him and if the jury finds he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating the evidence.  Any such failure is not enough by itself to prove guilt.  The People must still prove each element of the crime beyond a reasonable doubt.  If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

In order to give the instruction, the trial court must determine if (1) a question was asked that called for an answer explaining or denying incriminating evidence; (2) defendant knew the facts necessary to answer the question; and (3) in answering, defendant failed to explain or deny the incriminating evidence.  (People v. Saddler (1979) 24 Cal.3d 671, 682-683; People v. Marsh (1985) 175 Cal. App.3d 987, 999.)

Defendant contends the trial court erred in giving this instruction.  He argues the instruction is improper with respect to Wilson's hair in his car for three reasons.  First, he contends, the instruction is inappropriate when the inference of guilt it permits is not within the potential range of evidence in support of the defense case.  "[I]f the defendant does not answer such a question because of some fact which precludes his knowledge of it (like an alibi which removes him from the scene), a denial of guilt is deemed to have been made. [Citation.]" (People v. Mask (1986) 188 Cal. App.3d 450, 455.)  Defendant contends that since he denied Wilson was ever in his car, he need not explain or deny the presence of her hair in his car.  As the trial court found, defendant's denial that Wilson was in his car does not preclude his knowing how her hair got in the handle or the trunk, particularly since he admitted he was with her that night and they walked towards his car.  Under defendant's theory, the instruction could never be given if a defendant denied the crime because the inference drawn from the incriminating evidence would always be outside the range or evidence in support of the defense case.

Second, defendant argues he is not required to explain "the highly technical and arcane methods used for DNA analysis."  That may be, but he could still offer an explanation for the presence of the hair.

Third, defendant asserts he was never asked why Wilson's hair was on or in his car.  Defendant is mistaken.  The prosecutor asked, "How do you explain her hair in your door handle?"  Defendant replied, "Don't know.  I cannot give you that answer.  You tell me."  Later in cross-examination he was asked: "Do you have any

1  explanation for us why what's identified as being a hair matching a
   full profile of Christie Wilson[,] why that hair was in the trunk of
2  your vehicle?"  Defendant said, "Don't know sir."

3  The trial court did not err in instructing with CALCRIM No. 361.

4  (Opinion at 50-52.)

5  Here, petitioner has failed to demonstrate that the giving of CALCRIM No. 361

6  under the circumstances of this case violated his right to a fair trial.  It was not unfair to allow the

7  jury to consider petitioner's failure to explain how Wilson's hair got in his vehicle, given

8  petitioner's trial testimony that he and Wilson spent time together at the casino and walked

9  toward his car after leaving the casino on the night in question.  A reasonable person should be

10 expected to come up with an explanation for the presence of the victim's hair in his vehicle under

11 those circumstances.  The jury was also advised that a failure to explain evidence was not

12 enough, by itself, to prove guilt, and that it was up to them to determine the meaning and

13 importance of the petitioner's failure to explain the presence of the hair.  Allowing the jury to

14 consider petitioner's failure to explain the hair evidence under these circumstances did not render

15 his trial fundamentally unfair.

16 Nor did the jury instruction violate petitioner's right to testify.  Petitioner testified

17 at his trial and was given the opportunity to explain to the jury the presence of Wilson's hair in

18 his car.  The challenged instruction only allowed the jury to consider petitioner's failure to

19 explain that evidence if they found that he had failed to explain the evidence when he could

20 reasonably have been expected to do to based on what he knew.  The instruction did not prevent

21 petitioner from offering whatever explanation he chose to present.  In short, there is nothing

22 before this court suggesting that the giving of the challenged jury instruction at his trial violated

23 petitioner's federal constitutional rights.

24 Petitioner has failed to demonstrate that the state court decision rejecting this jury

25 instruction error argument was contrary to or an unreasonable application of federal law.

26 Accordingly, he is not entitled to federal habeas relief on Claim Seven.

3.  Requested Pinpoint Instruction (Ground Eight)

In his eighth ground for relief, petitioner claims that the trial court violated his

right to due process in failing to instruct the jury in his case on third party culpability as he

requested.  (Pet. (Doc. No. 1) at 8; Resp't's Lod. Doc. No. 17 at 130-37.)  He argues that

evidence suggesting Daniel Burlando might have been the perpetrator of the crime justified

giving such an instruction.  (Resp't's Lod. Doc. No. 17 at 130.)  Petitioner notes that the

prosecution deemed this evidence to be serious enough that it went to great lengths at trial to

explain to the jury why Burlando was not charged with the murder.  Specifically, according to

petitioner, the prosecutor elicited testimony from several police officers to the effect that

Burlando had cooperated with police and had appeared concerned about Wilson's disappearance.

(Id.)  Petitioner also points out that one police officer testified that Burlando was initially

perceived as a possible suspect but was later excluded as such.  (Id.)  Petitioner asserts that the

trial court rejected the defense request for this pinpoint instruction, finding that an instruction on

third party culpability did not "fall within the possible scope of the evidence."  (Resp't's Lod.

Doc. No. 13, Reporter's Transcript on Appeal (hereinafter RT) at 4111.)

The California Court of Appeal issued the last reasoned decision addressing this

claim of jury instruction error.  In rejecting petitioner's argument, that court explained its ruling

as follows:

> Defendant contends the trial court erred in denying his request for
> an instruction on third party culpability.[14]  He contends there was
> substantial evidence implicating Burlando, Wilson's boyfriend,
> sufficient to raise a reasonable doubt as to defendant's guilt.

_____

[14]  The defense requested an instruction reading as follows: "In the event that you find that the offense of murder or manslaughter has been committed, you have heard evidence that a person other than the defendant committed the offenses.  The defendant is not required to prove the other person's guilt.  It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt.  Evidence that another person committed the charged offense may by itself leave you with a reasonable doubt as to the defendant's guilt; however, its weight and significance, if any, are matters for your determination.  [¶]  If after considering all the evidence, including any evidence that another person committed the offenses, you have a reasonable doubt that the defendant committed the offenses, you must find the defendant not guilty."

Upon proper request, a defendant has a right to an instruction pinpointing his defense of third party culpability when there is sufficient evidence linking any particular third person to the actual perpetration of the crime. (People v. Kegler (1987) 197 Cal. App.3d 72, 80.) The test for sufficient evidence of third party culpability is set forth in People v. Hall (1986) 41 Cal.3d 826, 833: "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. As this court observed in [People v.] Mendez [(1924) 193 Cal.39], evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (Accord, People v. Cunningham (2001) 25 Cal.4th 926, 996; People v. Bradford (1997) 15 Cal.4th 1229, 1325 [Evidence of the culpability of a third party must link the third person either directly or circumstantially to the actual perpetration of the crime].)

In this case there was no direct or circumstantial evidence linking Burlando to the crime. There was no evidence he was at Thunder Valley Casino the night Wilson disappeared. There was no forensic evidence linking him to her disappearance. Burlando had no injuries after that night and no erratic behavior; instead, he reported Wilson as missing and cooperated fully in the police investigation.

Defendant admits the evidence linking Burlando to the crime is evidence of only motive and opportunity. Burlando and Wilson had a tumultuous relationship punctuated by violence. They had both cheated on the other. Burlando had previously hidden from Wilson at the casino, so she would not know he was there. He had no alibi after 11:00 p.m. on October 4. He failed to contact the police until the 6th, and refused an offer from friends to go to the casino to look for Wilson the night of the 5th. There was also a dispute about when and how often he called her the night she disappeared. Burlando had a stun gun in his car.

Defendant argues, however, this evidence is not "mere motive and opportunity," such that it is insufficient to raise a reasonable doubt. (People v. Hall, supra, 41 Cal.3d at p. 833.) He argues the strong evidence of motive and opportunity was sufficient to provide a direct link between Burlando and the crime. He contends this sort of motive and opportunity evidence was found sufficient in People v. Martinez (2002) 103 Cal. App.4th 1071, 1082.

In Martinez, defendant, who worked in a criminal defense attorney's office, was convicted of embezzling money a client

44

provided for bail.  (People v. Martinez, supra, 103 Cal. App.4th at pp. 1074-1075.)  On appeal, he contended the prosecution withheld material evidence:  pending criminal charges against the office manager.  The Attorney General countered such evidence would not have raised a reasonable doubt as to defendant's guilt.  (Id. at p. 1082.)  The appellate court disagreed, agreeing with defendant that impeaching the office manager with such evidence would have shifted the tenor of the trial and made the office manager a more plausible suspect.  Defendant claimed the office manager had told him to secrete the money in a cabinet, the money was not reported missing until the office manager returned from vacation, and there was testimony from others concerning money problems in dealing with the office manager.  (Ibid.)

We find Martinez distinguishable.  While the evidence against the office manager went to motive and opportunity to commit the embezzlement, the evidence also tied him directly to the missing money, as he allegedly gave the instructions on what to do with it and it was missing only after he returned.  That link is missing here; there is no evidence tying Burlando to Wilson's disappearance.

(Opinion at 53-56.)

Evidence of potential third-party culpability must be admitted when, under the "facts and circumstances" of the individual case, its exclusion would deprive the defendant of a fair trial.  Chambers v. Mississippi, 410 U.S. 284, 303 (1973).  The Court of Appeals for the Ninth Circuit has determined that where the proffered evidence simply affords a possible ground of suspicion pointing to a third party and does not directly connect that person with the actual commission of the offense, that evidence may be excluded.  See People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (citing Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983)).  But see Lunbery v. Hornbeak, 605 F.3d 754, 760-61 (9th Cir. 2010) (exclusion of a statement by a third party that he had killed defendant's husband deprived the defendant of the right to present a defense because the "excluded testimony . . . bore substantial guarantees of trustworthiness and was critical to [defendant's] defense").  As explained by the California Court of Appeal, under California law a criminal defendant has a right to present evidence of third party culpability if that evidence is capable of raising a reasonable doubt regarding his own guilt.  See Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir. 1999) (citing People v. Hall, 41 Cal. 3d 826,

1    833 (1986)).  In order for evidence pointing to another suspect to be admissible, however, "there

2    must be direct or circumstantial evidence linking the third person to the actual perpetration of the

3    crime."  Hall, 41 Cal. 3d at 833.  Mere motive or opportunity is not enough.  Id.

4            The decision of the California Court of Appeal that there was insufficient

5    evidence in this case to warrant a jury instruction on third party culpability is not based on an

6    unreasonable determination of the facts of this case.  Although there was evidence that Burlando

7    had a possible motive and the opportunity to murder Wilson, there was no evidence specifically

8    linking him with her disappearance.  Under these circumstances, the defense was not entitled to

9    an instruction on third party culpability because there was insufficient evidence to support a

10   defense theory that Burlando committed the crime.  See Mathews v. United States, 485 U.S. 58,

11   63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized

12   defense for which there exists evidence sufficient for a reasonable jury to find in his favor")

13   (citing Stevenson v. United States, 162 U.S. 313 (1896)).

14           In any event, the trial court's refusal to give an instruction on third party liability

15   would be harmless under the circumstances of this case.  See Hedgpeth v. Pulido, 555 U.S. 57,

16   61 (2008) ("harmless-error analysis applies to instructional errors so long as the error at issue

17   does not categorically 'vitiat[e] all the jury's findings.'"); Doe v. Busby, 661 F.3d 1011, 1018-19

18   (9th Cir. 2011).  Petitioner's jury was instructed that the prosecution had the burden to prove

19   petitioner's guilt beyond a reasonable doubt.  (RT at 4117.)  The jury was also instructed that:

20           [B]efore you may rely on circumstantial evidence to find the
             defendant guilty, you must be convinced that the only reasonable
21           conclusion supported by the circumstantial evidence is that the
             defendant is guilty.
22
             If you can draw two or more reasonable conclusions from the
23           circumstantial evidence, and one of those reasonable conclusions
             points to innocence and the other to guilty, you must accept the one
24           that points to innocence.

25   (Id. at 4120.)  These instructions allowed the jury to acquit petitioner of the charged crimes if

26   they believed that Burlando had committed the crimes.  In addition, the jury was fully alerted to

                                                    46

the issue of third party culpability by virtue of the evidence introduced at trial regarding

Burlando's possible motive and opportunity to commit the murder, and by defense counsel's

closing argument, wherein he suggested that circumstantial evidence indicated Burlando, and not

petitioner, committed the crime.  (Id. at 4226-27, 4259-61, 4270).  In light of the strong evidence

in this case of petitioner's guilt, the jury instructions that were given, and the lack of evidence

that Burlando was responsible for Wilson's disappearance, the omission of petitioner's requested

instruction on third-party culpability would not have had a "substantial and injurious effect or

influence in determining the jury's verdict." Brecht, 507 U.S. at 623.

　　　　For the foregoing reasons, petitioner is not entitled to federal habeas relief on this

claim of instructional error.

### 4.  Instruction on Proof Beyond a Reasonable Doubt (Ground Ten)

　　　　In his tenth ground for relief, petitioner claims that the jury instruction given at his

trial on reasonable doubt violated his right to due process because it "obscures the scope given to

individual subjectivity" and "fails to convey the necessary impression of subjective certitude the

evidence must induce in the jurors."  (Pet. (Doc. No. 1) at 8.)

　　　　The California Court of Appeal rejected petitioner's argument in this regard,

reasoning as follows:

> Defendant contends Judicial Council of California Criminal Jury
> Instructions (2006-2007), CALCRIM No. 220, which defines
> reasonable doubt, is an incorrect statement of law, or one that is
> likely to be applied in an unconstitutional manner.[15]

---

[15]  The trial court instructed the jury: "Ladies and gentlemen, the fact that a criminal charge or charges have been filed against the defendant is not evidence that the charge or charges are true.  You must not be biased against the defendant just because he's been arrested, charged with a crime, or brought to trial.  A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove each element of a crime beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.  [¶]  Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge or charges is or are true.  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.  In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially

1
2
3

> This court recently rejected the same contention in <u>People v.</u>
> <u>Zepeda</u> (2008) 167 Cal. App.4th 25, 29-32.  Indeed, we found,
> "Defendant's argument borders on the frivolous."  (<u>Id.</u> at p. 30.)
> Nothing in defendant's argument causes us to reconsider the issue.

4  (Opinion at 49-50.)

5          In state criminal trials, the Due Process Clause of the Fourteenth Amendment

6  "protects the accused against conviction except upon proof beyond a reasonable doubt of every

7  fact necessary to constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. 358,

8  364 (1970).  "[T]he Constitution does not require that any particular form of words be used in

9  advising the jury of the government's burden of proof.  Rather, 'taken as a whole, the instructions

10  [must] correctly conve[y] the concept of reasonable doubt to the jury.'"  <u>Victor v. Nebraska</u>, 511

11  U.S. 1, 5 (1994) (quoting <u>Holland v. United States</u>, 348 U.S. 121, 140 (1954) (internal citation

12  omitted)).  In evaluating the constitutionality of a jury charge such as this one, a court must

13  determine "whether there is a reasonable likelihood that the jury understood the instructions to

14  allow conviction based on proof insufficient to meet the <u>Winship</u> standard."  <u>Victor</u>, 511 U.S. at

15  6.  <u>See also Ramirez v. Hatcher</u>, 136 F.3d 1209, 1211 (9th Cir. 1998).

16          Petitioner has failed to demonstrate a reasonable likelihood that the jury in his

17  case understood the instructions given at his trial either to suggest a standard of proof lower than

18  due process requires or to allow conviction on factors other than the prosecution's proof.

19  Reviewing the instructions in their entirety, this court finds no reasonable likelihood that the jury

20  misunderstood the government's burden of proving petitioner's guilt beyond a reasonable doubt.

21  Taken as a whole, the instructions given at petitioner's trial correctly conveyed the concept of

22  reasonable doubt to the jury, did not lower the prosecutor's burden of proof, and did not instruct

23  /////

24

25  compare and consider all the evidence that was received throughout the entire trial.  Unless the
26  evidence proves the defendant guilty beyond a reasonable doubt, he's entitled to an acquittal, and
   you must find him not guilty."

1   the jury that petitioner had any burden to present evidence.  Victor, 511 U.S. at 6; Lisenbee v.

2   Henry, 166 F.3d 997, 1000 (9th Cir.1999); Ramirez, 136 F.3d at 1214.

3          This court also notes that several district courts, including this one, have

4   consistently rejected similar constitutional challenges to CALCRIM No. 220.  See, e.g., David v.

5   Martel, No. CV 11-2308-JST (JEM), 2011 WL 7144825, at *4-5 (S.D. Cal Dec. 27, 2011);

6   Buckner v. McDonald, No. CIV S-08-2279 JAM DAD P, 2010 WL 2843426, at *7 (E.D. Cal.

7   July 19, 2010); Chavez v. Hedgpeth, No. 1:09-cv-01624-OWW-SMS(HC), 2010 WL 915305, at

8   *9-10 (E.D. Cal. Mar. 11, 2010); Perez v. California, No. 1:08-CV-01701 JMD HC, 2010 WL

9   729466, at *5-6 (E.D. Cal. Mar. 2, 2010); Westbrooks v. Director of California Department of

10  Corrections, No. 09cv136-JLS (POR), 2010 WL 1573832, at *6 (S.D. Cal. Jan 29, 2010);

11  Martinez v. McDonald, No. 1:09-cv-00845-OWW-SMS(HC), 2010 WL 144863, at *2-3 (E.D.

12  Cal. Jan. 11, 2010); Campbell v. Haws, No. CV 09-632-CJC(E), 2009 WL 2241805, at *4 (C.D.

13  Cal. July 23, 2009) (same).

14         Accordingly, petitioner is also not entitled to federal habeas relief on this claim of

15  instructional error.

16     G.  Sufficiency of the Evidence (Grounds Nine, Eighteen)

17         1.  First Degree Murder (Ground Nine)

18         In his ninth ground for relief, petitioner argues that the evidence introduced at his

19  trial was insufficient to support the jury's verdict that he committed murder in the first degree

20  "either on a theory of felony-murder, kidnapping, or on a theory of premeditation and

21  deliberation." (Doc. No. 1 at 8; Resp't's Lod. Doc. No. 17 at 137-43.)[16]  Petitioner also asserts

22  that the trial erred "in not giving a manslaughter instruction." (Id.)

23  /////

24  _____

25  [16]  Pages 140 and 141 are missing from the pertinent portion of respondent's Lodged Doc.
    No. 17 (petitioner's opening brief on appeal), which forms part of petitioner's description of the
    claims contained in the instant petition.  However, the absence of those pages from the record has

26  not affected this court's consideration of petitioner's claims.

The opinion of the California Court of Appeal on petitioner's direct appeal is the last reasoned decision addressing petitioner's claim of insufficient evidence. That court rejected petitioner's arguments, reasoning as follows:

> Defendant contends there is insufficient evidence of first degree murder.[17] He contends there is no evidence to establish either premeditation and deliberation or a kidnapping and a conviction cannot be based on speculation and conjecture.
>
> The jury was instructed on two theories of first degree murder: premeditation and deliberation and felony murder based on kidnapping. While the prosecutor mentioned both in closing argument, he submitted that felony murder was the stronger theory. We thus first consider if there is substantial evidence of felony murder predicated on kidnapping.
>
> "In reviewing a challenge to the sufficiency of evidence, the reviewing court must determine from the entire record whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (People v. Mincey (1992) 2 Cal.4th 408, 432.)
>
> "Substantial evidence is '"evidence which is reasonable, credible, and of solid value."' [Citation.] Although 'mere speculation cannot support a conviction' [citation], the trier of fact is entitled to draw reasonable inferences from the evidence and we will ""presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."" [Citations.]" (People v. Bohana (2000) 84 Cal. App.4th 360, 368.)
>
> The standard of review remains the same in a case based upon circumstantial evidence. (People v. Proctor (1992) 4 Cal.4th 499, 528-529.) We must decide whether the circumstances reasonably justify the jury's findings, but "our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment. [Citation.]" (Id. at p. 529.)

/////

---

[17] Defendant does not challenge the sufficiency of the evidence that he killed Wilson; he admits the evidence is "sufficient to establish a criminal homicide." He challenges only the degree of homicide.

A killing committed in the perpetration of certain felonies, including kidnapping, is first degree murder under the felony-murder rule.  (Pen. Code, § 189; <u>People v. Seaton</u> (2001) 26 Cal.4th 598, 664.)  The People did not charge defendant with kidnapping, but such a charge is not necessary for a prosecutor relying on the felony-murder rule, so long as the elements of that offense are proved.  (<u>People v. Scott</u> (1991) 229 Cal. App.3d 707, 716.)  "Generally, to prove the crime of kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.  (§ 207, subd. (a).)"  (<u>People v. Jones</u> (2003) 108 Cal. App.4th 455, 462, fn. omitted.)

Defendant contends there is no evidence of a kidnapping in the parking lot because there is no evidence of movement by force or fear and without consent.  The videotape of defendant and Wilson leaving the casino does not show any force or struggle.  No altercation was reported in the parking lot at the time defendant and Wilson left the casino.  Defendant argues that even if the presence of Wilson's DNA and hair in the car indicates she was in his car, there is still no evidence of force.  Defendant contends her absence from the video when the car left could have meant she was lying down as a result of her intoxication.

We find sufficient evidence of kidnapping.  The evidence indicated defendant wanted to leave the casino with Wilson.  He flirted with her, bought her drinks, lent her money, listened sympathetically to her problems and offered to help.  He tried several times unsuccessfully to get her to leave.  When she was ready to leave, or about to be ejected, he left with her without cashing in his chips.

The surveillance videotape shows defendant and Wilson leaving; there is ample time for defendant to subdue her before the car leaves the parking lot.  As they leave the casino, defendant takes Wilson's arm and steers her towards his car; she pulls away.  Walking into the parking lot, defendant puts his arm around Wilson and she again moves away.  There are several flashes, indicating the car doors are unlocked but there is a gap of over three minutes until the car lights are turned on and the car leaves.  That defendant forced Wilson into the car during this time period is corroborated by her hair found wedged in the passenger exterior door handle.  It required force to dislodge the hair from her head and force to embed it in the exterior door handle.  Wilson is not visible in the car when it leaves the parking lot, indicating she is not likely a willing or conscious passenger.  Since the videotape does not indicate she is so drunk that she staggers, it is unlikely she is simply lying down on her own.  As such, she is an improbable companion looking forward to further evening activities with defendant.

51

Wilson was never seen again.  Her car remained in the casino parking lot.  Defendant's injuries and the DNA and blood in the car indicate there was a violent struggle later with the door open. Wilson, a kick boxer taught to defend herself by her stepfather, fought defendant off to no avail.  During the fight defendant killed Wilson.  He then disposed of her body in an unknown location. There is sufficient evidence of felony murder predicated on kidnapping.

Defendant contends that even if there is sufficient evidence of felony murder, the first degree murder conviction must be reversed because there is insufficient evidence of deliberate and premeditated murder.  Relying on People v. Guiton (1993) 4 Cal.4th 1116, defendant asserts that because the general jury verdict makes it impossible to determine on which theory the jury relied, the conviction must be reversed.  We need not determine if there is sufficient evidence of deliberate and premeditated murder because defendant misreads Guiton.  Where the prosecution presents the jury with both a factually sufficient and a factually insufficient ground for conviction, and it cannot be determined on which ground the jury relied, we affirm the conviction unless there is an affirmative indication that the jury relied on the invalid ground.  (People v. Guiton, supra, at pp. 1128-1129.)  Here there is no indication the jury relied on deliberate and premeditated murder.  Since the prosecutor argued the evidence "is strongest on this theory" of felony murder, it is likely the jury based its decision on felony murder, for which the evidence is ample.

Because we find sufficient evidence to support a first degree murder conviction, we need not address defendant's remaining contentions regarding the proper degree of homicide.

(Opinion at 56-61.)

As noted above, the Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. at 364.  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a

/////

/////

52

1    reasonable doubt.'" <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir. 2004) (quoting <u>Jackson</u>, 443

2    U.S. at 318).[18]

3            In conducting federal habeas review of a claim of insufficient evidence, "all

4    evidence must be considered in the light most favorable to the prosecution." <u>Ngo v. Giurbino</u>,

5    651 F.3d 1112, 1115 (9th Cir. 2011). "A petitioner for a federal writ of habeas corpus faces a

6    heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

7    on federal due process grounds." <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005). In

8    order to grant relief, the federal habeas court must find that the decision of the state court

9    rejecting an  insufficiency of the evidence claim reflected an objectively unreasonable application

10   of <u>Jackson</u> and <u>Winship</u> to the facts of the case. <u>Ngo</u>, 651 F.3d at 1115; <u>Juan H.</u>, 408 F.3d at

11   1275 & n.13. Thus, when a federal habeas court assesses a sufficiency of the evidence challenge

12   to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be

13   surmounted." <u>Boyer v. Belleque</u>, 659 F.3d 957, 964 (9th Cir. 2011). The federal habeas court

14   determines sufficiency of the evidence in reference to the substantive elements of the criminal

15   offense as defined by state law. <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Chein</u>, 373 F.3d at 983.

16           After reviewing the state court record in the light most favorable to the jury's

17   verdict, this court concludes that there was sufficient evidence introduced at petitioner's trial

18   from which a rational trier of fact could have found beyond a reasonable doubt that petitioner

19   committed first degree murder on a felony murder theory based on a kidnapping. As described

20   by the California Court of Appeal, the evidence introduced at petitioner's trial was sufficient to

21   support a finding that petitioner forced Christie Wilson into his car at the casino parking lot,

22   drove her to a different location, and murdered her. It is true, as petitioner argues, that the

23   prosecution was unable to produce any direct evidence that petitioner forced Wilson into his car

24

25           [18]  In federal court, when different liability theories are presented and a general guilty
     verdict is returned, a sufficiency of the evidence challenge will not prevail if the evidence is
26   sufficient to support one of the theories. <u>Griffin v. United States</u>, 502 U.S. 46, 59-60 (1991).

1    at the casino parking lot.  It is also true that the evidence raises an obvious question as to whether

2    petitioner would have been able to subdue Wilson in the very short time period, without being

3    seen, and maneuver her into his car.  However, in order to obtain federal habeas relief on this

4    claim, petitioner must demonstrate that the state courts' denial of relief with respect to his

5    insufficiency of the evidence arguments was an objectively unreasonable application of the

6    decisions in Jackson and Winship to the facts of this case.   Petitioner has failed to overcome the

7    deference due to the state court's findings of fact and its analysis of this claim.   Accordingly,

8    petitioner is not entitled to federal habeas relief on his insufficiency of the evidence claim.

9           Petitioner also claims in the caption of ground Nine that "the trial court erred on

10   instructional error for not giving a manslaughter instruction." (Doc. No. 1 at 8.)  Petitioner does

11   not elaborate on this aspect of his claim in either his petition or his traverse.  Because this claim

12   is vague and conclusory, it should be rejected.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir.

13   1995) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not

14   warrant habeas relief'") (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).

15          In addition, the argument fails to raise a cognizable claim for purposes of federal

16   habeas review.  Although the United States Supreme Court has held that the failure to instruct on

17   a lesser included offense in a capital case is constitutional error if there was evidence to support

18   the instruction, Beck v. Alabama, 447 U.S. 625, 638 (1980), it has not decided whether this

19   rationale also extends to non-capital cases.  See Turner v. Marshall, 63 F.3d 807, 818 (9th Cir.

20   1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).  The Ninth

21   Circuit, like several other federal circuits, has declined to extend Beck to find constitutional error

22   arising from the failure to instruct on a lesser included offense in a non-capital case.  See Solis v.

23   Garcia, 219 F.3d 922, 929 (9th Cir. 2000).  Because petitioner's was not a capital case, the state

24   trial court's failure to give a lesser included offense instruction did not rise to the level of

25   constitutional error for which federal habeas relief is available.  See Windham v. Merkle, 163

26   F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included

1   offenses in a non-capital case does not present a federal constitutional question.").  Accordingly,

2   petitioner is not entitled to federal habeas relief with respect to this jury instruction error claim.[19]

3         2.  Ground Eighteen

4         In his eighteenth claim for relief, petitioner argues that "the Court of Appeal,

5   Third Appellate District, acted contrary to rulings consistent with the laws of the state of

6   California; its decision involved an unreasonable application of clearly established federal law as

7   determined by the Supreme Court of the United States; and its decision was based on an

8   unreasonable determination of the facts in light of the evidence presented in the state court

9   proceeding and in violation of the Fourteenth Amendment of the United States Constitution."

10  (Doc. No. 1 at 10.)  Petitioner asserts that the facts introduced into evidence at his trial do not

11  support the jury's finding that he kidnapped Wilson.  He also argues that the decision of the

12  California Court of Appeal rejecting his sufficiency of the evidence claim, discussed immediately

13  above, was based on an unreasonable determination of the facts of his case.  (Id. at 32-37.)

14  Petitioner states that this ground for relief may be "cojoined" with claim Nine contained in the

15  instant petition.  (Traverse at 66.)

16  /////

17  /////

18  /////

19  _____

20  [19]  In the traverse, petitioner argues that "if this Court does find evidence of kidnapping
    here, then the claim of ineffective assistance of counsel must be advanced for counsel's failure to
    prepare a kidnapping defense."  (Traverse at 66.)  In this regard, petitioner argues that his counsel

21  should have challenged the short time frame within which he had to subdue Wilson in order to
    get her into his car, and also should have presented evidence that petitioner's health was not

22  robust enough for him to have carried out this feat.  (Id. at 66-67.)  To the extent petitioner is
    attempting to belatedly raise a new claim of ineffective assistance of counsel in his traverse,

23  habeas relief should be denied.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994)
    (a traverse is not the proper pleading to raise additional grounds for relief); Greenwood v. Fed.

24  Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues which are argued
    specifically and distinctly in a party's opening brief").  Moreover, even if this claim had been

25  properly raised in these habeas proceedings, petitioner has failed to demonstrate deficient
    performance on his counsel's part or prejudice, for the reasons expressed in this court's order and

26  findings and recommendations filed on December 28, 2011.  See Doc. No. 79 at 6-8.

1    This court will construe petitioner's eighteenth ground for relief as a continuation

2    of, or supplement to, his ninth ground for relief.[20]   Essentially, petitioner repeats arguments made

3    in his Claim Nine that the evidence introduced at his trial was insufficient to support his

4    conviction for first degree murder on a theory of felony murder based on a kidnapping.

5    Petitioner argues in more detail here that there was no substantial evidence that he kidnapped

6    Wilson.  Petitioner specifically objects to the finding by the California Court of Appeal that the

7    casino surveillance videotape shows that when petitioner and Wilson left the casino, petitioner

8    "takes Wilson's arm and steers her toward his car; she pulls away" and that "walking into the

9    parking lot, defendant puts his arm around Wilson and she again moves away." (Pet. (Doc. No.

10   1) at 33; Opinion at 59.)  Petitioner argues that the casino videotape does not show that Wilson

11   was "forced down the aisle where [his] car is" or that he was "steering" Wilson.  (Pet. (Doc. No.

12   1) at 33.)  He also argues that the videotape does not depict Wilson "pull away," but rather that

13   she is merely "non-responsive and removes [petitioner's] arm."  (Id.)

14   Petitioner also objects to the conclusion of the California Court of Appeal that

15   there was "ample time for [petitioner] to subdue [Wilson] before the car leaves the parking lot."

16   (Pet. (Doc. No. 1) at 33; Opinion at 59.)  Petitioner argues that his health and the fact that Wilson

17   had been trained in kickboxing render it unlikely that he could have subdued her and forced her

18   into his car in less than four minutes.  (Pet. (Doc. No. 1) at 34-35.)  He also argues that he could

19   not have accomplished these "super-human activities" without drawing attention to himself,

20   noting that there were people milling around the casino parking lot at the time.  (Id.)  He

21   contends that there was no direct evidence "that force or fear was applied or that lack of consent

22   existed when Wilson and [petitioner] walked into the parking lot."  (Id. at 35-36.)  Petitioner

23   repeats all of these same arguments in his traverse.  (See Traverse at 67-68.)

24

25   [20]  In light of this interpretation of petitioner's Claim Eighteen, the court will not address respondent's argument that Claim Eighteen is a separate claim which is procedurally barred from

26   consideration by this court.  (See Doc. No. 31 at 18-29.)

1        This court has reviewed the surveillance videotape admitted into evidence at

2   petitioner's trial and concludes that the above-described conclusions by the California Court of

3   Appeal are not based on an unreasonable determination of the facts of this case.  The videotape

4   shows that when petitioner and Wilson left the casino, petitioner had his arm through Wilson's

5   arm but, after a few seconds, she detached her arm from his.  The videotape tape depicts that

6   petitioner then put his arm around Wilson and she moved to the right, so that his arm was no

7   longer around her.  As they continued to walk toward the parking lot, the videotape shows that

8   petitioner again put his arm around Wilson and she veered slightly away from him, only to veer

9   again in his direction shortly thereafter.  The videotape also reflects that although there were

10  people milling around the entrance to the casino at the time, the more distant parts of the parking

11  lot were almost completely empty.  This court concludes that the casino surveillance videotape

12  admitted into to evidence at petitioner's trial largely corroborates the factual scenario recited by

13  the California Court of Appeal in its opinion with regard to the exit of petitioner and Wilson

14  from the casino.

15        The surveillance videotape does not depict petitioner and Wilson at petitioner's

16  car.  Therefore, there was no direct evidence regarding what happened there.  However, as

17  explained by the California Court of Appeal, the hair and DNA evidence found in petitioner's

18  vehicle, along with petitioner's facial injuries, supported the conclusion that petitioner forcibly

19  thrust Wilson into his car against her will.  This is true notwithstanding the existence of evidence

20  supporting petitioner's defense arguments:  that petitioner had only three or four minutes to

21  accomplish the kidnapping, that Wilson knew how to kickbox, that petitioner was not young but

22  rather was in his mid-50s, and that petitioner exited the parking lot in an unhurried manner.

23  Notwithstanding the evidence pointed to by petitioner, after a careful review of the state court

24  record this court concludes that the decision of the California Court of Appeal rejecting

25  petitioner's sufficiency of the evidence claim is not based on an unreasonable determination of

26  the facts of this case.

1   Petitioner also argues that the state appellate court violated his right to due

2 process and to the effective assistance of counsel when it did not allow his appellate counsel

3 sufficient time for oral argument, even though counsel had obtained an order allowing him

4 additional time to argue.  (Doc. No. 1 at 32-33.)  In his traverse petitioner explains that his

5 eighteenth claim is "based primarily on the fact that Petitioner's appellate counsel was not

6 allowed to address the merits of his claims despite the fact that the Application for additional

7 time for Oral Argument had been granted and calendared by the clerk of the court (for 30

8 minutes)."  (Traverse at 117.)

9   Petitioner's claim, if any, that the California Court of Appeal violated state law or

10 state regulations when it failed to accord his appellate counsel sufficient time for oral argument

11 fails to state a federal constitutional claim and should be rejected.  As explained above, a federal

12 writ is not available for alleged error in the interpretation or application of state law.  Wilson,

13 131 S. Ct. at 16.  With respect to petitioner's arguments that the state appellate court's failure to

14 allow his counsel additional time for argument violated his federal constitutional rights to due

15 process or to the effective assistance of counsel, petitioner has failed to demonstrate any

16 prejudice.  There is no evidence the result of the appellate proceedings in this case would have

17 been different had petitioner's appellate counsel been given more time for oral argument.  See

18 Brecht, 507 U.S. at 623.  Accordingly, for the foregoing reasons, petitioner is not entitled to

19 federal habeas relief on these claims.[21]

20

---

21  [21]  On July 5, 2012, petitioner filed with this court a motion requesting production of the
transcripts and record of the oral argument on appeal in his case before the California Court of
22 Appeal for the Third Appellate District.  (Doc. No. 115.)  Therein, petitioner argues that a
transcript or a "CD of oral argument" will corroborate his claim that the state appellate court
23 violated his rights in failing to provide his counsel adequate time to argue his case.  (Id. at 2.)
Petitioner also suggests that a transcript of the oral argument will somehow support his
24 contention that the state appellate court mischaracterized the evidence admitted at his trial in the
opinion affirming his judgment of conviction.  (Id. at 2-3.)  As explained above, petitioner is not
25 entitled to federal habeas relief with respect to the underlying claims for which he seeks support
through this motion.  Accordingly, petitioner's motion to compel production of transcripts and
26 records of the oral argument before the state appellate court will be denied.

H.  Coercion by Sergeant McDonald (Grounds Twelve and Thirteen)

In his twelfth and thirteenth grounds for relief, petitioner challenges the actions of

Sergeant McDonald when he arrived at petitioner's residence on October 9, 2005, as part of his

investigation into the disappearance of Christie Wilson.  Petitioner claims that Sergeant

McDonald coerced him into allowing the search of his vehicle and agreeing to be questioned at

the police station.  He also claims that his trial counsel rendered ineffective assistance in failing

to conduct an investigation into the events of October 9, 2005, and in failing to thoroughly

examine Sergeant McDonald with respect to these events at the preliminary hearing and at the

hearing on his motion to suppress evidence.  Petitioner's claims are set forth in the petition

before this court as follows:

> Ground Twelve
>
> Sergeant McDonald continued to demand that petitioner give a
> statement at the police station even though petitioner stated he
> would not unless an attorney was present; and when petitioner
> asked McDonald to leave his property, McDonald threaten [sic]
> petitioner with the taking of all four (4) of his vehicles in violation
> of his Fourth, Fifth, Sixth, and Fourteenth Amendments of the
> United States Constitution
>
> Ground Thirteen
>
> Petitioner's counsel were ineffective in failing to impeach Sergeant
> McDonald at preliminary hearing and evidentiary hearings on
> appellant's motion to suppress pursuant to Section 1538.5 by
> showing a pattern of deception, inconsistencies, and misstatements
> through prior testimony and evidence that counsel never introduced
> in violation to the assistance of counsel, as guaranteed by the Sixth
> and Fourteenth Amendments of the United States Constitution

(Pet. (Doc. No. 1) at 9.)

With respect to ground twelve, petitioner explains that when Sergeant McDonald

came to his residence on October 9, 2005, his questions "soon escalated into a series of demands,

that Petitioner go to the police station and give a statement that evening."  (Traverse at 90.)

Petitioner states that he told McDonald he could not go to the police station at that time because

he was having dinner with his family, but that he would be there the next day with an attorney.

59

(Id.)  McDonald "ignored Petitioner and continued to demand he go to the police station that evening."  (Id.)  According to petitioner, McDonald then stated that he "would take all [petitioner's] cars on the property if he did not consent to go to the police station."  (Id.) Petitioner told him to leave but Sergeant McDonald "refused to leave, ignored Petitioner, restated his threat to take all four (4) of Petitioner's vehicles on the property."  (Id. at 90-91.)  Petitioner then called his friend, civil attorney Patrick Little, who came to petitioner's residence to assist him.  (Id. at 91.)  Petitioner alleges that he agreed to take his car to the police station only after Sergeant McDonald "badgered" and threatened him and that he was therefore coerced to do so. (Id. at 93; see also Resp't's Lod. Doc. 9 at 21-22; Doc. No. 72 at 71-75.)

Petitioner alleges that Sergeant McDonald's actions, described above, "deprived Petitioner of liberty in a manner lacking fundamental fairness and offensive to the universal sense of fair play," and violated his right to be questioned with the assistance of the "attorney of his choice."  (Traverse at 89.)  Petitioner states that because McDonald insisted he go to the police station immediately, he was forced to proceed with a civil attorney who was not familiar with criminal law and who therefore "performed deficiently."  (Id. at 90-92.)  He claims that Sergeant McDonald's actions "crossed the line by shifting from its role of investigation to accusation in violation of the due process clause."  (Id. at 91.)

Petitioner argues that he was "in custody" during  Sergeant McDonald's visit to his residence on October 9, 2005, and that his right to counsel had therefore attached.  (Id. at 92.) He describes his claim as "the right of counsel did attach and McDonald failed to honor it when he did not leave Petitioner's property."  (Id. at 97.)  Petitioner also claims that his waiver of constitutional rights, in the form of agreeing to go to the police station with his vehicle, was not "knowing, intelligent, and voluntary."  (Id. at 93.)  He states that he was "badgered into submission."  (Id.)  Petitioner claims that this situation violated his rights under the Fifth, Sixth and Fourteenth Amendments.  (Id. at 94; see also Doc. No. 72 at 71-74.).

/////

In his traverse, petitioner explains that in his Claims Twelve and Thirteen, he is asserting "that he was denied effective assistance of counsel when his attorneys did not consult with him concerning facts of Sergeant McDonald's actions before Patrick R. Little arrived at his property and met with McDonald and failed to investigate any of those facts prior to motion to suppress hearings." (Traverse at 92.) He argues that his trial counsel failed "to litigate a Fourth, Fifth, Sixth, and Fourteenth Amendment claim effectively and competently, including counsel's failure to investigate the facts and be fully prepared for the motion to suppress proceedings in December of 2005." (Id. at 94.) Petitioner particularly challenges his trial counsels' failure to cross-examine Sergeant McDonald, Detective Pollock, and attorney Patrick Little at the hearing on his motion to suppress evidence. (Id. at 95.) Petitioner also explains that he "is asserting in Ground Thirteen a continuation of Ground Twelve with McDonald's conduct and actions at Petitioner's property . . . as it relates to defense counsel's failure to not pursue the inconsistent testimony given by Sergeant McDonald at the evidentiary hearing on Petitioner's motion to suppress." (Id.)

In support of this claim petitioner explains that he informed his trial counsel that: (1) he had invoked his right to counsel when Sergeant McDonald was at his house on October 9, 2005; (2) he told Sergeant McDonald he wanted a criminal attorney; and (3) he only called attorney Little "as a last resort and not the product of his free choice because McDonald would not leave his property even though he had told McDonald to leave his property." (Id. at 96.) Petitioner argues that his trial counsel should have used these facts to impeach Sergeant McDonald's testimony at the hearing on the motion to suppress. (Id.) Instead, according to petitioner, counsel "conducted no investigation" into petitioner's account of McDonald's actions at his property before attorney Little arrived at the scene. (Id.) Petitioner further explains:

> In sum, in Ground Twelve Petitioner asserted that the right of counsel did attach and McDonald failed to honor it when he did not leave Petitioner's property. This simply meant that McDonald could not prevent Petitioner from obtaining the assistance of a criminal attorney. And, here, Petitioner contends he had a right to

1

2

3

4

> a criminal attorney of his choice on October 9. [A]t the very least, McDonald had an affirmative obligation not to act in a manner that circumvented and diluted the protection afforded by the right to counsel of choice. Thus, defense counsel were ineffective in failing to impeach Sergeant McDonald at evidentiary hearing on motion to suppress.

5   (Id. at 97.)

6          Petitioner raised these claims for the first time in his petition for writ of habeas

7   corpus filed in the California Supreme Court on May 13, 2009. (Resp't's Lod. Doc. 9 at 20-29.)

8   That petition was summarily denied. (Resp't's Lod. Doc. 10.) Accordingly, this court will

9   conduct an independent review of the record to determine whether habeas corpus relief is

10  available under 28 U.S.C. § 2254(d) on Claims Twelve and Thirteen of the instant petition.

11  Stanley, 633 F.3d at 860.

12         To the extent petitioner is claiming his Fourth Amendment rights were violated in

13  connection with Sergeant McDonald's actions when he came to petitioner's property, or in the

14  search of petitioner's vehicle, his claim is not cognizable in this federal habeas corpus

15  proceeding. Stone, 428 U.S. at 494. A Fourth Amendment claim can only be litigated on federal

16  habeas where a petitioner demonstrates that the state courts did not provide an opportunity for

17  full and fair litigation of the claim; it is immaterial whether the petitioner actually litigated the

18  Fourth Amendment claim. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); Gordan

19  v. Duran, 895 F.2d 610, 613 (9th Cir. 1990). As explained above, petitioner received a hearing

20  before the trial court on his motion to suppress the evidence obtained from the search of his

21  vehicle. At that hearing, Sergeant McDonald and attorney Patrick Little both testified and were

22  cross-examined by petitioner's counsel. There is nothing before this court suggesting that

23  petitioner was not provided a full and fair opportunity to litigate in state court any Fourth

24  Amendment claims he wished to present. Accordingly, petitioner's Fourth Amendment claim is

25  barred in this federal habeas proceeding.

26  /////

1    Nor is petitioner entitled to relief on his claims that his Fifth and/or Sixth

2 Amendment right to counsel was violated by Sergeant McDonald's actions on October 9, 2005.

3 The Sixth Amendment right to counsel "does not attach until a prosecution is commenced, that

4 is, "'at or after the initiation of adversary judicial criminal proceedings – whether by way of

5 formal charge, preliminary hearing, indictment, information, or arraignment.'" McNeil v.

6 Wisconsin, 501 U.S. 171, 175 (1991) (citations omitted).  See also United States v. Gouveia, 467

7 U.S. 180, 187 (1984) ("a person's Sixth and Fourteenth Amendment right to counsel attaches

8 only at or after the time that adversary judicial proceedings have been initiated against him.").

9 This is because the Sixth Amendment right to counsel, by its terms, applies "in all criminal

10 prosecutions."  U.S. Const., Amd. VI.  The right "becomes applicable only when the

11 government's role shifts from investigation to accusation." Moran v. Burbine, 475 U.S. 412,

12 430-32 (1986) (the right to counsel attaches when "formal charges" have been initiated or when

13 "the government has committed itself to prosecute"); United States v. Hays, 231 F.3d 663, 671-

14 72 (9th Cir. 2000).[22]  When Sergeant McDonald arrived at petitioner's residence on October 9,

15 2005, he had just begun to investigate Wilson's disappearance.  Petitioner had not been formally

16 charged, nor had any judicial proceedings been initiated against him.  The state had not yet

17 committed to prosecuting petitioner for any crime.  Nor had the state shifted its role from that of

18 investigation to accusation, notwithstanding Sergeant McDonald's insistence that petitioner come

19 in for questioning.  In short, petitioner agreed to be questioned by police and to allow them to

20 search his car before any Sixth Amendment right to counsel attached.  Accordingly, the Sixth

21 Amendment did not bar the admission of the challenged evidence in this case.

22    The Fifth Amendment right to counsel attaches only upon custodial interrogation.

23 McNeil, 501 U.S. at 178-79; Edwards v. Arizona, 451 U.S. 477 (1981) (suspect who requests

24

----

25 [22] Similarly, under the California Constitution, "the constitutional right to counsel becomes applicable only when the government's role shifts from investigation to accusation . . . the defendant's right to the presence of an attorney during interrogation arises only after the first

26 formal charging proceeding." People v. Wheelock, 117 Cal. App.4th 561, 566, 567 (2004).

1   counsel during custodial interrogation is not subject to further interrogation until counsel is

2   provided); Miranda v. Arizona, 384 U.S. 436, 444-45 (1966); United States v. Hines, 963 F.2d

3   255, 256 (9th Cir. 1992) ("It is well established, however, that the Fifth Amendment right to

4   counsel under Miranda does not vest until a defendant is taken into custody").  Custodial

5   interrogation has been defined as "questioning initiated by law enforcement officers after a

6   person has been taken into custody or otherwise deprived of his freedom of action in any

7   significant way."  Miranda, 384 U.S. at 444.  See also Thompson v. Keohane, 516 U.S. 99, 108

8   (1995)  When Sergeant McDonald spoke with petitioner at his residence on October 9, 2005, and

9   even later at the police station, petitioner was not in custody.  There is no evidence before this

10  court that petitioner was handcuffed, placed under arrest, or deprived of his freedom of action in

11  any way.  In fact, petitioner was told he could leave at any time and he did in fact leave in the

12  middle of the interrogation.  Under these circumstances, petitioner's right to counsel had not

13  attached and his Fifth Amendment rights were not violated by Sergeant McDonald on October 9,

14  2005.

15          Petitioner also claims that his consent to be questioned and to turn over his

16  vehicle to be searched was coerced by Sergeant McDonald's conduct and demeanor.  When the

17  subject of a search is not in custody and the state attempts to justify a search on basis of his

18  consent, as was the case here, it must demonstrate that the consent was voluntarily given.

19  Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  See also United States v. Mendenhall,

20  446 U.S. 544, 557 (1980); United States v. Russell, 664 F.3d 1279, 1281 (9th Cir. 2012).

21  Voluntariness is a question of fact to be determined from the totality of the circumstances.

22  Schneckloth, 412 U.S. at 227; Pavao v. Pagay, 307 F.3d 915, 919 (9th Cir. 2002).  The Ninth

23  Circuit has stated:

24          We have identified five factors to be considered in determining the
            voluntariness of consent to search:  "(1) whether defendant was in
25          custody; (2) whether the arresting officers have their guns drawn;
            (3) whether Miranda warnings have been given; (4) whether the
26          defendant was told he has a right not to consent; and (5) whether

                                              64

1            defendant was told a search warrant could be obtained.  The fact
           that some of these factors are not established does not
2            automatically mean that consent was not voluntary."

3 Russell, 664 F.3d at 1281 (quoting United States v. Morning, 64 F.3d 531, 533 (9th Cir.1995) (in

4 turn quoting United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir.1988)).  The subject's

5 knowledge of his "right to refuse consent is one factor to be taken into account, the government

6 need not establish such knowledge as the *sine qua non* of an effective consent."  United States v.

7 Drayton, 536 U.S. 194, 206-07 (2002) (quoting Schneckloth, 412 U.S. at 227).  In making the

8 voluntariness determination, the "ultimate test" is whether the subject's "will has been overborne

9 and his capacity for self-determination critically impaired" and does not turn "on the presence or

10 absence of a single controlling criteria."  Schneckloth, 412 U.S. at 225-26.

11          Here, there is no evidence that petitioner's will was overborne or that his capacity

12 for self-determination was critically impaired when he consented to the search of his vehicle and

13 agreed to come to the police station for questioning.  It cannot reasonably be disputed that

14 petitioner was not arrested nor placed in custody and that Sergeant McDonald did not draw his

15 weapon or engage in any other show of force during his October 9, 2005 visit to petitioner's

16 property.  See Russell, 664 F.3d at 1281.  That petitioner was not given the Miranda warning is

17 not material here since petitioner was not under arrest at the time of his consent.  Id. (citing

18 United States v. Vongxay, 594 F.3d 1111, 1120 (9th Cir. 2010) (It would . . . make little sense to

19 require that Miranda warnings . . . be given by police before requesting consent.")  The record

20 reflects that petitioner was aware that he was not required to consent to the search of his car or to

21 the giving of a recorded statement at the sheriff's station since he was allowed by Sergeant

22 McDonald to delay the decision as to whether to consent until he had the opportunity to speak to

23 his friend, lawyer Patrick Little.  (RT at 43-45, 63, 82 & 84)  Petitioner's knowledge of his right

24 to refuse was further evidenced by the fact that he was advised that he was free to go at any time

25 and was allowed to terminate his recorded interview at the sheriff's station and leave.  (RT at 50-

26 51.)  Accordingly, consideration of this factor points to a free and voluntary consent.  Russell,

1  664 F.3d at 1281.  Finally, the record reflects that petitioner was not told that a search warrant for

2  his car could be obtained if he refused to consent.[23]  (RT at 66.)  Thus, this factor too indicates

3  voluntary consent.  <u>Russell</u>, 664 F.3d at 1281

4        Although petitioner no doubt felt some degree of pressure to comply with

5  Sergeant McDonald's requests, the record on the whole reflects that his decision appears to have

6  been "the product of an essentially free and unconstrained choice by its maker."  <u>Schneckloth</u>,

7  412 U.S. at 225.  As the California Court of Appeal found:

> The [trial] court's finding that defendant's consent to the seizure
> was voluntary is supported by substantial evidence.  McDonald
> testified that once Little arrived, defendant was willing to
> cooperate.  Although he could not recall the exact timing or words
> of his remark about taking all the cars, McDonald was certain it
> was an off-hand remark, not a threat.  Little agreed that defendant
> had nothing to hide and Little did not object to any actions taken by
> the sheriff's department.  Further, defendant went to the sheriff's
> office and gave a statement.  His actions were consistent with
> voluntary consent to seize the car.

14  (Opinion at 26.)  This court agrees with the conclusion of the California Court of Appeal in this

15  regard.  Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.

16        Petitioner's final allegation is that his trial counsel rendered ineffective assistance

17  in connection with their response to Sergeant McDonald's actions on October 9, 2005.  This

18  aspect of petitioner's ineffective assistance of counsel claim also lacks merit and should be

19  rejected.  First, petitioner's claim that his trial counsel failed to "pursue the inconsistent

20  testimony given by Sergeant McDonald at the evidentiary hearing on Petitioner's motion to

21  /////

---

[23]  The record also reflects that during the discussion of which of petitioner's cars he had
driven to the casino on October 5, 2005 and that the authorities therefore wanted to search,
Sergeant McDonald made a comment along the lines of "beats having to take them [petitioner's
cars] all."  (RT at 47, 68-69.)  Whether the statement was an off-hand remark upon petitioner's
designation of the Toyota as the desired car through his friend, attorney Little or a veiled threat,
may be the subject of some dispute between the parties.  In any event, the comment was not a
specific threat by authorities to obtain a warrant and does not change this court's assessment of
the voluntary nature of petitioner's consent.

suppress," (traverse at 95), is vague, conclusory, and unsupported by evidence or citations to the record and habeas relief should be denied on that basis.

Second, petitioner has failed to establish prejudice with respect to his claim that his trial counsel rendered ineffective assistance in connection with the motion to suppress evidence filed on his behalf. "[I]n order to show prejudice when a suppression issue provides the basis for an ineffectiveness claim, the petitioner must show that he would have prevailed on the suppression motion, and that there is a reasonable probability that the successful motion would have affected the outcome." Bailey v. Newland, 263 F.3d 1022, 1029 (9th Cir. 2001) (citing Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)). Petitioner has failed to make this showing. As explained above, petitioner was not entitled under the either the California or U.S. Constitutions to the assistance of "counsel of his choice" during the events at his house on October 9, 2005, because he was not in custody and his right to counsel had not attached at that time. Further, there is no evidence before this court that petitioner's will was overborne at the time he consented to go to the police station for questioning and to allow his vehicle to be searched. Accordingly, any arguments that petitioner's Fifth, Sixth, or Fourteenth Amendment rights were violated by Sergeant McDonald's actions on October 9 would have been meritless. Of course, as noted above, an attorney's failure to make a meritless objection or motion does not constitute ineffective assistance of counsel. Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing Boag, 769 F.2d at 1344). See also Rhoades v. Henry, 638 F.3d 1027, 1036 (9th Cir. 2011) (counsel did not render ineffective assistance in failing to investigate or raise an argument on appeal where "neither would have gone anywhere"); Matylinsky v. Budge, 577 F.3d 1083, 1094 (9th Cir. 2009) (counsel's failure to object to testimony on hearsay grounds not ineffective where objection would have been properly overruled), cert. denied, ___U.S.___, 130 S. Ct. 1154 (2010); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance").

/////

1      In any event, the conclusion of the state trial and appellate courts that petitioner

2  consented to the police interrogation and the search of his vehicle is fully supported by the record

3  in this case.  The arguments made by petitioner here in support of his Claims Twelve and

4  Thirteen would not have led to a different outcome on his motion to suppress evidence.  Further,

5  as noted by respondent, the search and seizure of petitioner's Toyota Camry, as well as the search

6  of his person and his home, were pursuant to a valid search warrant that was issued on October

7  10, 2005, on the basis of information that was not obtained during the events at petitioner's

8  residence on October 9, 2005.  (RT at 1561-62; CT at 386-91.)  Accordingly, petitioner's vehicle

9  would have been searched regardless of the consent he gave to Sergeant McDonald to search the

10  vehicle on October 9, 2005.

11      For the reasons set forth above, the state court decision rejecting the arguments

12  petitioner raises in his Claims Twelve and Thirteen is not contrary to or an unreasonable

13  application of federal law, nor is it based on an unreasonable determination of the facts of this

14  case.  Accordingly, petitioner is not entitled to federal habeas relief on these claims.

15      I.  Violation of Right to a Fair and Impartial Jury (Ground Fourteen)

16      In his fourteenth ground for relief, petitioner claims that his Sixth and Fourteenth

17  Amendment rights to a "fair and impartial jury" were violated when his trial was allowed to be

18  held in the Sacramento County venue, which had been exposed to "highly adverse" publicity

19  about his case.  (Doc. No. 1 at 9.)  He also claims that his trial counsel rendered ineffective

20  assistance in failing to move for a change of venue to "a more distant community not exposed to

21  prejudicial publicity."  (Id. at 12.)  In his traverse, petitioner appears to focus his argument

22  mainly on the ineffective assistance of counsel aspects of this claim.  (Traverse at 11.)

23      The state court record reflects that "upon request and motion of the defense . . .

24  and upon stipulation of the People," the trial court ordered that petitioner's trial venue would be

25  moved from Placer County to Sacramento County.  (CT at 354.)  There is no evidence in the

26  record before this court that petitioner's trial counsel, or petitioner, objected to this change of

68

venue.  To the contrary, it appears from the trial court's order that following discussions between the court and counsel, the defense specifically requested a change of venue to Sacramento County which the prosecution stipulated to.  (CT at 354-55.)  However, petitioner now argues that the Sacramento County venue was "too close" to Placer County where the crime allegedly occurred because both counties "are unified into one single mass media market."  (Doc. No. 1 at 12.)  He contends that his trial should have been held in a more distant location.  (Id.)

Petitioner argues that there was saturation media coverage of his case and that, for this reason, the jury pool was tainted and partial.  (Id. at 12-19.)  He also argues that the media coverage of his case was misleading and inflammatory.  (Id.)  He argues that the trial court "never implemented reasonable alternatives to reduce publicity."  (Id. at 14.)  Petitioner also complains that the trial court failed to prevent the Placer County Sheriff from releasing inflammatory information to the media during the course of his trial.  (Id. at 15-16.)  In his traverse, petitioner faults his trial counsel for failing to move for a new trial based on inflammatory statements made to the media during trial by Christie Wilson's family members and by an attorney hired by the Wilson family to file a civil lawsuit against petitioner.  (Traverse at 12-13.)  Petitioner argues, "it did not make any difference if the trial was held in Sacramento, Auburn or Folsom."  (Id. at 16.)  Petitioner summarizes his claims with respect to this issue as follows:

> . . . prejudice was compelled when the case generated extensive and nearly continuous publicity immediately after Christi Wilson's disappearance (before and after preliminary hearing and trial). Under these facts, the failure to change venue to a more distant community free of adverse publicity deprived petitioner of Due Process and a fair trial in violation of the Sixth and Fourteenth Amendments of the United States Constitution.  And, whether the court erred or defense counsel failed to asked [sic] the court to protect petitioner's right to a fair trial, the error affected petitioner's ability to obtain an impartial jury.

(Id. at 17.)

/////

1    Petitioner raised these claims for the first time in his second petition for a writ of

2   habeas corpus filed in the California Supreme Court on January 4, 2010.  (Resp't's Lod. Doc. 11

3   at 4-12.)  The Supreme Court denied that petition, stating as follows:  "The petition for writ of

4   habeas corpus is denied.  (See In re Robbins (1998) 18 Cal.4th 770, 780; In re Clark (1993) 5

5   Cal.4th 750.)."  (Resp't's Lod. Doc. 12.)  The Supreme Court's citation to In re Robbins and In re

6   Clark reflects that the habeas petition was denied because it was deemed untimely.  Walker v.

7   Martin, 562 U.S. ___, ___,131 S. Ct. 1120, 1126 (2011) ("A summary denial citing Clark and

8   Robbins means that the petition is rejected as untimely.").

9    Respondent argues that the California Supreme Court's citation to In re Robbins

10   and In re Clark in denying petitioner habeas relief constitutes a state procedural timeliness bar

11   which precludes this court from considering the merits of petitioner's claim challenging the

12   venue of his trial.  In his traverse, petitioner contests the adequacy of California's timeliness rule.

13   (Traverse at 20.)  Accordingly, the burden is on respondent to demonstrate the adequacy of the

14   procedural rule relied on by the California Supreme Court in denying relief as to this claim.

15   Bennett v. Mueller, 322 F.3 573, 586 (9th Cir. 2003).

16    State courts may decline to review a claim based on a procedural default.

17   Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977).  As a general rule, "[a] federal habeas court

18   will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state

19   law ground that is independent of the federal question and adequate to support the judgment."

20   Walker, 131 S. Ct. at 1127 (quoting Beard v. Kindler, 558 U.S. ___, ___, 130 S. Ct. 612, 615

21   (2009).  See also Maples v. Thomas, ___U.S.___, ___, 132 S. Ct. 912, 922 (2012); Greenway v.

22   Schriro, 653 F.3d 790, 797 (9th Cir. 2011); Calderon v. United States District Court (Bean), 96

23   F.3d 1126, 1129 (9th Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).

24   "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to

25   adjudication of the claim on the merits."  Martin, 131 S. Ct. at 1127.  In order for a state

26   procedural rule to be found independent, the state law basis for the decision must not be

70

1   interwoven with federal law.  Cooper v. Neven, 641 F.3d 322, 332 (9th Cir.), cert. denied

2   ___U.S.___, 132 S. Ct. 558 (2011); Bennett, 322 F.3d at 581; LaCrosse v. Kernan, 244 F.3d 702,

3   704 (9th Cir. 2001); Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000).  To be deemed

4   adequate, the rule must be well established and consistently applied.  Walker, 131 S. Ct. at 1128;

5   Beard 130 S. Ct. at 617; Greenway, 653 F.3d at 797-98; Poland v. Stewart, 169 F.3d 575, 577

6   (9th Cir. 1999).  Even if the state rule is independent and adequate, the claims may be reviewed

7   by the federal court if the petitioner can show:  (1) cause for the default and actual prejudice as a

8   result of the alleged violation of federal law; or (2) that failure to consider the claims will result

9   in a fundamental miscarriage of justice.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000);

10   Coleman, 501 U.S. at 749-50; see also Maples, 132 S. Ct. at 922.

11          As noted above, the United States Supreme Court recently held that denial of

12   habeas relief by the California Supreme Court on the grounds that the application for relief was

13   not timely filed is an independent and adequate state procedural ground requiring denial of a

14   subsequent habeas petition in federal court.  Martin, 131 S. Ct. 1120.[24]  See also Alvarez v.

15   Wong, No. 09-15547, 425 Fed. Appx. 652, at *1 (9th Cir. Apr. 5, 2011) (affirming dismissal of a

16   habeas petition, recognizing the holding in Walker that "denial of habeas relief by the California

17   Supreme Court on the ground that the application . . . was filed untimely was an independent and

18   adequate state procedural ground requiring denial of subsequent habeas petitions in federal court"

19   and that a citation to In re Clark "signals the court's conclusion that the petition was untimely.")[25]

20   The Supreme Court noted, however, that "federal courts must carefully examine state procedural

21   requirements to ensure that they do not operate to discriminate against claims of federal rights."

22   Martin, 131 S. Ct. at 1130.

23

24          [24]  In Martin, a non-capital case, the state habeas petition in question had been denied by
     the California Supreme Court with citations to In re Clark and In re Robbins, as was the case
     here.  131 S. Ct. at 1127.

25

26          [25]  Citation to this unpublished decision is appropriate pursuant to Ninth Circuit Rule 36-
     3(b).

1    In this case, the California Supreme Court's citation to In re Clark, and In re

2 Robbins signals that petitioner's habeas petition was untimely.  Martin, 131 S. Ct. at 1122.

3 There is no evidence in the record that the timeliness bar was imposed in this case by the

4 California Supreme Court in an attempt to discriminate against petitioner's claims of a violation

5 of his federal rights or that it was imposed in an unfair manner.  There is also no basis for

6 concluding that the imposition of California's timeliness rule here operated to "the particular

7 disadvantage of petitioners asserting federal rights."  Martin, 131 S. Ct. at 1131.  See also

8 Kindler, 130 S. Ct. at 620 (Kennedy, J., concurring) (a state procedural ground would be

9 inadequate if the challenger shows a "purpose or pattern to evade constitutional guarantees").

10 Because California's timeliness rule is a valid procedural ground for precluding federal review of

11 petitioner's claim of improper venue, this court may only reach the merits of the claim if

12 petitioner were to show cause and prejudice or that this court's failure to consider the claim will

13 result in a fundamental miscarriage of justice.

14    "[T]he existence of cause for a procedural default must ordinarily turn on whether

15 the prisoner can show that some objective factor external to the defense impeded . . . efforts to

16 comply with the state's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986).  See also

17 Coleman, 501 U.S. at 753 ("cause" under the cause and prejudice test must be something

18 external to the petitioner that cannot be fairly attributed to him); Smith v. Baldwin, 510 F.3d

19 1127, 1146 (9th Cir. 2007) ("In order to establish cause for a procedural default, a petitioner must

20 demonstrate that the default is due to an external objective factor that 'cannot fairly be attributed

21 to him.'")  "To establish prejudice resulting from a procedural default, a habeas petitioner bears

22 'the burden of showing not merely that the errors at his trial constituted a possibility of prejudice,

23 but that they worked to his actual and substantial disadvantage, infecting his entire trial with

24 errors of constitutional dimension.'"  White v. Lewis, 874 F.2d 599, 603 (9th Cir. 1989) (citing

25 United States v. Frady, 456 U.S. 152, 170 (1982)).  See also Cooper, 641 F.3d at 327.  To show

26 that a failure to consider the merits of a claim would result in a fundamental miscarriage of

1   justice, a petitioner must establish factual innocence.  See Smith v. Murray, 477 U.S. 527, 537

2   (1986); Smith, 510 F.3d at 1139-40; Gandarela v. Johnson, 286 F.3d 1080, 1085–86 (9th Cir.

3   2002); Wildman v. Johnson, 261 F.3d 832, 842–43 (9th Cir. 2001).  The burden of establishing

4   cause and prejudice or a fundamental miscarriage of justice always rests with the petitioner.

5   Coleman, 501 U.S. at 750; White, 874 F.2d at 603.

6           Petitioner argues that he has demonstrated cause and prejudice for his failure to

7   raise his venue claim earlier.  (Traverse at 14-29.)  He contends that all of his state habeas

8   petitions were filed "properly and timely" and that he was "pursuing his rights diligently."  (Id. at

9   14, 21-22, 23.)  Petitioner states that the first habeas petition he filed in the California Supreme

10  Court was filed in haste "because his petition for review was pending and Petitioner needed to

11  give the Court an opportunity to have the totality of the surrounding circumstances be presented

12  to the Court."  (Id. at 15.)  He further explains that he intended to amend that petition to add the

13  claims that he later raised in the second habeas petition he filed in the California Supreme Court,

14  including his claim of improper venue.  (Id. at 25.)  However, according to petitioner, he was

15  unable to file his motion to amend because he was assaulted by two inmates on September 17,

16  2009 and had to spend several months in the hospital and then in protective custody.  Petitioner

17  further explains that some of his legal documents were missing after he was transferred to

18  another prison following his time in protective custody, and that he was not allowed sufficient

19  time in the prison law library at any of his institutions of confinement.  (Id. at 16-17, 24.)

20  Petitioner argues that "his lack of access to the law library and incapacitation from having been

21  assaulted and stabbed multiple times are extraordinary circumstances beyond his control" that

22  prevented him from raising his improper venue claim in the first habeas petition he filed in the

23  California Supreme Court, and forced him to file a second habeas petition in that court to assert

24  those claims.  (Id. at 24-25.)

25          Even assuming the truth of all of petitioner's many allegations in this regard, he

26  fails to explain why he did not pursue his improper venue claim on direct appeal, in his habeas

1   petitions filed in the Placer County Superior Court and California Court of Appeal, or in the first

2   habeas petition he filed in the California Supreme Court.  All of these petitions were filed before

3   petitioner was allegedly assaulted in prison and temporarily lost some of his legal records.  It is

4   true, as petitioner argues, that he raised his claim of improper venue shortly after his petition for

5   writ of certiorari was denied by the United States Supreme Court, and that all of his state habeas

6   petitions were filed during or shortly after his state appellate proceedings were concluded.

7   However, petitioner's claims regarding the venue of his trial, including his trial counsel's actions

8   with regard to the change of venue to Sacramento County, were known to him from the time he

9   was charged with the murder or shortly thereafter.  In short, petitioner has failed to demonstrate

10  that any objective factor impeded him from pursuing his improper venue claims in a timely

11  manner.

12          Petitioner also appears to argue in his traverse that the allegations contained in his

13  first habeas petition filed in the California Supreme Court essentially served to put that court on

14  notice of the claims contained in the second habeas petition he filed in that court, by virtue of his

15  allegations concerning the ineffective assistance of trial counsel.  (Traverse at 25-26.)  Petitioner

16  explains that his first habeas petition contained "'a pattern of facts' that clearly implicated

17  specific Constitutional violations during his trial as raised in [his venue claim]."  (Id. at 26.)  Put

18  another way, petitioner states that "when [he] alerted the State courts to the Federal nature of his

19  IAC claims . . . he fairly stated the substance of his IAC claims as well for Grounds Fourteen

20  through Seventeen [contained in the instant petition]."  (Id.)

21          Again, this argument ignores the fact that petitioner has not explained his failure

22  to include these claims in his earlier petitions for relief filed in state court.  In any event,

23  assuming arguendo that the above-described arguments have some relevance to whether

24  petitioner's venue claim was timely filed in state court, this court has compared the two habeas

25  petitions filed by petitioner in the California Supreme Court and finds that petitioner's claim

26  regarding the venue of his trial was not set forth in the first such habeas petition.  Accordingly,

74

the California Supreme Court was not put on notice of petitioner's improper venue claim by way of his first habeas petition filed in that court.

Finally, petitioner claims that this court's failure to consider his challenge to the venue of his trial will result in a fundamental miscarriage of justice because he "actually innocent" of the crimes. (Id. at 27.) A petitioner may establish a procedural gateway permitting review of defaulted claims if he demonstrates "actual innocence." Gandarela, 286 F.3d at 1085 (citing Schlup v. Delo, 513 U.S. 298, 327 (1995)). See also Smith, 510 F.3d at 1139. "[I]f a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claim." Schlup, 513 U.S. at 316. The term "actual innocence" means factual innocence, not merely legal insufficiency. Bousley v. United States, 523 U.S. 614, 623-24 (1998); Gandarela, 286 F.3d at 1087. "[A] colorable showing amounts to establishing that it is more likely than not that no reasonable juror would have convicted the petitioner in the light of the new evidence." Paradis v. Arave, 130 F.3d 385, 396 (9th Cir.1997) (citation omitted). See also Smith, 510 F.3d at 1140 ("In order to pass through the actual innocence procedural gateway of Schlup, Smith must show that, in light of all available evidence, it is more likely than not that no reasonable juror would convict him of the relevant crime.") "This standard is not easy to meet," Gandarela, 286 F.3d at 1086, and is "very narrow." Sawyer v. Whitley, 505 U.S. 333, 341 (1992). While petitioner has pointed to evidence which supported his defense, that evidence is not sufficient to make it more likely than not that no reasonable juror could convict him of Wilson's murder. He has come forward with no evidence rebutting the strong evidence of his guilt which included his interaction with Wilson inside the casino, the video depicting him and Wilson leaving the casino together, evidence of Wilson's hair in petitioner's car door handle and her DNA and blood in his car, petitioner's own injuries which were indicative of a struggle and /////

his actions thereafter reflecting his consciousness of guilt.  Petitioner has therefore failed to meet the exacting standard for passage through the actual innocence procedural gateway.

In short, petitioner has failed to make an adequate showing of cause and prejudice or that this court's failure to consider his improper venue claim will result in a fundamental miscarriage of justice.  Accordingly, his improper venue claims are procedurally defaulted and barred from federal habeas review.

J.  Ineffective Assistance of Counsel

1.  Ground Eleven

In his eleventh ground for relief, petitioner claims that his trial counsel "were ineffective in that they failed to conduct a reasonable pretrial investigation, failed to identify and interview witnesses, failed to hire experts per legal fees (of $200,000.00) paid to counsel, and failed to prepare for trial."  (Doc. No. 1 at 8.)[26]  In the traverse, petitioner explains that "it is defense counsel's failure to: (a) investigate, (b) hire experts, (c) mount a complete defense that includes kidnapping, and (d) prepare for trial that is assailed here, rather than informed tactical decisions made in the wake of a reasonably thorough investigation."  (Traverse at 71.) Petitioner states that his essential claim is that his trial counsel "failed to subject the prosecution's case to meaningful adversarial testing."  (Id. at 77.)

These claims were raised for the first time in petitioner's habeas petition filed in the California Supreme Court on May 13, 2009, and which was summarily denied.  (Resp't's Lod. Doc. 9, 10.)  Accordingly, this court must independently review the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860.

In addition to his overarching claim that his trial counsel provided ineffective assistance in failing to effectively counter the prosecution's case, petitioner complains about the

---

[26]  Petitioner was represented jointly by more than one attorney during the proceedings and his claims of ineffective assistance of counsel appear to be directed at all of his counsel. Accordingly, the court will refer to petitioner's counsel in the plural herein.

following fifteen specific alleged deficiencies in his attorneys' performance: (1) failure to conduct any pretrial investigation to attempt to substantiate William Pence's testimony that he saw Christie Wilson in Folsom after her disappearance from the casino; (2) failure to adequately prepare for trial because they believed petitioner would be "going home," in light of the fact that Wilson was seen by Pence in Folsom after her disappearance; (3) failure to present expert testimony with regard to whether Wilson's hair found in his car could have been planted there by the police; (4) the failure to present expert testimony regarding Wilson's history of mental illness and her problems retaining a job and with gambling; (5) failure to present expert testimony explaining how the scratches on Burlando's body compared to the scratches on petitioner's body; (6) the failure to present expert testimony regarding whether, and to what extent, Burlando's drug use contributed to his violent behavior towards Wilson; (7) failure to investigate and present evidence that petitioner's car was parked in the casino parking lot in a location where it would have been impossible for him to forcibly subdue Wilson without being seen by others; (8) the failure to present expert testimony refuting the testimony of Sprint Nextel Manager Moises Lopez that after petitioner left the casino he traveled from north to south on Highway 49 at approximately 7:51 a.m., and to establish that there was a car accident on that same morning that caused petitioner to avoid Highway 49 on his way to work; (9) failure to introduce testimony establishing that petitioner was not alone when he went to the Auburn Disposal Center (trash dump) on October 9, 2005, but that he was accompanied by his son and another person, and that there was nothing unusual about the garbage he disposed of that day; (10) the failure to obtain expert testimony explaining the significance of the fact that the DNA of two criminalists was also found in the samples they were analyzing in this case and whether this could indicate that the

/////

/////

/////

/////

77

DNA results introduced into evidence at his trial were inaccurate;[27] (11) failure to introduce

testimony explaining whether there was any secondary DNA transfer to petitioner's car by virtue

of the fact that his car and Wilson's car were parked next to each other in the Placer County

Sheriff's Department yard and that petitioner's vehicle was processed by "multiple forensic

technician criminalists;" (12) the failure to obtain a handwriting expert to establish that an

incriminating sentence contained in a note written by petitioner to another jail inmate was forged

by the other inmate; (13) failure to elicit testimony regarding petitioner's "state of mind"

immediately after Wilson's disappearance, in order to "negate the element of malice necessary

for murder;" (14) the failure to introduce testimony that petitioner was not required to be at work,

or to report to his supervisor, on the day after Wilson's disappearance, in order to refute the trial

testimony of Janet Wilde; and (15) the failure to present testimony from the person who sold

petitioner his Camry in 2005 to establish that the trunk carpet or liner that was missing from the

Camry may have been stolen before petitioner bought the car.  (Resp't's Lod. Doc. 9 at 9-14.)

Petitioner also complains that he and his wife paid his trial counsel a significant sum "for these

experts that never testified for the defense, for these investigators that could have followed up on

above factors or leads, which could have led to evidence and witnesses . . . that could have

refuted many of the shifting theories and wild speculation presented at trial by the prosecution."

(Id. at 14.)  Petitioner argues that "it was the duty of petitioner's counsel to conduct a prompt

investigation and explore all avenues leading to facts."  (Id.)

       In connection with Claims One and Two of the instant petition, petitioner also

contends that his trial counsel were ineffective in failing to introduce evidence challenging the

prosecution's evidence, and/or to establish petitioner's innocence.  (Traverse at 44, 46.)  There,

petitioner clams that his counsels' "failure to hire experts to refute the prosecutions' eighty four

---

[27]  As respondent explains, criminalist Shawn Kacer's own DNA was found in one of the
ten or twelve cuttings of a shirt that he analyzed, and, in two instances criminalist Angelynn
Moore's own DNA was found in "the extract or samples or the product" during mitochondrial
DNA testing.  (RT at 3439-41, 3689-90.)

1    (84) witnesses contributed to the outcome of the verdict, especially when the prosecution

2    repeatedly and continuously impressed the jurors for seven (7) weeks with laymen and expert

3    testimony that was fueled by speculation and unadulterated conjecture while defense counsel

4    only presented four (4) witnesses, including appellant himself in only two and a half days in the

5    final eighth (8th) week of the trial." (Id. at 46.)

6            In his traverse, petitioner explains that he has "diligently tried to obtain"

7    declarations from potential witnesses but that his wife and children are afraid to do so because

8    his wife's "case and probation" might be affected by any such action.[28] (Id. at 75.)  Petitioner

9    also contends that his friend, attorney Patrick Little, is afraid that if he signs a declaration in

10   support of petitioner's claims for habeas relief he will be arrested and charged with a crime, as

11   happened to petitioner's wife.  (Id.)  Petitioner informs the court, however, that his wife and sons

12   would corroborate his alibi defense if they were called to testify under oath at any evidentiary

13   hearing.  (Id.)  Petitioner states that his trial counsel were aware of this potential alibi testimony

14   by his wife and sons, but failed to present it at his trial.  (Id. at 76.)  Petitioner also summarizes

15   the statements that he believes several witnesses would have put into declarations if they had

16   provided one.  (Id.)  Finally, petitioner complains that his counsel "hired not a single expert to

17   refute any of the prosecution's experts."  (Id.)

18           The Sixth Amendment guarantees the effective assistance of counsel.  The United

19   States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

20   Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

21   counsel, a petitioner must first show that, considering all the circumstances, counsel's

22

23        [28] According to news accounts referred to by petitioner, in December of 2007, following
     his trial, petitioner's wife was charged in federal court with wire fraud and money laundering in
24   connection with her refinancing of their home which was reportedly undertaken in order to obtain
     funds for petitioner's defense.  (Doc. No. 71 at 70.)  This court's own records establish that such
25   a criminal complaint was filed in this court on December 11, 2007.  See Case No. 2:07-MJ-383
     EFB, Doc. 1.  Court records also establish that petitioner's wife entered a deferred prosecution
26   agreement, all terms of which she satisfied resulting in the dismissal of all charges against her on
     November 22, 2010.  Id., Doc. Nos. 54 & 58.

                                                      79

1    performance fell below an objective standard of reasonableness.  466 U.S. at 687-88.  After a

2    petitioner identifies the acts or omissions that are alleged not to have been the result of

3    reasonable professional judgment, the court must determine whether, in light of all the

4    circumstances, the identified acts or omissions were outside the wide range of professionally

5    competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a

6    petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland,

7    466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for

8    counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

9    694.  A reasonable probability is "a probability sufficient to undermine confidence in the

10   outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981

11   (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

12   deficient before examining the prejudice suffered by the defendant as a result of the alleged

13   deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

14   sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955

15   (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

16          Defense counsel has a "duty to make reasonable investigations or to make a

17   reasonable decision that makes particular investigations unnecessary."  Mickey v. Ayers, 606

18   F.3d 1223, 1237 (9th Cir. 2010) (quoting Strickland, 466 U.S. at 691).  "This includes a duty to .

19   . . investigate and introduce into evidence records that demonstrate factual innocence, or that

20   raise sufficient doubt on that question to undermine confidence in the verdict."  Bragg v. Galaza,

21   242 F.3d 1082, 1088 (9th Cir. 2001), amended by 253 F.3d 1150 (9th Cir. 2001) (citing Hart v.

22   Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)).  In this regard, it has been recognized that "the

23   adversarial process will not function normally unless the defense team has done a proper

24   investigation."  Siripongs v. Calderon (Siripongs II), 133 F.3d 732, 734 (9th Cir. 1998) (citing

25   Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)).  Therefore, counsel must, "at a minimum,

26   conduct a reasonable investigation enabling him to make informed decisions about how best to

80

1  represent his client." Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting

2  Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations omitted).

3  See also Porter v. McCollum, 558 U.S. 30, ___, 130 S. Ct. 447, 453 (2009) (counsel's failure to

4  take "even the first step of interviewing witnesses or requesting records" and ignoring "pertinent

5  avenues for investigation of which he should have been aware" constituted deficient

6  performance).  On the other hand, where an attorney has consciously decided not to conduct

7  further investigation because of reasonable tactical evaluations, his or her performance is not

8  constitutionally deficient.  See Siripongs II, 133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170,

9  1173 (9th Cir. 1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  See also Bobby v. Van

10  Hook, 558 U.S. 4, ___, 130 S. Ct. 13, 19 (2009) (failure to unearth cumulative mitigating

11  evidence where their investigation had produced sufficient mitigating evidence was not deficient

12  performance by counsel).  "A decision not to investigate thus 'must be directly assessed for

13  reasonableness in all the circumstances.'"  Wiggins, 539 U.S. at 533 (quoting Strickland, 466

14  U.S. at 691).  See also Kimmelman, 477 U.S. at 385  (counsel "neither investigated, nor made a

15  reasonable decision not to investigate"); Babbitt, 151 F.3d at 1173-74.

16        A reviewing court must "examine the reasonableness of counsel's conduct 'as of

17  the time of counsel's conduct.'"  United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990)

18  (quoting Strickland, 466 U.S. at 690).  Furthermore, "'ineffective assistance claims based on a

19  duty to investigate must be considered in light of the strength of the government's case.'"  Bragg,

20  242 F.3d at 1088 (quoting Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).  See

21  also Rhoades v. Henry, 611 F.3d 1133, 1142 (9th Cir. 2010).  In assessing an ineffective

22  assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls

23  within the 'wide range of professional assistance.'"  Kimmelman, 477 U.S. at 381 (quoting

24  Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

25  acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

26  695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Here, petitioner has failed to adequately allege or establish either deficient performance or prejudice with respect to his many claims of ineffective assistance of counsel. Petitioner's conclusory allegations that further investigation, or the hiring of various experts, would have resulted in a different verdict in his case are clearly insufficient to establish either deficient performance or prejudice.  See Jones, 66 F.3d at 205 ("conclusory suggestions" and "bald assertions" fall short of stating an ineffective assistance of counsel claim and do not entitle the petitioner to an evidentiary hearing).  Likewise, a general assertion that further investigation by counsel may have uncovered exculpatory evidence is insufficient to establish prejudice. Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997) (petitioner's ineffective assistance claim denied where he presented no evidence concerning what counsel would have found had he investigated further, or what lengthier preparation would have accomplished).  Simply speculating, or stating, that further investigation would have led to evidence that could have led to a different verdict does not establish prejudice.  Bible v. Ryan, 571 F.3d 860, 871 (9th Cir. 2009); Gonzalez v. Knowles, 515 F.3d 1006, 1015-16 (9th Cir. 2008) ("Such speculation is plainly insufficient to establish prejudice.")  Petitioner has presented no evidence that his counsels' failure, if any, to conduct investigation into all of the areas he has now suggested was objectively unreasonable.  See Strickland, 466 U.S. at 691 ("Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.")[29]

Although petitioner complains that his trial counsel failed to call witnesses, including expert witnesses, at his trial, petitioner has not identified any experts who would have testified in his favor nor has he presented any evidence as to what any particular witness would

---

[29]  In addition, there is no evidence before this that petitioner's counsel did not conduct investigation into the areas now suggested by petitioner and simply conclude that those areas were not fruitful.  Of course, "counsel need not undertake exhaustive witness investigation." Matylinsky v. Budge, 577 F.3d 1083, 1092 (9th Cir. 2009).  See also Mickey, 606 F.3d at 1237 ("At the same time, of course, counsel need not investigate interminably.")

have testified to which would have aided his defense.  See Bragg, 242 F.3d at 1088 (petitioner

failed to establish prejudice where he did "nothing more than speculate that, if interviewed," the

witness would have given helpful information); Wildman, 261 F.3d at 839 (speculating as to

what expert witness would say is not enough to establish prejudice); Dows v. Wood, 211 F.3d

480, 486-87 (2000) (no ineffective assistance of counsel for failure to call witnesses where

petitioner did not identify an actual witness, provide evidence that the witness would testify, or

present an affidavit from the alleged witness); Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir.

1997) (same); United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective

assistance because of counsel's failure to call a witness where, among other things, there was no

evidence in the record that the witness would testify); United States v. Berry, 814 F.2d 1406,

1409 (9th Cir. 1987) (appellant failed to meet prejudice prong of ineffectiveness claim because

he offered no indication of what potential witnesses would have testified to or how their

testimony might have changed the outcome of the hearing).  Petitioner's own opinion as to what

potential witnesses would have said is insufficient for this purpose.  Without any evidence that

specific witnesses would have testified in a manner that might have led to a different result at his

trial, petitioner's bare allegations are insufficient to support his claims in this regard.  Finally,

petitioner's claim that his trial counsel completely failed to investigate and present an adequate

defense is not supported by the record.  Rather, the state court record before this court makes

clear that petitioner's counsel were familiar with the facts of the case, contested the prosecution

case against petitioner aggressively and employed a reasonable defense strategy.[30]

---

[30]  The prosecution's witnesses, particularly those relating to the DNA and other forensic evidence (RT 3193-3162; 3244-3256, 3262-64; 3290-3297, 3337-3348; 3510-3624, 3642-3647; 3684-3691), were subject to extensive and vigorous cross-examination by defense counsel.  In the defense case, counsel presented the following:  testimony from one of petitioner's sons refuting the prosecution claim that petitioner had removed the mats from the trunk of his car following the killing (RT at 3761-81); testimony from a friend of petitioner's supporting his contention that he had in fact contracted poison oak working on his property near the time of the victim's disappearance (RT 3784-89); testimony from William Pence that he had encountered a young woman he believed to be Christie Wilson on the street in Folsom the day following

1    In sum, petitioner's claims of ineffective assistance of counsel raised in Claim

2    Eleven are conclusory, lack support, and fail to demonstrate that petitioner suffered prejudice as a

3    result of the performance of his trial counsel.  The decision of the California Supreme Court

4    rejecting these claims is not contrary to or an unreasonable application of Strickland.

5    Accordingly, petitioner is not entitled to federal habeas relief.

6    2.  Ground Fifteen

7    In his fifteenth ground for relief, petitioner claims that

8    legal binders containing police reports, witness statements,
     counsel's notes, and prepared questions were missing from the
9    courtroom at a critical time in midtrial due to counsel David
     Dratman's 10-day emergency absence.  This, coupled with the
10   toxic working relationship and the inability of trial counsel to set
     aside their differences, was fatal to the defense of [petitioner] and
11   contributed greatly to the ineffective cross-examination of
     prosecution's lay and expert (94) witnesses."

12

13   (Pet. (Doc. No. 1) at 18.)  In this regard, petitioner explains that his trial counsel David Dratman

14   had to leave the trial for a short period of time because of a family medical emergency, and that

15   he took certain defense files with him.  (Id.)  Petitioner alleges that his co-counsel, Ron Peters,

16   tried to obtain these defense files during attorney Dratman's absence but was unable to do so.

17   (Id. at 18-19.)  Petitioner claims that Mr. Peters improperly continued forward with the trial at

18   that point even though he did not have the missing files.  (Id.)  Petitioner explains that when

19   attorney Dratman returned to the trial, the relationship between himself and Peters was "toxic."

20   (Id. at 19.)  Petitioner contends that if his trial counsel had been more cooperative with each

21   other, they would have more effectively objected to the prosecution's cross-examination of

22   defense witness William Pence, would have elicited testimony that "Wilson was seen alive some

23   _____

24   Wilson's disappearance and that the young lady was looking for Thunder Valley Casino,
     indicating that she had had too much to drink the night before and had left her car in the casino
     parking lot (RT 3795-3839); and the testimony of petitioner himself in which he denied having
25   committed the crimes of which he was accused (RT at 3844-3987).  Finally, in closing argument
     to the jury defense counsel raised many of the attacks on the prosecution's case suggested by
26   petitioner in these habeas proceedings.  (See RT 4213- 4273.)

13-hours after she had been seen at the casino[31]," would have requested a continuance of trial in order to obtain the files in attorney Dratman's possession, and would have hired and presented expert testimony. (Id. at 20.)

Petitioner raised these claims for the first time in his second petition for a writ of habeas corpus filed in the California Supreme Court, dated January 4, 2010. (Resp't's Lod. Doc. 11 at 4-12.) As discussed extensively above, the California Supreme Court denied that petition with citations to In re Robbins and In re Clark. For the reasons explained above in connection with petitioner's Claim Fourteen, the denial of habeas relief by the California Supreme Court on the grounds that petitioner's application for relief was not timely filed is an independent and adequate state procedural ground barring review of this claim in these federal habeas proceedings. Martin, 131 S. Ct. 1120. Accordingly, the court will not reach the merits of this aspect of petitioner's ineffective assistance of trial counsel claim.

3. Ground Sixteen

In his sixteenth ground for relief, petitioner claims that his trial attorneys rendered ineffective assistance in failing to investigate the facts surrounding petitioner's conviction for possession of a deadly or dangerous weapon. (Pet. (Doc. No. 1) at 22-24; Traverse at 111-112.) He explains that he informed his trial counsel that his son, a minor, purchased the weapon (a baton) from a person named Mr. Lopez at a martial arts school without his parents' consent and that it probably fell out of his son's sports bag while it was in the trunk of petitioner's car. (Id.) Petitioner states that the baton was a "replica of a real police or correctional officer's baton" and that it is not illegal because "it is less than half the size, the length, and the weight." (Pet. (Doc. No. 1) at 23.) Petitioner claims that he did not know the baton was in his car. He also claims that he informed his trial counsel of these facts but that his counsel failed to interview Mr. Lopez

---

[31] The record reflects that defense counsel did in fact elicit such testimony from witness Pence at petitioner's trial. (RT 3794-3806 ;3839-41.) In the end, many of petitioner's arguments including this one simply reflect his disagreement with the jury's verdict based upon the evidence and argument presented to them.

or to investigate his son's purchase of the baton.  (Id.)  Petitioner argues that his counsel should

have visited Mr. Lopez and/or the martial arts school "to determine whether [Lopez] might serve

as a suitable witness."  (Id. at 24.)  He alleges that his trial counsel "failed to demonstrate that

petitioner was factually innocent because the baton was his son's, found in the trunk of the car,

and unknown to petitioner because it had been accidentally dropped out and into the trunk of the

car upon the transportation of his son from home to his high school, soccer practice, and/or the

martial arts school."  (Id.)

Petitioner raised this claim for the first time in his second petition for a writ of

habeas corpus filed in the California Supreme Court, dated January 4, 2010.  (Resp't's Lod. Doc.

11 at 4-12.)  As set forth above, the Supreme Court denied that petition with citations to In re

Robbins and In re Clark.  Again, for the reasons set forth above, the denial of habeas relief by the

California Supreme Court on the grounds that petitioner's application for relief was not timely

filed is an independent and adequate state procedural ground barring consideration of this claim

on federal habeas review.  Martin, 131 S. Ct. 1120.  Accordingly, the court will also not reach the

merits of this aspect of petitioner's ineffective assistance of trial counsel claim.

### 4.  Ground Seventeen

In his seventeenth ground for relief, petitioner claims that his trial counsel

rendered ineffective assistance in failing to create and present a chart, similar to the chart

presented to the jury by the prosecutor, which would have demonstrated petitioner's innocence of

the charged crimes.  (Doc. No. 21 at 25-31; Traverse at 112-13.)  In this regard petitioner

explains:

> "If the prosecutor was allowed by the trial court to prepare exhibit
> 288 (a chart) in front of the jury, then trial counsel could and
> should have prepared a similar exhibit or summaries that
> corroborated petitioner's defense.  However, whether in error,
> mistaken belief, or constitutional error trial counsel concentrated
> his efforts in launching objections when the prosecution offered
> exhibit 288 into evidence as argumentative, misleading, irrelevant,
> inflammatory and in violation of evidence code section 352; and
> that it excluded exculpatory evidence."  Trial counsel went on to

1    object that "it was a trial by charts."  Thus, if the Appellate Court is
     constitutionally correct in their opinion, that the trial court did not
2    abuse its discretion in admitting exhibit 288, then trial counsel was
     deficient and provided ineffective assistance of counsel in his
3    failure to prepare exhibits with exculpatory evidence and/or to
     rebut the prosecution's evidence in exhibit 288.
4

5    (Pet. (Doc. No. 1) at 25.)[32]

6            Petitioner raised this claim as well for the first time in his second petition for a

7    writ of habeas corpus filed in the California Supreme Court, dated January 4, 2010.  (Resp't's

8    Lod. Doc. 11 at 4-12.)  As set forth above, the Supreme Court denied that petition with citations

9    to In re Robbins and In re Clark.  For the reasons set forth above, the denial of habeas relief by

10   the California Supreme Court on the grounds that petitioner's application for relief was not

11   timely filed is an independent and adequate state procedural ground barring consideration of this

12   claim on federal habeas review.  Martin, 131 S. Ct. 1120.  Accordingly, the court will also not

13   reach the merits of this aspect of petitioner's ineffective assistance of trial counsel claim.

14   /////

15   /////

16   _____

17        [32]  The summary chart used by the prosecution at petitioner's trial was described by the
     California Court of Appeal as follows:
18
           Exhibit 288 consists of a large poster board showing in calendar
19         form two weeks of October 2005, the 2d through the 15th.  As
           witnesses testified, the prosecutor would place a small summary of
20         their testimony on the appropriate date.  The summaries were
           placed on three transparent overlays according to the person or
21         entity whose activities were described.  Exhibit 288A summarized
           Wilson's activities; exhibit 288B was for law enforcement and
22         exhibit 288C for defendant.  The net effect was a timeline showing
           the activities of the major players in the case over the critical time
23         period.

24   (Resp't's Lod. Doc. 1 at 46.)  The California Court of Appeal concluded that the summary chart,
     Exhibit 288, was properly admitted into evidence by the trial court.  (Id. at 47-48)  The state
25   appellate court observed that "nothing in the record, however, indicates defendant was precluded
     from preparing his own exhibit summarizing, in a timeline, testimony favorable to the defense."
26   (Id. at 48.)

K.  Cumulative Error (Ground Nineteen)

In his nineteenth ground for relief, petitioner claims that "the combined effect of instructional errors, the prejudice from multiple evidentiary errors, and the cumulative impact of multiple deficiencies in defense counsel's performance and conduct requires reversal."  (Pet. (Doc. No. 1) at 10.)  Respondent argues that this claim should be rejected on the grounds that petitioner failed to exhaust it in state court.  (Doc. No. 31 at 115.)

Generally, a state prisoner must exhaust all available state court remedies either on direct appeal or through collateral proceedings before a federal court may consider granting habeas corpus relief.  28 U.S.C. § 2254(b)(1).  A state prisoner satisfies the exhaustion requirement by fairly presenting his claim to the appropriate state courts at all appellate stages afforded under state law.  Baldwin v. Reese, 541 U.S. 27, 29 (2004); Casey v. Moore, 386 F.3d 896, 915-16 (9th Cir. 2004).  However, an application for a writ of habeas corpus "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).  See Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable").  Pursuant to 28 U.S.C. § 2254(b)(2), this court will deny petitioner's unexhausted claim that the cumulative effect of all the errors at his trial violated his federal constitutional rights.

The Ninth Circuit has concluded that under clearly established United States Supreme Court precedent, the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)).  See also Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) (if no error of constitutional magnitude occurred at trial, "no cumulative prejudice is possible").  "The fundamental question in determining whether the combined effect of trial errors violated a

88

1    defendant's due process rights is whether the errors rendered the criminal defense 'far less

2    persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or

3    influence' on the jury's verdict." Parle, 505 F.3d at 927 (quoting Brecht, 507 U.S. at 637).

4            Above, this court has addressed each of petitioner's claims raised in the petition

5    seeking federal habeas relief and has concluded that no error of constitutional magnitude

6    occurred at petitioner's trial. This court also concludes that the many errors alleged by petitioner,

7    even when considered together, did not render his defense "far less persuasive," nor did they

8    have a "substantial and injurious effect or influence on the jury's verdict." See Parle, 505 F.3d

9    at 927. Accordingly, petitioner is not entitled to federal habeas relief with respect to his claim

10    of cumulative error.

11    III. Request for Evidentiary Hearing

12            Petitioner has requested an evidentiary hearing on many of the claims set forth in

13    the pending habeas corpus petition. (See Traverse at 118-19; see also Doc. No. 106.)

14            Pursuant to 28 U.S.C. § 2254(e)(2), an evidentiary hearing is appropriate under

15    the following circumstances:

16        (e)(2) If the applicant has failed to develop the factual basis of a
17        claim in State court proceedings, the court shall not hold an
           evidentiary hearing on the claim unless the applicant shows that-

18            (A) the claim relies on-

19            (i) a new rule of constitutional law, made retroactive to cases on
20            collateral review by the Supreme Court, that was previously
           unavailable; or

21            (ii) a factual predicate that could not have been previously
           discovered through the exercise of due diligence; and
22

23            (B) the facts underlying the claim would be sufficient to establish
           by clear and convincing evidence that but for constitutional error,
           no reasonable fact finder would have found the applicant guilty of
24            the underlying offense[.]

25            Under this statutory scheme, a district court presented with a request for an

26    evidentiary hearing must first determine whether a factual basis exists in the record to support a

1  petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate."  Baja v.

2  Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).  See also Earp v. Ornoski, 431 F.3d 1158, 1166

3  (9th Cir. 2005); Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005).  A petitioner

4  requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim

5  for relief."  Earp, 431 F.3d at 1167 (citing Insyxiengmay, 403 F.3d at 670, Stankewitz v.

6  Woodford, 365 F.3d 706, 708 (9th Cir. 2004) and Phillips v. Woodford, 267 F.3d 966, 973 (9th

7  Cir. 2001)).  To show that a claim is "colorable," a petitioner is "required to allege specific facts

8  which, if true, would entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998)

9  (internal quotation marks and citation omitted).[33]

10        The court concludes that no additional factual supplementation is necessary in this

11  case and that an evidentiary hearing is not appropriate with respect to the claims raised in the

12  instant petition.  For the reasons described in the analysis undertaken above, the facts alleged in

13  support of petitioner's claims, even if established at a hearing, would not entitle him to federal

14  habeas relief.  Further, petitioner has not identified any concrete and material factual conflict in

15  need of resolution that would require this court to hold an evidentiary hearing.  Therefore,

16  petitioner's request for an evidentiary hearing should be denied.

17                    MOTIONS FOR LEAVE TO CONDUCT DISCOVERY

18  I.  Motion for Leave to Conduct Discovery filed April 14, 2011

19        On April 14, 2011, petitioner filed a motion seeking leave to conduct discovery.

20  Therein, he asserts that the evidence he seeks to discover will provide support for his Claims Six,

21  /////

22  /////

23

24        [33]  The court also notes that the Supreme Court has recently held that federal habeas
    review to determine whether relief is permitted under 28 U.S.C. §  2254(d)(1) "is limited to the
25  record that was before the state court that adjudicated the claim on the merits" and "that evidence
    introduced in federal court has no bearing on" review under § 2254(d)(1).  Cullen v. Pinholster,
26  563 U.S. ___, ___, 131 S. Ct. 1388, 1398, 1400 (2011).

Nine, and Eleven through Seventeen of the pending petition.[34]  (Doc. No. 59 at 2.)  Petitioner

explains that he is requesting this discovery because his trial counsel failed to conduct a thorough

investigation into the charges against him even though his wife paid "substantial amounts of

money for his defense."  (Id.)  Petitioner specifically faults his trial counsel for failing to obtain

forensic experts to test the prosecution's evidence, including the bloodstain and hair evidence

found in petitioner's car; and for failing to "go to the crime scene or have an investigator testify

about the crime scene." (Id. at 5.)  Petitioner explains that his trial counsel told both him and his

wife that expert witnesses would be obtained, but later "inexplicably counsel decided not to do

so." (Id. at 7.)  Petitioner argues that the discovery he now seeks leave to conduct will also

support his claims that is he innocent and that incriminating blood and hair evidence introduced

at his trial was in fact planted in his car by the police.  (Id. at 4.)

            In his motion, petitioner makes thirteen discovery requests, which concern "the

decision to file charges, results of any investigation conducted, and laboratory notes by [six lab

personnel]."  (Id. at 3 and 9-34.)  Petitioner also requests discovery of his medical file at the

Placer County Jail and the results of any tests conducted on two blood draws "taken from

Petitioner at the County Jail under the guise of a blood test."[35]  (Id. at 3, 8.)  Moreover, petitioner

seeks leave to take the depositions of three of his defense counsel and his friend, attorney Patrick

Little, concerning "(1) legal fees obtained and paid to counsel by Petitioner's wife, (2) nature of

---

[34]  To review, in his sixth ground for relief, petitioner argues that the trial court violated his right to due process by allowing Sergeant McDonald to testify regarding the details of his investigation into Wilson's disappearance.  In Claim Nine, petitioner argues that the evidence introduced at his trial was insufficient to support his conviction for first degree felony murder based on a kidnapping.  In his Claims Eleven, Fifteen, Sixteen, and Seventeen, petitioner argues that his trial counsel rendered ineffective assistance.  In his Claims Twelve and Thirteen, petitioner challenges the actions of Sergeant McDonald during his visit at petitioner's residence on October 9, 2005, as part of his investigation into Wilson's disappearance.  In his Claim Fourteen, petitioner challenges whether Sacramento County was a proper venue for his trial.

[35]  Petitioner asserts that his vehicle "was processed and re-examined multiple times and nothing was ever found until after petitioner's blood had been drawn, not just once, but twice in less than a 30-day period." (Id. at 8.)

1   defense strategy selected, (3) Expert resources considered and selected to support defense

2   strategy, (4) steps taken in preparation for trial, and (5) purpose and content of meeting

3   discussions held with Petitioner's wife, civil attorney Patrick R. Little, and counsel Ron Peters

4   concerning request for and purpose of legal fees." (Id.)  Finally, in his motion petitioner

5   "reserves the right to seek leave of court for further Discovery prior to an evidentiary hearing."

6   (Id.)

7          Petitioner's specific requests for discovery set forth in his motion are the

8   following:

9   **Request No. 1A:**  Petitioner requests an order that he be allowed to "view and examine" all of

10  his medical and laboratory records while he was housed at the Placer County Jail in 2005 and

11  2006, including the results of all tests and examinations, and the "name, address and telephone

12  number" of all persons who scheduled his appointments, performed tests, and reviewed the test

13  results, and any person "who was involved in the chain-of-custody" of any blood draw.  (Id. at 9.)

14  **Request No. 1B:**  Petitioner requests an order that he be allowed to "view, examine, and conduct

15  laboratory tests" on all bloodstain evidence found in his vehicle for the purpose of determining

16  "the presence and/or contamination of any preservative used in collection vials (to include EDTA

17  or anticoagulant chemical reagent)." (Id.)

18  **Request No. 1C:**  In this "request," petitioner asks that any testing be conducted by a laboratory

19  "mutually agreed upon by the Attorney General and Petitioner's appointed counsel," or by the

20  court if the parties cannot agree on a laboratory.  (Id. at 9-10.)  Further, petitioner requests that

21  the results of any testing be disclosed to "Petitioner's counsel and the Attorney General."  (Id. at

22  9.)  Petitioner explains that he is requesting the above-described discovery because the results

23  "would raise a reasonable probability that, in light of all the evidence, petitioner's verdict and

24  sentence would have been more favorable if the results of the bloodstain(s') testing had been

25  made available at the time of trial."  (Id. at 10.)  Petitioner states that new testing would "yield a

26  /////

1  reasonable probability of [contradicting] prior test results conducted by the DOJ at the direction

2  of the prosecution." (Id.)

3  **Request No. 2A:**  Petitioner requests the opportunity to view and examine his vehicle for

4  evidence to test the prosecution's assertion at trial that the vehicle was driven to a "remote

5  location." (Id. at 11.)  He requests that any "mud or dirt" found on the vehicle be "tested for its

6  origin." (Id.)  Petitioner argues that this evidence would "yield a reasonable probability" of

7  contradicting the prosecutor's theory that he drove the victim to a remote location north of

8  Auburn and dumped her body there.  He states that he was "never North of Auburn on the week

9  of Wilson's disappearance." (Id.)  He argues that the evidence would support his claim that his

10  trial counsel improperly failed to investigate his case.  (Id.)

11  **Request No. 3A:**  Petitioner states that the prosecutor consulted a blood stain expert (Brian

12  Kennedy) who opined that the amount of blood found in petitioner's car was insufficient to

13  identify any type of blood pattern, thereby contradicting the testimony of the forensic experts

14  who testified for the prosecution at trial that the stains were "spattered" and "not the result of

15  transfer." (Id. at 12-13.)  Petitioner requests that his "court appointed counsel" be allowed to

16  interview Mr. Kennedy and that Kennedy be permitted to "testify before this Court" about his

17  statements to the prosecutor.  (Id. at 13.)  Petitioner believes the results of an interview with Mr.

18  Kennedy would support his claim that his trial counsel improperly failed to call expert witnesses

19  to refute the prosecution's expert testimony, and would also support petitioner's contention that

20  the bloodstains found on his vehicle were "planted." (Id. at 14.)

21  **Request No. 4A**:  Petitioner requests the opportunity to view and examine the Thunder Valley

22  Casino video surveillance tapes, and requests that a forensic video analyst provide an

23  independent analysis of those tapes.  (Id. at 15.)  He argues that this discovery is necessary

24  because the California Court of Appeal did not accurately depict in its opinion what is seen on

25  the videotapes admitted into evidence at his trial and ignored other important factors discernible

26  from the videotape.  (Id. at 16.)  Petitioner contends that this evidence would support his claims

1   that his trial counsel were ineffective in failing to hire a forensic expert and that he is innocent of

2   the charges upon which he was convicted.  (Id.)

3   **Request No. 5A:**  Petitioner requests an order allowing his "court appointed counsel" to

4   interview defense witness William Pence.  (Id. at 17.)  He also requests an order requiring Pence

5   testify before "this Court" about his encounter in Folsom with the woman he thought was

6   Christie Wilson, and about whether Pence was intimidated or threatened by the prosecutor's

7   investigators prior to his testimony for the defense at petitioner's trial.  (Id.)   Petitioner argues

8   that this discovery would support his proposed new habeas claim that the prosecutor committed

9   misconduct by both intimidating Pence and by making misstatements in his closing argument.

10   (Id. at 18-20.)[36]

11   **Request No. 6A:**  Petitioner requests an order allowing him to view and examine all reports and

12   notes written by DNA analyst Shawn Kacer, and an order allowing him to conduct laboratory

13   tests on all bloodstain evidence found in the back seat of his Toyota Camry.  (Id. at 21.)  He also

14   requests a "reverification" of "all frequencies for the major and minor contributors" to these

15   bloodstains.  (Id.)  Petitioner argues that this evidence could support his theory that the

16   bloodstain evidence was planted in his vehicle by the police, as evidenced by the fact that "the

17   _____

18   [36]   The court notes that on May 14, 2012, petitioner filed with the court a declaration
    signed by William Pence, dated April 25, 2012.  Therein, Mr. Pence explains the circumstances
19   surrounding his trial testimony in the instant case.  In particular, he states that:  (1) the poor
    quality of the picture of Christie Wilson contained in the photographic lineup he was asked to
20   view by Placer County Sheriff detectives was "definitely a factor" in his inability to "identify the
    victim of this crime;" (2) he believes "that every attempt was made to make sure I did not choose
21   Christie Wilson from that photo lineup;" (3) when he thereafter contacted Sergeant McDonald a
    second time after seeing Christie Wilson's photograph on the Internet to tell him how confident
22   he was that he had seen Christie Wilson, he was told "not to worry about it;" (4) although he
    provided Sergeant McDonald his business card with all of his contact information listed, when a
23   defense investigator contacted him many months later he told Pence that he had been looking for
    him for some time because the only accurate information provided to the defense by the
24   prosecution was his last name; (5) while he will "never know for sure," he "strongly suspect[s]
    that had [he] been shown a truly representative photo of Christie Wilson, the outcome may have
25   been drastically different;" and (6) the prosecutor at petitioner's trial was allowed to cross-
    examine him about a DUI he received nine months after "sighting the person who I believed to
26   be Christie Wilson" and that this attempt to impeach his testimony caused him "immense stress."
    (Doc. No. 100).

1  mixed stains in the back seat were discovered after the car had been in law enforcement custody

2  for several months and had been examined several times for stain evidence" and the fact that

3  some of the samples were contaminated by the blood of the laboratory technicians.  (Id. at 21-

4  22.)  Petitioner also argues that this requested discovery could support his proposed new habeas

5  claim that the prosecutor committed misconduct when he "misrepresented the DNA evidence and

6  its frequencies in closing argument" to the jury and his claim contained in the instant petition that

7  his trial counsel rendered ineffective assistance in failing to rebut the testimony of the

8  prosecution's expert witnesses.  (Id. at 22-23.)

9  **Request No. 7A:**  Petitioner requests an order allowing him to view ledgers from the Auburn

10  Dump and to interview the employee who interacted with him and his son when petitioner

11  dumped his trash there on October 9, 2005.  (Id. at 25.)  Petitioner states that this evidence is

12  necessary to contradict the prosecutor's claim that he went to the dump by himself to get rid of

13  incriminating evidence and/or Wilson's body.  (Id.)

14  **Request No. 8A:**  Petitioner requests an opportunity to view and examine the California Highway

15  Patrol traffic accident report for October 5, 2005, in order to refute the prosecution's theory that

16  petitioner traveled south on Highway 49 on his way home after he dumped Wilson's body.  (Id.

17  at 26.)  Petitioner states the CHP report would show that there was a traffic accident on Highway

18  49 on the morning of October 5, 2005, that forced him to avoid Highway 49.  (Id.)

19  **Request No. 9A:**  Petitioner requests an opportunity to view the original note allegedly written

20  by him to another inmate at the Placer County Jail and to have the note inspected by a

21  handwriting expert.  (Id. at 27.)  Petitioner argues that this evidence will show that an

22  incriminating sentence contained in this note was not written by petitioner but was in fact forged

23  by the other inmate.  (Id.)  He contends that this evidence would counter the prosecutor's

24  argument that petitioner wrote this incriminating sentence, and would support his claim that his

25  trial counsel rendered ineffective assistance in failing to have the note analyzed by a handwriting

26  expert.  (Id. at 27-28.)

**Request No. 10A:** Petitioner requests an order allowing him to view and examine all medical records and photographs pertaining to his facial injuries in early October of 2005 "and that a dermatologist provide an independent and unbias[ed] medical analysis of Petitioner's injuries." (Id. at 28.)  Petitioner argues that this evidence would support his claim that his trial counsel rendered ineffective assistance in failing to hire a dermatologist to compare petitioner's injuries with the injuries that Daniel Burlando suffered after a fight with Wilson in March, 2005.  (Id. at 29.)  He contends that the discovery sought would counter the prosecutor's argument that his injuries were caused when Wilson scratched him during a fight.  (Id.)

**Request No. 11A:**  Petitioner requests the opportunity to view and examine his car door, the hair that was allegedly found on the car door, "and that a subject-matter expert examine and provide an independent and unbias[ed] analysis of this evidence; and more specifically environmental factors affecting hair and physic position of hair on door handle."  (Id.)  Petitioner notes that one of the witnesses at his trial testified that the placement of this hair in the door handle of his vehicle was unusual in that it was "wrapped around in a loop inside the door handle's mechanism."  (Id.)  Petitioner states that he drove his vehicle on numerous occasions between October 5, 2005, the day of Wilson's disappearance, and October 9, 2005, the day he took the car to the police station to be searched, and that "there is no reason what-so-ever for this one hair to be wrapped around the door handle unless it was deliberately planted by a third party connected to this case and with access to the Placer County Evidence Yard."  (Id. at 30.)  Petitioner argues that if his trial counsel had hired a "subject-matter expert" and if the expert had testified at his trial, "it would have yield[ed] a reasonable probability of contradicting the prosecution's claims." (Id.)

**Request No. 12A:** Petitioner requests the opportunity to view and examine all cell phone data for his cell phone, in an attempt to demonstrate that he was not on Highway 49, north of his residence, at any time during the week of October 3 to October 9, 2005.  (Id. at 31.)  He also requests that a "cell phone subject matter expert" examine and analyze the cell phone data.  He

96

1   argues that this evidence would counter the evidence introduced by the prosecution which

2   indicated that he drove from north to south on Highway 49 toward his residence early in the

3   morning on October 5, 2009.  Petitioner also argues that this evidence would support his claim

4   that his trial counsel rendered ineffective assistance in failing to hire an expert on cell phone data

5   to prove that petitioner was not driving south on Highway 49 on the morning of Wilson's

6   disappearance.  (Id. at 31-32.)

7   **Request 13A:** Petitioner requests a court order allowing him to interview two secretaries in the

8   office of his defense counsel, the trial court's "bailiffs, clerk and reporter," a civil attorney named

9   Nina Ashford, and "all witnesses who may be called to testify at an evidentiary hearing, and any

10  and all persons who were present outside of the courtroom when prejudicial statements were

11  made by attorney Nina Ashford and Wilson's family members."  (Id. at 33.)  Petitioner argues

12  that this evidence would allow him to demonstrate that his trial counsel rendered ineffective

13  assistance.  He states that "this will not be a fishing expedition since Petitioner has alleged

14  serious constitutional violations that can be corroborated by witnesses."  (Id.)  More specifically,

15  petitioner explains that he needs "crucial facts [or] declarations from the very persons who can

16  assert that defense binders were missing for several days during trial; from the person who can

17  assert that she (legal assistant named Jackie) was instructed to call attorney David Dratman in an

18  effort to get defense binders back to the courtroom; from civil attorney who assisted Petitioner

19  and his wife obtain all the funds to pay for his legal fees, hire experts, and prepare for trial; from

20  defense attorneys who asked for and received substantial amounts of money to prepare a defense

21  and hire experts; and from [experts] who can rebut and contradict the prosecution's own

22  experts."  (Id. at 34.)

23          In summary, petitioner argues that he requires all of the discovery requested in his

24  motion in order to prove his allegations that his trial attorneys rendered ineffective assistance.

25  Petitioner argues that he would not have been convicted of the murder "if his defense team had

26  done only what was required to do under the Sixth and Fourteenth Amendments of the Unites

1   States Constitution." (Id. at 35.)  Petitioner contends that he has made credible allegations of

2   constitutional violations and that the requested discovery would enable him to investigate and

3   prove his claims. (Id.)

4          Citing the Supreme Court's recent decision in Pinholster, 131 S. Ct. at 1398,

5   respondent argues that to the extent petitioner's discovery requests pertain to claims that were

6   adjudicated on the merits in state court, discovery is not warranted because, under to 28 U.S.C. §

7   2254(d)(1), federal review of habeas claims is limited to the record that was before the state court

8   at the time of its adjudication.  (Doc. No. 63 at 7-8.)  Citing 28 U.S.C. § 2254(e)(2), respondent

9   also argues that, to the extent petitioner's discovery request pertains to claims that were not

10  previously adjudicated on the merits in state court, discovery should be denied because petitioner

11  failed to develop in state court the facts he now seeks to discover.  (Id. at 8-9.)  Finally,

12  respondent argues that all of petitioner's discovery requests fail on the merits because they are

13  not supported by good cause.  (Id. at 10-31.)

14         A habeas petitioner is not entitled to discovery as a matter of course, but only

15  upon a fact-specific showing of good cause and in the court's exercise of discretion.  Rule 6(a),

16  Rules Governing § 2254 Cases; Bracy v. Gramley, 520 U.S. 899 (1997); Harris v. Nelson, 394

17  U.S. 286 (1969); Rich v. Calderon, 187 F.3d 1064, 1068 (9th Cir. 1999) (discovery is available

18  "only in the discretion of the court and for good cause"); Jones v. Wood, 114 F.3d 1002, 1009

19  (9th Cir. 1997).  The burden of demonstrating the materiality of the information requested is on

20  the moving party.  Stanford v. Parker, 266 F.3d 442, 461 (6th Cir. 2001) (citing Murphy v.

21  Johnson, 205 F.3d 809, 813–15 (5th Cir. 2000)).  "Bald assertions and conclusory allegations do

22  not provide sufficient ground to warrant requiring the state to respond to discovery or require an

23  evidentiary hearing."  Parker, 266 F.3d at 460.  Good cause exists "where specific allegations

24  before the court show reason to believe that the petitioner may, if the facts are fully developed, be

25  able to demonstrate that he is entitled to relief.  Bracy, 520 U.S. at 908–09.

26  /////

1    This court will deny petitioner's discovery motion in its entirety because

2    petitioner has failed to demonstrate good cause for the extensive discovery that he seeks.  First,

3    to the extent that petitioner's requests for discovery are directed to claims Fourteen, Fifteen,

4    Sixteen, and Seventeen, those claims are subject to a procedural default and are not properly

5    before this court on federal habeas review.  Similarly, to the extent petitioner requests discovery

6    in order to support new habeas claims, not presented in the petition pending before this court, his

7    motions to amend the instant petition to add these new claims were denied.  (Doc. No. 82.)

8    Accordingly, obtaining discovery in support of those new claims would be a futile exercise.

9    Second, to the extent petitioner seeks to interview potential lay or expert witnesses, he has failed

10   to support his requests with the required specificity.  Petitioner has not identified any witnesses

11   who would have testified in his favor and he has not presented any evidence as to what any

12   witness would have testified to which would have aided the defense.  Nor has petitioner

13   explained why the discovery that he now seeks is any different from the discovery that was

14   available to him in state court.  It is entirely possible that petitioner's trial counsel conducted the

15   same investigation that petitioner now seeks to undertake through his discovery motion and

16   found it unproductive, or decided that the discovery was not material to the defense.  Indeed,

17   petitioner states with respect to several of his discovery requests that he asked his trial counsel to

18   investigate these matters or that his counsel was aware of certain witnesses.  (See e.g., Doc. No.

19   71 at 18, 24, 26.)

20   Petitioner is essentially seeking to now interview various persons on the off

21   chance that they will provide helpful information.  In short it is clear that petitioner wants to start

22   over and re-investigate the case against him from the beginning.  The habeas discovery rules do

23   not permit such a wide ranging exercise, nor do they allow a petitioner to investigate his entire

24   case anew after he has been convicted.  Habeas petitioners may not seek to use discovery as a

25   "fishing expedition . . . to explore their case in search of its existence." Rich, 187 F.3d at 1067

26   (quoting Calderon v. U.S.D.C. (Nicolaus), 98 F.3d 1102, 1106 (9th Cir. 1996)).  See also Kemp

v. Ryan, 638 F.3d 1245, 1260 (9th Cir. 2011) (same).  Similarly, "good cause for discovery

cannot arise from mere speculation" and "discovery cannot be ordered on the basis of pure

hypothesis."  Arthur v. Allen, 459 F.3d 1310, 1311 (11th Cir. 2006).

          Finally, and most important, this court has concluded that none of petitioner's

habeas claims lack merit.  Petitioner has not convinced the court that his requested discovery

would entitle him to federal habeas relief on any claim.  Nor has petitioner demonstrated a

"reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is

confined illegally and is therefore entitled to relief."  Harris v. Nelson, 394 U.S. 286, 300 (1969).

In short, there is no good cause to conduct further discovery with respect to petitioner's various

habeas claims at this time.[37]  Petitioner's motion seeking leave to conduct discovery will

therefore be denied.

II.  Notice of Newly Discovered Evidence

          On March 12, 2012, petitioner filed a document entitled "Notice of Newly

Discovered Evidence."  (Doc. No. 90.)  Therein, petitioner explains that he recently received a

large package of trial documents from one of the attorneys who defended him at trial.  (Id. at 1.)

---

[37] Because petitioner's discovery motion fails on its merits, the court will not address
respondent's argument that the recent decision in Pinholster precludes the granting of discovery.
However, the undersigned notes that the decision in Pinholster is not necessarily controlling with
regard to the availability of discovery in habeas cases.  In Pinholster the Supreme Court
addressed the question of whether a district court can consider new evidence when assessing
whether a state court's decision was "contrary to, or involved an unreasonable application of,
clearly established Federal law" under 28 U.S.C. § 2254(d)(1).  The decision in Pinholster does
not mention discovery in the habeas context , nor does it reference the Supreme Court's own
decision in Bracy or Rule 6 of the Rules Governing Section 2254 Cases, upon which the
Supreme Court relied in reaching its decision to grant discovery.  See, e.g., Conway v. Houk, No.
07–cv–947, 2011 WL 2119373 (S.D.Ohio  May 26, 2011) (noting that "Pinholster did not . . .
alter or even speak to the standards governing discovery set forth in [Rule 6] and Bracy v.
Gramley" and finding that omission "reason enough to refrain from invoking Pinholster's
restrictions at the discovery phase").  In addition, the court in Pinholster addressed only 28
U.S.C. § 2254(d)(1).  Therefore, the decision in Pinholster may not be controlling where, as here,
a petitioner pursues a writ of habeas corpus on other theories in addition to § 2254(d)(1).  See
e.g., Nicolas v. Morgan, No. RDB-06-2637, 2012 WL 254848 (D. Md. Jan. 25, 2012); Quezada
v. Brown, No. 08-CV-5088 (KAM), 2011 WL 4975343, *2 (E.D.N.Y. Oct. 19, 2011); Conway v.
Houk, No. 2:07-cv-947 (S.D. Ohio May 26, 2011).  For these reasons, the decision in Pinholster
may have no bearing on the availability of discovery in a federal habeas proceeding.

1   Petitioner describes the documents he received as "part of a larger set in the trial binders his

2   defense counsel prepared for his trial in 2006," and he explains that "these are the file binders

3   which contained discovery, police reports, and witnesses' statements that were missing at trial."

4   (Id. & n.1.)  Petitioner states that within this set of documents he discovered a memorandum

5   from Jill Spriggs, a California Department of Justice Assistant Bureau Chief for the Bureau of

6   Forensic Services, to Garen Horst, the lead prosecutor at petitioner's trial, which details the

7   resignation from the Justice Department of criminalist Tom Sutliff, who apparently was involved

8   in performing investigative services in petitioner's case.  The memo describes an error made by

9   Mr. Sutliff on a "proficiency test" and Sutliff's subsequent resignation from the California

10  Department of Justice.[38]

11          The memorandum from Ms. Spriggs to Mr. Horst explains that:

12          during the technical review of Criminalist Sutliff's notes, the
            technical reviewer noticed a discrepancy between the date the
13          proficiency samples were sampled/extracted and the date the
            photos were taken of the evidence.

14
            Criminalist Sutliff documented that he started his proficiency test
15          the afternoon of April 20, 2006.  The DNA extraction notes were
            dated April 20, 2006 through April 21, 2006, since this was an
16          overnight extraction.  However, in checking the file creation date
            on the CD containing the digital photographs of the evidence, the
17          date of the photographs indicated that the evidence was still intact
            on April 21, 2006.  The extraction of the evidence could not have
18          begun on April 20, 2006, as the samples were still intact as
            indicated by the file creation date of the photographs.
19
            In discussions with Criminalist Sutliff, he indicated he did in fact
20          start the DNA extraction on April 21, 2006 and the dates on his
            DNA extraction sheets were in error.  Criminalist Sutliff was
21          relieved of casework on May 5, 2006 pending corrective action.
            During the corrective action process, Criminalist Sutliff was denied
22  /////

23  /////

24  _____

25      [38]  According to testimony given at petitioner's trial, a proficiency test is administered to
    all criminalists once a year in order to ensure the criminalist is "still doing things right."  (RT at
    3043.)  Such proficiency testing is "part of the quality assurance program" and is "unrelated to
26  any actual casework."  (Doc. 90 at 8.)

1    a merit raise based on the issue at hand and voluntarily resigned
     from state service on July 6, 2006.
2

3    (Id. at 8.)

4          Petitioner argues that this memorandum "demands a full review, further

5    discovery, and requires production of all documents associated with lab records of DNA, blood,

6    and hair evidence; and of all related testing and experiments conducted." (Id. at 1.)  Petitioner

7    contends that further discovery with respect to the memorandum will support his claims that his

8    trial counsel rendered ineffective assistance in failing to adequately investigate his case, that the

9    evidence admitted at trial was insufficient to support his conviction for murder, and that he was

10   denied the right to a fair and impartial jury because of the venue in which his trial was held.  (Id.

11   at 2.)  He argues that further investigation would also support his argument that the hair and

12   bloodstain found in his Toyota Camry were planted there by law enforcement, and would

13   impeach the testimony of Department of Justice criminalists to the effect that the forensic results

14   of tests on the bloodstain could not exclude petitioner or Christie Wilson as the source.  (Id. at 4.)

15   Finally, petitioner argues that further investigation into the circumstances described by the

16   memorandum would have supported his argument that Department of Justice senior criminalist

17   Ricci R. Cooksey, who testified at his trial, made "exaggerated claims" and "lied about the test

18   results."  (Id.)

19         Petitioner also states that this "newly discovered evidence" lends support to the

20   arguments set forth in his April 14, 2011 motion for leave to conduct discovery, discussed

21   immediately above.  (Id.)  He argues that the "misconduct" by "one criminalist at the Department

22   of Justice" raises "a reasonable probability that the verdict would have been more favorable if his

23   defense counsel had acted upon the misconduct reported," especially in light of evidence that

24   "there had been two documented cases of DNA contamination" and that "no evidence had been

25   found after two thorough examinations of the Toyota Camry and that mysteriously a blood-stain

26   appeared in the back seat of the car after his client's blood was drawn two different times in a 30-

day period." (Id.) Petitioner argues that it is "unfathomable" that his trial counsel did not "undertake a more thorough investigation into such crucial aspect of the misconduct reported in this memorandum." (Id. at 2-3.)

In his motion, petitioner seeks production of the following documents:

(1) All documents and notes electronically stored (and in paper) that were not filed in this matter and that pertains to the misconduct reported by Jill Spriggs in his [sic] memorandum to Garen Horst dated September 29, 2006.

(2) All documents and notes electronically stored (and in paper) that criminalist Tom Sutliff wrote, handled, and/or reported that would show activity on the computer(s) used and evidence handled by Tom Sutliff in this case.

(Id. at 3.) Petitioner also "seeks to subpoena" and to "interview" Tom Sutliff, Jill Spriggs, Ricci Cooksey, and Brian Kennedy, who "directly examined evidence and offered opinions concerning hair and DNA (bloodstains)." (Id. at 6.) Petitioner argues that "the information these actors have will support Petitioner's claims of misconduct and tampering of the evidence."

Respondent opposes petitioner's notice of newly discovered evidence, which respondent construes as another motion seeking leave to conduct discovery. As in his response to petitioner's April 14, 2011 motion seeking discovery, respondent argues that petitioner's request for discovery here is precluded by the decision in Pinholster, that petitioner is not entitled to discovery because he failed to develop in state court the facts he now seeks to discover, and that petitioner's discovery requests fail on the merits because they are not supported by good cause. (Doc. No. 92 at 2-3.)

Petitioner filed a reply to respondent's opposition, along with numerous additional exhibits, on May 2, 2011. (Doc. Nos. 96, 97.) On that same date, he also filed a motion to strike "conclusions with speculative phrasing" allegedly contained in respondent's opposition to this discovery motion. (Doc. No. 95.) Therein, petitioner objects to respondent's characterization of the DNA/blood evidence presented at his trial, specifically the meaning and significance of the testimony of California Department of Justice senior criminalist Shawn Kacer. The undersigned

1    has reviewed the state court record in this case.  Respondent's arguments regarding the testimony

2    presented at trial has been taken by the court as merely the argument of a party.  Moreover,

3    petitioner's view of the evidence admitted at his trial has likewise been considered.  In any event,

4    the testimony placed at issue by petitioner's motion to strike plays no role in the court's

5    consideration of his March 12, 2012 motion for leave to conduct discovery in this habeas

6    proceeding.  Accordingly, petitioner's motion to strike (Doc. No. 95) will be denied.

7              After a review of the relevant record, including all of the exhibits filed by

8    petitioner in his March 12, 2012 submission, this court concludes that petitioner has failed to

9    demonstrate good cause for the discovery that he seeks.  Even assuming arguendo that Mr. Sutliff

10   had a significant role in the investigation of petitioner's case, petitioner has failed to show that

11   the circumstances documented in the memorandum from Ms. Spriggs to Mr. Horst had any

12   impact on Sutliff's activities in connection with petitioner's trial, or on the activities of any of the

13   other criminalists who participated in the investigation of this case.  Petitioner has also failed to

14   make any showing that further investigation into the reasons for Mr. Sutliff's resignation would

15   support his conclusory assertion that DNA evidence was planted in his car by law enforcement

16   officers.  Petitioner's speculation that further investigation into these matters might lead to

17   significant evidence in favor of the defense case is insufficient to demonstrate good cause.

18   Parker, 266 F.3d at 460 (Finding that the petitioner's "requested discovery, when reviewed in

19   light of the recently examined record, falls more in the category of a fishing expedition.")

20             Even if it were found that petitioner's trial counsel were somehow ineffective in

21   failing to conduct further investigation into the circumstances of Tom Sutliff's resignation from

22   the Department of Justice, petitioner has failed to demonstrate that he suffered prejudice as a

23   result.  Petitioner's speculation that further investigation might have uncovered irregularities in

24   the collection of evidence by the criminalists assigned to his case, or in the DNA evidence

25   introduced at his trial, is insufficient to demonstrate a "reasonable probability that, but for

26   counsel's unprofessional errors, the result of the proceeding would have been different."

Strickland, 466 U.S. at 694.  For these reasons, petitioner's March 12, 2012 notice of newly

discovered evidence, construed as an additional motion for discovery (Doc. No. 90) will also be

denied.

CONCLUSION

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED that:

1.  Petitioner's April 14, 2011 motion seeking leave to conduct discovery (Doc.

No. 59) is denied;

2.  Petitioner's March 12, 2012 "Notice of Newly Discovered Evidence,"

construed as a motion to conduct discovery (Doc. No. 90), is denied;

3.  Petitioner's May 2, 2012 motion to strike (Doc. No. 95) is denied;

4.  Petitioner's motion and request for an evidentiary hearing (Doc. No. 106) is

denied; and

5.  Petitioner's July 5, 2012 motion to compel production of the transcripts and

record of the oral argument before the California Court of Appeal (Doc. No. 115) is denied.

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

habeas corpus be denied.

These findings and recommendations will be submitted to the United States

District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within

twenty-one days after being served with these findings and recommendations, any party may file

written objections with the court.  The document should be captioned "Objections to Findings

and Recommendations."  Any reply to the objections shall be served and filed within fourteen

days after service of the objections.  Failure to file objections within the specified time may

waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th

Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may

address whether a certificate of appealability should issue in the event he files an appeal of the

judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

1   court must issue or deny a certificate of appealability when it enters a final order adverse to the

2   applicant).

3   DATED: September 18, 2012.

4

5

6                                       DALE A. DROZD
                                      UNITED STATES MAGISTRATE JUDGE

7   DAD:8
  garcia968.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26